```
1              IN THE UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3                        - - -

4    AVENTIS PHARMA S.A.,        :      Civil Action
     SANOFI-AVENTIS U.S., LLC,   :
5                                :
                Plaintiffs,      :
6                                :
          v.                     :
7                                :
     HOSPIRA, INC., APOTEX,INC.,:
8    and APOTEX CORP.,           :
                                 :      07-721-GMS
9              Defendants.       :      (Consolidated)

10                       - - -

11                 Wilmington, Delaware
                Wednesday, September 30, 2009
12                      10:00 a.m.
                   Pretrial Conference
13
                         - - -
14

     BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge
15
     APPEARANCES:
16
                STEVEN J. BALICK, ESQ.
17              Ashby & Geddes
                     -and-
18              GEORGE F. PAPPAS, ESQ.,
                CHRISTOPHER N. SIPES, ESQ.,
19              MICHAEL N. KENNEDY, ESQ., and
                KEVIN B. COLLINS, ESQ.
20              Covington & Burling LLP
                (Washington, D.C.)
21
                              Counsel for Plaintiffs
22

23

24

25
```

1    **APPEARANCES CONTINUED:**

2            **RICHARD K. HERRMANN, ESQ., and**
                **MARY MATTERER, ESQ.**
3            **Morris James LLP**
                        **-and-**
4            **JAMES F. HURST, ESQ.,**
                **IMRON T. ALY, ESQ., and**
5            **JOVIAL WONG, ESQ. (Washington, D.C.)**
                **Winston & Strawn LLP**
6            **(Chicago, IL)**

7                              **Counsel for Defendant Hospira**

8            **DANIEL V. FOLT, ESQ.**
                **Duane Morris, LLP**
9                        **-and-**
                **ARTHUR DRESNER, ESQ.,**
10           **RICHARD T. RUZICH, ESQ. (Chicago, IL),**
                **KERRY B. McTIGUE, ESQ. (Atlanta, GA), and**
11           **MATTHEW C. MOUSLEY, ESQ. (Philadelphia, PA)**
                **(New York, N.Y.)**

12                           **Counsel for Apotex Defendants**

13

14                          **-   -   -**

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Good morning

2          (Counsel respond "Good morning.")

3          THE COURT:  Please take your seats.  This is an

4   office conference.  As such, we will suspend the formalities

5   of the regular session of Court.  Counsel, however you feel

6   comfortable having a discussion with me, whether that's

7   rising or being seated, I am comfortable with whatever you

8   choose.  I know lawyers are used to being up and sometimes

9   just more comfortable in that setting.  But I have taken the

10  podium away from you, so you can't get me there, at least.

11          Let's start with introductions.  Delaware

12  counsel.

13          MR. BALICK:  Good morning, Your Honor.  How are

14  you today?

15          THE COURT:  Fine, thank you, Mr. Balick.

16          MR. BALICK:  Steven Balick from Ashby & Geddes

17  for the plaintiffs.  My co-counsel, starting from Your

18  Honor's right, some of whom you have met and some of whom

19  you probably have not, George Pappas, Christopher Sipes,

20  Michael Kennedy, and Kevin Collins, all from Covington &

21  Burling.

22          THE COURT:  Good morning.

23          Who is going to do the honors?

24          MS. MATTERER:  Your Honor, good morning.  For

25  Hospira, Inc., I have from the law firm of Winston & Strawn

James Hurst, and Imron Aly, and, also, Jovial Wong, and my

partner from Morris James, Richard Herrmann, is here.

THE COURT:  Good morning, Mr. Herrmann.

MR. FOLT:  Good morning, Your Honor.  Dan Folt

for Apotex, joined by my partners today from various

offices, our lead counsel Art Dresner to my left from our

New York office, Rich Ruzich from our Chicago office, Kerry

McTigue from our Atlanta office, and we brought Matt Mousley

from our Philadelphia office.  Thank you.

THE COURT:  Good morning.

I want to say something.  I want it to be

understood in the spirit in which it's intended, that is,

constructive criticism, and not coming down on the heads of

the lawyers or being angry or anything like that.

I was teaching last night one of the courses at

one of the two law schools I teach at, patent litigation.  I

don't remember the question that it was that I posed to the

student who responded, but he said, Well, it's because the

lawyers want to maintain their credibility.  And I said,

well, that's not exactly responsive to the point that I am

trying to get you to, but let me digress a little bit here.

And I did for some time, actually.

The ultimate point that I was trying to make was

that lawyers who appear in any American courtroom, that the

most valuable and most important currency that you have to

trade on is your credibility.  And I posited to the students

how vital it was that they, as young lawyers, and as they

moved on into their practices, were scrupulous in spending

it wisely, spending that currency wisely.

I have to comment here today that I am not

exactly of the opinion that the currency that you have --

and I must say, particularly on the defendants' side of the

table -- has been spent as well as it could have been

insofar as the motions in limine that have been filed.

I have ten -- 12, actually.  And as my daughter

says, "My bad," I will accept the fact that I left myself

open to I think it's five a side from the defendants, I

believe that's the count, and I wasn't clear and should have

been clearer insofar as the limitations on that.

But I do recall, I think, at least I would

imagine that I probably did, and I do in most Bench trial

settings, try to urge upon counsel the thought that it is a

Bench trial, and therefore, it seems to me that spending a

lot of your time and your clients' money and my time going

through motions that probably would be better left for

another day, issues that can be preserved in another way,

and quite frankly, are probably better addressed after

hearing testimony in some instances.  That seems to have

somehow gotten lost here.

I promise you that you are swimming decidedly

upstream on these motions.  I will entertain them probably

in brief.  But I wanted to say that, again, for whatever

it's worth.  I am going to keep saying it, over time, about

a variety of things, because, quite frankly, I and my

colleagues, and I think it's fair for me to say that I speak

for them, are lamenting at various times in conversations

among ourselves the current state of affairs out there in

the land with regard to litigation practice.  And maybe we

are a little more sensitive to it here in Delaware because

of the now extended period of vacancy that we have and our

very heavy, complex civil litigation docket, matched up

against, or at least it butts up against the dictates of the

United States Constitution insofar as our criminal case

responsibilities, and how difficult it is and has become for

us to juggle that.

This is not your problem.  But you do need to be

aware of it and act accordingly, I think, not to the

detriment of your clients or preserving your positions that

you must preserve.  And you are here to win.  Look, I know

that.  This is what you are here to do.  You are here to win

your clients' case.  None of the Judges are naive about

that.

Enough said on that subject.  I want to start

out with the plaintiffs' motions.

I will just call out the title and the docket

item.  262 is the opening, is the motion and opening brief.

It's styled No. 1, a Motion to Preclude Defendants from

Relying on a "Prior Public Use" Invalidity Defense.

          Mr. Pappas.

          MR. PAPPAS:  Your Honor, if you will, we have

divided up the responsibilities.

          THE COURT:  You get to do that.  You get to

divide them up.  It's just me and my young man here.  That's

it.

          MR. PAPPAS:  We are well aware of it, Your

Honor.  That is why we limited ourselves to two.  Also, we

have divided them up so we can attempt to address them, to

the extent you take them up, in as brief and in as succinct

a fashion as possible.

          It will be divided into Mr. Collins, Mr. Sipes

and I, as you call them out, if that is permissible, Your

Honor.

          MR. COLLINS:  Good morning, Your Honor.  I will

be handling this motion.  It is pretty straightforward.

          In the reply, the third round of reports from

the experts on the defendants' side, they interjected a

public use invalidity defense for the first time in this

case.  There is no reason to do that.

          Had we known about that prior to that, there

would have been fact discovery on this issue.  It's a

specific invalidity defense.

Our inventor testified in April 2009 that he was relying on these clinical trials that existed and took place prior to the filing of the application. We produced our NDA that showed these clinical trials. And we produced this NDA to the defendants in June 2008.

They were well aware of these facts.

So for the first time they interject this defense in the third round of reports. There has been no fact discovery on this. There is an experimental use exception to the public use. There is fact discovery that hasn't been taking place. There is no expert reports on this.

THE COURT: So the first time you heard about it was in the rebuttal?

MR. COLLINS: That's correct. The third round of reports, Your Honor.

So it is pretty straightforward. It is too late to come into the case. And we would ask Your Honor to enter an order precluding either defendant from interjecting this into the trial.

THE COURT: Who is going to respond?

MR. HURST: Actually, all we are doing is pointing out the natural consequence of a position their expert took for the first time in rebuttal. That is all we

1    are doing.

2           Our position here, Your Honor, is that the

3    claims require a formulation that can be administered

4    without causing anaphylactic manifestations.  Our position

5    is, they didn't teach or enable that.  That is our position.

6    We weren't arguing that this had been used in the past as a

7    prior public use, because, in fact, we don't think that even

8    today these formulations are capable of being given without

9    causing anaphylactic manifestations.  In fact, you have got

10   to load the patient up with steroids in advance.  There has

11   got to be a crash cart next to the patient before you can

12   give this drug to them, because, in fact, to give this drug

13   risks anaphylactic manifestations.  So we don't think they

14   have ever taught or enabled it.

15          In response to that argument, their expert in

16   rebuttal says, yes, we did, and we proved it during the

17   clinical trials.  He said, as of July 1991, the priority

18   date, he says, we proved this as of July of 1991.  If that

19   is true, Your Honor -- and we don't believe it is true --

20   but if his argument is true, then, necessarily, it's a prior

21   public use, because he said he proved it, they proved it

22   during clinical trials.

23          Once it's proven, the experimental use exception

24   that Mr. Collins raised is gone.

25          So their expert has said, we proved it in July

1 of 1991; therefore, these clinical trials, once he says they

2 proved it, they are no longer experimental use, and that

3 becomes a prior public use.

4    All we are doing, Your Honor, is literally

5 taking his argument at face value and saying, look, if you

6 are actually right about that, your patent is invalid for a

7 different reason.  That is the only argument we are making.

8 It is entirely contingent on the argument that their expert

9 makes.

10    MR. COLLINS:  Very quickly, Your Honor.

11    Hospira doesn't dispute that this was not

12 interjected into the case until the third round of reports.

13 It is a fact-intensive inquiry.  It would require

14 third-party discovery that did not take place in this case

15 because it was not advanced in fact discovery.

16    Again, the Federal Circuit is very clear:  The

17 test for public use, from close consideration of evidence,

18 relevant to experimentation, the nature of the activity that

19 occurred in public, public access to the use,

20 confidentiality obligations imposed on members of the public

21 who observed the use, and commercial exploitation.

22    So no fact discovery on that, because it was

23 raised in the third round of expert reports.  Accordingly,

24 it should not be in the case.

25    THE COURT:  Apart from the point you just made,

1    you need to respond to that, because this is a notice issue

2    and prejudice that is claimed as a result of the lack of

3    notice.

4            MR. HURST:  The lack of notice arises from the

5    fact that all we are doing is commenting on an argument that

6    was made literally for the first time in the rebuttal

7    report, Your Honor.

8            THE COURT:  You are saying they should have

9    known that you were going raise this defense.

10           MR. HURST:  No.  They should have realized that

11   the consequence of the argument they were making is they

12   jeopardize the validity of the patent.  They raised for the

13   first time in July of 1991 is when they proved it.  They

14   said we proved in July of 1991 --

15           THE COURT:  But is it right or is it not that

16   the first time the plaintiff was put on notice as to this

17   particular position was in the third round of reports?

18           MR. HURST:  That is true, Your Honor.

19           THE COURT:  How --

20           MR. HURST:  My response is, I am only raising

21   the argument as a contingency.  If their expert literally

22   gets up on the stand, Your Honor, and says, We proved this

23   fact by July of 1991, I will say:  If so, the clinical

24   trials were ongoing and public after that.  Right?

25           I think as a matter of law the experimental use

1    doctrine is gone as soon as they say they proved it.  They

2    did make that claim for the first time.

3                THE COURT:  Why don't you react to that.

4                MR. COLLINS:  Your Honor, there is a lot of

5    evidence that hasn't been taken on this public use and the

6    experimental exception to it, and it would require

7    third-party discovery that we couldn't take because we

8    didn't know it was in the case.

9                THE COURT:  He is saying that your expert

10   introduces this issue.

11               MR. COLLINS:  Actually, I would disagree with

12   Mr. Hurst on that, Your Honor.  Our inventor testified, Mr.

13   Fabre, in April 2009.  He was asked the question by

14   Hospira's counsel:  What is the proof that you have in July

15   1991 that this statement in the specification was true that

16   this formulation would reduce the anaphylactic

17   manifestations?

18               He said, Because in July 1991, at that time,

19   this was the patent that was filed with the clinical

20   trials --

21               THE COURT:  Slow down, counsel.

22               MR. COLLINS:  I am sorry.  The bottom line is,

23   the inventor testified that the clinical results he was

24   referring to that occurred without pre-administration of

25   steroids as of July 1991 occurred much earlier than that, in

1    1990 and before that.

2              So the defendants were put on notice that these

3    clinical trials existed, but they never interjected it into

4    the case.  Again, there is issues about commercial

5    exploitation, whether that was done for commercial

6    exploitation, whether there is an experimental use to that.

7    Again, none of that fact discovery has taken place.

8              It wasn't as if our experts interjected this for

9    the first time.  The inventor told them that in April 2009.

10   In addition to that, our NDA told them that when we produced

11   it in June 2008.

12             MR. HURST:  Two facts.  Those clinical trials

13   were ongoing, which is what the inventor referred to.  He

14   said these were ongoing trials and they continued past the

15   critical date.  And the NDA says the same thing.  The

16   clinical trials passed over July of 1991.

17             So the position that we understood Sanofi was

18   taking is that they proved this fact -- and we disagree with

19   it, but that's their position -- they said they proved that

20   you could give these formulations without anaphylactic

21   manifestations through these clinical trials, which ended

22   after July of 1991.  Their expert, as we understood it, was

23   coming up with a new position, that, No, no, no.  We proved

24   it midway through the clinical trials as of 1991.

25             And really all we are doing -- it will be a

short examination. If he says, We did prove it through
these public clinical trials before July 1991, all those
factors, all that discovery is out the window because there
is no more experimental use exception.

THE COURT: Is there a way to limit the inquiry
so as to give you the protection that you are looking for,
because of the absence of fact discovery on this particular
issue?

MR. COLLINS: No, Your Honor, because what we
would do is we would issue subpoenas to third-party
institutions that actually conducted these clinical trials,
see the protocols they used, see how much control
sanofi-aventis had on it to conform to an experimental use
exception to the public use defense. We would find out from
patient records what the patients were told with respect to
the claimed formulation.

This notion that somehow we advanced a legal
argument, somehow that turns into an entire independent
invalidity defense, is just not appropriate.

THE COURT: Your colleague...

Turnabout will be fair play.

MR. SIPES: I am wondering if maybe we can work
this out. This is our understanding, if I was a little
confused. What the inventor said was that, in his view, the
Phase 1 trial was an experimental use that enabled him to

determine that he believed his formulation was successful.
So he was making clear in his view it was experimental use.
That is, he was using it to determine whether it had
suitable properties.

But the fact is, on experimental use -- and they
did not at that time challenge it as public use as opposed
to experimental use, that is, the confidentiality, the fact
that we controlled the protocol or whatnot.

If they will agree that it meets the
requirements for experimental use, and their sole issue on
public use is the inventors' reliance on it in order to
determine the expectation that it had suitable properties,
and then they argue that that mere fact makes it a public
use, we can live with that.

What we don't want is them coming in and now
saying it was otherwise public -- I mean, obviously, we
agree that they are publications, they have been around in
publications. But the tests themselves were public, it
seems to us, unfair.

THE COURT: Can you accept -- I am going to cut
it off here. If you can accept it, you can. If you can't,
you can't. Because I am not going to let you introduce a
new basis for contending invalidity based on a rebuttal
report. You just can't lay in the woods to do that.

MR. HURST: Frankly, I didn't quite follow what

he said, so I can't accept it.  But can I talk to him later?

THE COURT:  Sure.  And I am going to require, if you are able to reach an accord, I am going to need it written down in specific terms in a stipulation.

MR. HURST:  Thank you, Your Honor.

THE COURT:  I am going to grant the motion conditionally, upon hearing further from counsel, because I think that the underlying reason for the motion is meritorious.

That is the ruling.

MR. HURST:  Thank you, Your Honor.

MR. COLLINS:  Thank you, Your Honor.

THE COURT:  Then we have at Item 263, Plaintiffs' Motion No. 2, To Preclude The Defendants From Presenting Unpled Inequitable Conduct Allegations.  I just want you to, in talking about this, keep in mind Rule 15 and its liberal policies -- its directive that courts should liberally amend, permit liberal amendments even during and after trial.

MR. COLLINS:  Your Honor, again, Kevin Collins for the plaintiffs on this motion.

Again, the Federal Circuit -- and I heard Your Honor with respect to Rule 15 and I know leave is to be freely granted.  But at some point the target has to stop for us to put on a defense to inequitable conduct.

1          The Federal Circuit requires, and most recently

2    in this Exergen case, where they talked about the heightened

3    standard for inequitable conduct, it must be pled with

4    particularity.

5          THE COURT:  Indeed.

6          MR. COLLINS:  Even after Your Honor granted

7    Hospira's motion that was filed in June, most recently, on

8    September 17, there was an order allowing Hospira to amend

9    its counterclaim to add two additional specific allegations

10   of inequitable conduct.

11         We are not talking about this.

12         There has been new allegations placed into the

13   proposed findings by Hospira and Apotex.  They are not tied

14   to any amended pleading or any counterclaim.  There is

15   allegations in interrogatory responses that we are concerned

16   about.

17         Again, we are going to trial in three and a half

18   weeks, and we are trying to prepare witnesses.  Our

19   witnesses haven't prepared opinions on this because they

20   haven't been part of the case.

21         I understand, Your Honor, with respect to Rule

22   15, but --

23         THE COURT:  I didn't say that to signal a view.

24         MR. COLLINS:  Your Honor, I have a chart

25   prepared.  I am happy to get into details.  But the only way

I could figure it out was with a color-coded chart.  The
yellow line up at the top indicates the allegations that are
properly of record in a counterclaim.  At the time we filed
the pretrial order, Apotex went on and filed another motion
for leave to amend to add additional inequitable conduct
allegations.

The excuse that Apotex has proffered in its
motion is that they just took the deposition of one of the
prosecuting attorneys.  I would suggest to Your Honor, there
is not a single fact in that deposition that gives rise to
inequitable conduct.  Indeed, the allegations they raise
related to a Gueritte-Voegelein article that you will hear a
lot about at trial, and as part of the invalidity case,
there was not a single deposition question asked to the
prosecuting attorney:  Were you ever in possession of this?

The inventors were never questioned about this.
And somehow they are just going to put it into the case.

So there is a lot of unpled inequitable conduct
allegations in interrogatory responses, in proposed
findings, that don't find and are not tied to counterclaims.

We would ask, rather than going through
specifics -- and we are happy to do that -- just that an
order be entered precluding either defendant from advancing
inequitable conduct allegations that aren't in a pleading of
record as of this moment.

1          MR. ALY:  Your Honor, there are two defendants,

2     so I will let Apotex speak for Apotex.

3          But on behalf of Hospira, Mr. Collins made some

4     points.  A large part of them are moot as to Hospira because

5     they were in an amended complaint -- amended counterclaim,

6     and Your Honor has granted the amended counterclaim.

7          THE COURT:  I think I recall reading that.

8          MR. COLLINS:  Your Honor, we certainly don't

9     contest what Your Honor allowed in the most recent order.

10    No dispute there.

11         MR. ALY:  Your Honor, that leaves two little

12    pieces.  The issue as to these two little pieces is that

13    they were in our interrogatory responses on the day that

14    discovery ended.  We make it a habit of supplementing those

15    discovery responses.  In this case that was May 29, 2009,

16    which include all these defenses, the two defenses which

17    they are talking about now.  One relates to a Tarr prior art

18    reference, and the other relates to a commercial catalog

19    describing polysorbate 80, one of the ingredients that is at

20    issue in the formulation.

21         THE COURT:  These are the two he has contended

22    are unpled allegations.

23         MR. ALY:  Yes, Your Honor.  These are the two

24    so-called new defenses because they are not technically in

25    the pleadings.  We agree, those two are not in the

1  pleadings.  But from a notice requirement point of view,

2  they have had notice of them since then.  Discovery was

3  taken on them.

4              THE COURT:  What was the second one?

5              MR. ALY:  The second one was a commercial

6  catalog.

7              THE COURT:  The first was a Tarr prior art

8  reference?

9              MR. ALY:  Yes, T-a-r-r.  Your Honor, discovery

10 was taken about both of those.  In fact, that's how we found

11 out about the commercial catalog, through talking to the

12 inventors and the different information they had.

13             As to the Tarr reference in particular, the

14 experts have actually even addressed, both sides' experts

15 have addressed that reference to talk about whether it is

16 really material or not material in terms of inequitable

17 conduct.

18             So there has been discovery.  There has been

19 opportunity for it.  In fact, the expert has already

20 considered at least that one issue.  If they didn't consider

21 the separate one, that was their choice.  It was also -- the

22 commercial catalog was the Seppic catalog.  That was also in

23 our reports, and they could have considered that.  I am

24 talking about our opening reports, the first round we

25 submitted in this case through expert discovery.

1          For those two, they are not in the complaint,

2    but plaintiffs had been on notice of them.  So if it is a

3    matter of a slight modification just to include those two in

4    addition to what is already there, that is sufficient.

5          Thank you, Your Honor.

6          THE COURT:  Let me deal with just Hospira for a

7    moment here.

8          MR. COLLINS:  What Mr. Aly said was generally

9    accurate.  These specific allegations of Tarr and these

10   other commercial catalogs were in the May 29th interrogatory

11   responses.  Hospira subsequently filed their motion for

12   leave in June and didn't add those.  So they chose to add

13   specific allegations --

14         THE COURT:  The question is, apart from the

15   failure, which he concedes, the Rule 9(b) failure, what is

16   your reaction on the issue of fairness?

17         MR. COLLINS:  On the issue of fairness, Your

18   Honor, they weren't in the case when we were doing our

19   expert reports.

20         THE COURT:  Has there been discovery on them?

21   Have the experts addressed the Tarr reference?

22         MR. COLLINS:  Validity, yes, Your Honor.

23   Materiality, no.  Validity, these references are in the case

24   for validity, no question about it.  But in terms of

25   materiality and cumulativeness, we never had a chance to

1    address that.

2              So, yes, they are in the case, but for a

3    different issue.

4              THE COURT:  Counsel, I think you were referring

5    to a May 29th supplemental response to an interrogatory as

6    to -- what was the specific thing you were responding to?

7              MR. ALY:  Interrogatory defenses, including

8    inequitable conduct, and those were included among those

9    defenses.  That's correct.

10             MR. COLLINS:  I agree, Your Honor, they were in

11   the interrogatory responses.  Hospira then moves and doesn't

12   include them.  We don't put them in our expert reports

13   because they are not part of the case yet at that point.

14   There was certain --

15             THE COURT:  What would be necessary to enable

16   you to not feel disadvantaged at this point?

17             MR. COLLINS:  I guess perhaps a supplemental

18   expert report.

19             I would like to, actually, if I could confer.

20             THE COURT:  Sure.

21             MR. SIPES:  What we don't want to hear, then --

22   we need to prepare for trial.  We don't want to go back --

23             THE COURT:  I don't want to set you off on new

24   discovery larks and that kind of thing.  Go ahead.

25             MR. SIPES:  We don't want to be hearing from

them, Oh, this isn't in your expert report, when we have
tried to respond to allegations that, while they put them in
the May 29 interrogatory responses, they didn't then, when
they decided to amend to say what they are going to add to
their pleadings, they chose not to put them in their request
to amend.

As long as we are not hearing from them:  That
is not in your expert reports.  For these two, that's
probably all right.

THE COURT:  Fair enough.

Your response, Mr. Aly?

MR. ALY:  Your Honor, I am holding their expert
report.

THE COURT:  Respond to his point directly.  He
doesn't want to be confronted with an objection, Well,
Judge, that's not in their expert report.

MR. ALY:  It was the other way around, Your
Honor.  And I apologize.  Maybe I was excited, because when
I heard them to say that this wasn't argued in the expert
reports, I am holding one of their expert reports, Kinam
Park, and they are addressing that point.

So the supplementation, they already have done
it.  They have already addressed this point specific to
inequitable conduct, not just for relevancy.  It says, The
Tarr emulsion article is not material, under the heading

1    There Was No Inequitable Conduct in the expert report of

2    Kinam Park, one of their seven experts.

3             Maybe I was mistaken, Your Honor.  I was excited

4    about that.

5             MR. SIPES:  Your Honor, this is the problem,

6    that it is a small field, and there are two Tarr articles.

7    I think what you are referring to was the Tarr emulsion

8    article, not the Tarr --

9             MR. ALY:  There is the Tarr emulsion article and

10   then there is the Tarr and Yalkowsky reference that they are

11   both referring to in that paragraph.  The point that I was

12   making, Your Honor, is these issues are already addressed in

13   here.

14            There is another heading also that Sanofi Did

15   Not Misrepresent Differences From the Tarr and Yalkowsky

16   References, if you want to talk about that one as well,

17   there is a section on it there.

18            MR. SIPES:  What about the separate catalog

19   issue?

20            MR. ALY:  We were talking about Tarr.  Now if

21   you want to switch to the commercial catalog, there is a

22   section on etoposide prior art is not material, the same

23   arguments that you made there could apply to the catalog,

24   because you are talking about the ingredients there, if

25   that's what you want to talk about.  They were in our

1     original reports all along.  They had the opportunity.

2              MR. SIPES:  If he thinks there is enough there

3     that there won't be an objection and we have some latitude

4     to respond, that is fine.

5              THE COURT:  You will have that latitude.

6              Anything further you want to say?

7              MR. ALY:  No, Your Honor.

8              THE COURT:  So, then, I guess, for purposes of

9     the record, I am going to deny this motion, conditioned upon

10    the discussion that we have had, if counsel feel the need to

11    file with the Court a stipulation to make clear what we have

12    agreed on.  But I don't want to have to mediate the

13    stipulation, if you understand what I am saying.  If you

14    can't agree, the record will speak for itself, and we will

15    maybe need to have another round of discussion at trial.

16             But that will be the -- Mr. Collins?

17             MR. COLLINS:  Your Honor, one more point with

18    respect to Hospira.

19             There are additional allegations of inequitable

20    conduct that don't appear in their discovery responses, that

21    aren't part of their counterclaim, that appear for the first

22    time in their proposed findings that were just submitted.

23    We presume those are off the table, because they were never

24    even in discussion.

25             THE COURT:  We have narrowed the discussion down

1    to two points.  That is where it's going to rest.

2              MR. COLLINS:  That is fine, Your Honor.

3              THE COURT:  All right.  So that ruling goes to

4    Hospira.

5              MR. DRESNER:  As to Apotex, none of the issues

6    of inequitable conduct that we are raising are not tied to

7    motions to amend pleadings appropriately.  In the first

8    instance, Your Honor has granted the motion to amend for

9    Hospira, Apotex has filed a joinder in that motion, in

10   conference with counsel for Sanofi that have indicated that

11   they would oppose that joinder.  But the only basis for

12   opposing that joinder would be the same basis that they

13   opposed it for Hospira.  And I expect that would be granted

14   as to Apotex as well.

15             In addition to that, there is only one other

16   factor relating to inequitable conduct that Apotex seeks to

17   raise.  That relates to a reference known as the

18   Gueritte-Voegelein reference.

19             As to that reference, Your Honor, we have also

20   filed a motion to amend the pleadings.  So it is a subject

21   for a motion to amend.  And that is consistent with Rule 15.

22   Mr. Collins indicated that in our response we pointed out

23   that we recently filed this amendment in view of the fact

24   that we recently took the deposition of the attorneys that

25   prosecuted the case.

1        And we wanted to do that.  We wanted to wait and

2   see what that deposition would reveal.  In fact, it didn't

3   reveal anything new.  Mr. Collins is correct about that.

4   But we owed it to everybody to make sure that that

5   deposition was taken before we just went ahead and filed the

6   motion.

7        Now that that is done, the motion is on file.

8   It's tied to this reference.  And in the spirit of Rule 15,

9   we would expect that to be granted.

10        THE COURT:  Mr. Collins.

11        MR. COLLINS:  Very well.  One of the reasons

12   that Your Honor denied motion for leave to amend is if it's

13   futile.  If they haven't properly pled an inequitable

14   conduct claim, then they shouldn't be allowed to bring it.

15   The Gueritte-Voegelein reference, all that's alleged is it

16   is not disclosed.  There is no specific allegation as to who

17   didn't disclose it, when, where, and for what purpose.  So

18   one of the reasons that Your Honor would deny a motion for

19   leave to amend, particularly at this late date, is if it is

20   futile.

21        If you look at, Your Honor, it is attached to

22   the reply, the portion of the transcript that deals with

23   Gueritte-Voegelein, it is highlighted, it is all of three

24   pages.  There is not a specific question in there that goes

25   to inequitable conduct with respect to Gueritte-Voegelein.

1          THE COURT:  This is the attorney?

2          MR. COLLINS:  Yes, the prosecuting attorney, Mr.

3    Tom Irving from Finnegan Henderson.  If Your Honor looks at

4    this, it doesn't make any sense how this testimony can

5    somehow lead to an inequitable conduct defense.

6          THE COURT:  He has conceded that point and

7    agreed with you that this is not the reason they seek to

8    amend.

9          MR. DRESNER:  That's correct, Your Honor.

10         MR. COLLINS:  So in the absence of a well-pled

11   complaint, there was a specific intent to deceive the Patent

12   Office by a specific person, material nondisclosure, that

13   shouldn't be allowed at this point.

14         THE COURT:  Why do you say that amendment at

15   this point would be futile again?

16         MR. COLLINS:  Because there has been no specific

17   allegation as to who failed to disclose the material

18   reference.  All they have said is, the Gueritte-Voegelein

19   reference was not disclosed to the Patent Office.

20         MR. DRESNER:  Your Honor, that is a subject for

21   the motion to amend.  That is not a subject for the motion

22   in limine.

23         THE COURT:  Can we wrap them together?  Is it

24   possible for me to dispose of them together?

25         MR. COLLINS:  Yes.

1          MR. DRESNER:  Your Honor, our motion to amend

2     contains what we believe are the adequate requirements under

3     the Exergen case to satisfy the requirements for amending

4     the complaint.  We believe it is adequately pled.  It is a

5     proper motion.

6          THE COURT:  So the essence of the motion to

7     amend is what?

8          MR. DRESNER:  Well, first of all, the authors of

9     Gueritte-Voegelein were tied to the company of the inventors

10    of the patents in suit.  They were part of the same company.

11    The inventors had reason to know about this.  It was part of

12    the background.  It was part of the information.

13         THE COURT:  It's the inventors in your motion,

14    the new averments, that you would contend that failed to

15    notify the PTO?

16         MR. DRESNER:  That's correct.

17         MR. COLLINS:  Your Honor, the inventors'

18    depositions were taken.  They had Gueritte-Voegelein in

19    their possession, any they didn't even ask a specific

20    question to these inventors whether they were in possession

21    of that.

22         You know, they can plead it.  But there is

23    nothing to back it up other than the bare allegation.

24         MR. DRESNER:  There is no prejudice, Your Honor,

25    to having --

1           THE COURT:  I am not hearing prejudice.  I am

2    going to cut to the chase here on this one.  I am going to

3    deny the motion as to Apotex as well.

4           MR. COLLINS:  Your Honor, just to be clear, that

5    is only with respect to Gueritte-Voegelein.  If there is

6    other references --

7           THE COURT:  Yes --

8           MR. DRESNER:  That is all we are asking for.

9           THE COURT:  That is all he is asking for, is the

10   GV reference.

11          MR. DRESNER:  GV.

12          MR. COLLINS:  Very well, Your Honor.

13          THE COURT:  And, therefore, subsumed in that

14   ruling is, if I didn't make it clear, I am going to grant

15   the motion to amend as well.  So I am assuming there is an

16   order attached to that motion.  We will find it.

17          MR. DRESNER:  There is, Your Honor.

18          THE COURT:  And I will enter it.

19          Okay.  Let's go with Hospira's first.  I think

20   there is some duplication.

21          MR. HURST:  We should have done a better job of

22   coordinating, Your Honor, between Apotex and Hospira, and

23   that by itself would have reduced our numbers.  We should

24   have done that.

25          Can I make a suggestion for streamlining

1   purposes?

2              THE COURT:  Please do.

3              MR. HURST:  First, Your Honor, your comments at

4   the outset, thank you for those.  I appreciate it, honestly.

5   If, on behalf of Hospira, I can rely on the papers for three

6   of my five motions and just argue two of them, the first two

7   that we filed, by way of --

8              THE COURT:  That is with regard to Dr. Kaler.

9              MR. DRESNER:  That is the Apotex issues, Your

10  Honor.

11             THE COURT:  I have Apotex in front of me.  I am

12  sorry.

13             MR. HURST:  By way of explanation if nothing

14  else here, of our five motions, Your Honor, two went to the

15  claim construction issue that we think Your Honor resolved.

16  I just wanted to talk about those.  Those are the ones I

17  wanted to pursue.

18             The other two related to what we believe would

19  be chunks of trial time.  Here is one of our concerns.  The

20  other side has proposed, Your Honor, seven expert witnesses.

21  I know from recent experience before Your Honor and,

22  obviously, knowledge about how you handle trials, sometimes

23  trial time gets crunched because your resources are limited.

24             So two of our motions were designed that I am

25  going to rely on the papers, bioequivalence and secondary

1    considerations, really it was designed to -- we think we

2    have good motions, to eliminate blocks of time.  And I was

3    concerned about time, which is why I personally authorized

4    all five of our motions.  So I take full responsibility.

5            But that was the reasoning.  I was concerned

6    about time for two of them, mostly because we have so many

7    experts on the other side and I know that means I have to

8    take a lot of time on my side of the chess clock for

9    cross-examination.  And it's concerning to us.

10           Our first motion was "essentially free of

11   ethanol," Your Honor.

12           THE COURT:  The way you style it is "To Preclude

13   Sanofi's Experts From Testifying About Claim Construction."

14   I am not going to let experts testify about claim

15   construction.  You know that.

16           MR. HURST:  Yes, sir.

17           THE COURT:  Go ahead.

18           MR. PAPPAS:  Your Honor, if I may.

19           Counsel made a point about being concerned about

20   time.  We do, too.  We will have a chance to address that

21   with you.  But before we hear -- I have to ask you to

22   consider this -- before we hear any more about numerosity of

23   experts, they have five, we have seven, and we will explain

24   why.

25           But we have two opponents.  I just want Your

Honor to be aware that these defendants filed expert reports

that contained just under 1,000 pages of opinions, 927, to

be exact.

With five experts, they filed 927 pages of

opinions.  That's what we have to defend against.

We, with seven, only filed 613.

I suggest those numbers speak for themselves in

terms of who is slimming things down.

THE COURT:  Okay.  Duly noted.

To my point, because I think there are two

motions.

MR. HURST:  Two motions relating to claim

construction issues.

THE COURT:  To experts testifying about claim

construction.  That is just not going to happen.

MR. HURST:  And the reason that we brought the

motion is because the expert report is designed entirely

around a claim construction that we view as completely

contradictory to Your Honor's ruling from the Markman

hearing.  So that's why we believe it is important --

THE COURT:  In what regard?

MR. HURST:  Here is what happened.

There is two types of solutions at issue in the

claims.  One is a stock solution.  That's just a

concentrate.  And Your Honor ruled that a stock solution is

essentially free of ethanol only if it has five percent or less ethanol.  That came basically from the spec.  I don't understand Sanofi to be challenging that ruling at all.

What you do with the stock solution is you just dilute it with water or some water-based solution, and then you get your perfusion, and you put it into the IV bag and you drip it into the patient.

They have the amount of ethanol.  The stock solution has the same amount of ethanol as the perfusion because you are not adding any, the same absolute amount.

The point here of the invention allegedly was to avoid ethanol manifestations, demonstrations of drunkenness or impaired vision or whatever happens, the various things that happen when you drink too much ethanol.

Here were the competing claim constructions. Sanofi came to Your Honor and said that for a perfusion it can have up to two percent ethanol.  Their experts are arguing the same thing, Your Honor.  They are arguing it in a different way.  But their experts are now saying we infringe because they are arguing that the claim construction allows for up to two percent ethanol in a perfusion.  You declined at Markman to accept that, and instead what you did was you accepted our proposed construction with a slight modification.

We said that for a perfusion it has to have the

1    same amount -- it has to be made from a stock solution with

2    five percent or less.

3              Sanofi said, well, "made from," that introduces

4    a method step.  If you have to say it's made from -- and

5    this is a composition claim.  So we amended it on the fly.

6    I actually proposed it during the hearing.  I don't know if

7    you remember.  And we said, okay, well, it is not meant to

8    introduce a method step.  It is meant to focus on the amount

9    of ethanol in the perfusion and they have to have the same

10   amount.  So it got changed to the perfusion has to have the

11   same amount of ethanol as the stock.  You are worried about

12   absolute amounts, how much you are delivering to the

13   patients.  Your Honor declined to accept the "up to two

14   percent."  Their arguments from their experts literally are

15   saying the same thing in a different way.  Their arguments

16   against our claim construction and the one that Your Honor

17   adopted are the same ones that they made during the Markman

18   hearing.

19             Our position is that should not be allowed.

20             MR. SIPES:  Your Honor, if I may respond

21   briefly.

22             First of all, we agree that neither side should

23   be rearguing claim construction through experts.  We are on

24   the same page there.  That is not what this motion is about.

25   In fact, our experts have come in with testimony about

1    application of your claim construction to the products at

2    issue.

3           What this is about is attempting to revoke what

4    they had acknowledged, what Your Honor had decided at claim

5    construction, that they can't have a process limitation,

6    that these are composition claims.  So you didn't construe

7    the claim they wanted as made from a stock solution.  It has

8    to be perfusion with the same amount of ethanol as a stock

9    solution with five percent ethanol.

10          Our expert testimony goes to how much ethanol

11   that is.

12          What is interesting is, they are actually

13   speaking out of both sides of their mouth.  Their experts

14   for invalidity have come in with the very same amount of

15   ethanol in the perfusion and say, yes, that's essentially

16   free of ethanol.  It turns out, that will scale, depending

17   upon how much it says.  You start with the stock solution,

18   and you dilute it, it's not actually water, it's a

19   perfusion, but it's mostly water.  The upper limit is one

20   milligram of your docetaxel, and you can go down from there

21   to about .3 milligrams of the docetaxel as the minimum.  You

22   just can't have any more concentration because if you put it

23   in the patient it causes severe harm.  Perfusions have to be

24   very dilute or you kill the patient, or at least it causes

25   substantial harm.  Apotex has shown what the upper limit is

on a perfusion based on a stock solution that is five percent.

What is interesting is he says, wait, we start with a stock solution that is more than five percent. We start with a stock a solution that is 23 percent. That is true. But what they do is they start with a smaller stock solution that is more concentrated. They dilute down more. I can write it down, so it will be clear. But I can walk through it.

What their experts have agreed and our experts have agreed is that, you know, a stock solution that you could use to make these perfusions essentially free is two milligrams per milliliter of docetaxel and five percent -- that would be stock solution that is essentially free -- dilute it down to one milligram per milliliter of docetaxel for the perfusion, and diluting it by half, it would then be two and a half percent ethanol.

We are all on the same page. Their experts have relied and had to argue why it might have been obvious to do that. We say it's not obvious. But we are all in agreement.

That perfusion at one milligram per milliliter, you will have ethanol at 2.5 percent. Of course, if you went more dilute, instead of one milligram per milliliter you went to half, you diluted it again by half, you have .25

1    percent.  But that's the way "essentially free" works.

2              Based on the very concentrated stock solution,

3    10 milligrams per milliliter of the docetaxel, 23 percent

4    ethanol, then they diluted not by half, by a factor of 10,

5    so that with one milligram of per milliliter of docetaxel,

6    they have 2.3 percent ethanol, less than what they agree is

7    essentially free.

8              They would have exactly the same perfusion if in

9    the course of diluting down the stock solution they stopped

10   for a minute at two milligrams per milliliter of docetaxel,

11   2.3 percent ethanol, that would be their product.  That

12   would be their product, stopped at a stock solution that we

13   would all agree, under five percent would be essentially

14   free.  Then you add more perfusion.  You are down.  That is

15   what our experts show, is that as soon as you recognize this

16   as a composition claim, as Your Honor ruled at claim

17   construction, the ethanol they have in their perfusion is

18   essentially free.  They make it starting with a more

19   concentrated stock solution.  But the way they make their

20   perfusion, we all agreed at the claim construction, doesn't

21   affect the claim application.  The claim is how much

22   ethanol, what is the upper limit on ethanol that can be in a

23   perfusion that is essentially free of ethanol?

24             Interestingly, all the experts have come up with

25   the same number, which is 2.5 percent in the perfusion.  Our

experts are applying that to their product.  So their motion

isn't designed to present and reargue claim construction.

They are actually trying to change claim construction.  They

want to prevent us from having our experts put on testimony

to apply the claim construction.

MR. HURST:  Your Honor, the argument that you

just heard from Mr. Sipes was very much the argument they

made at the Markman hearing, where we spent a lot of time on

this, and we had graphics up here to explain all the math

that he just went through.

There is a correlation between stocks and

perfusions.  If the stock has too much ethanol in it,

because it has more than five percent, that means it's not

essentially free of ethanol, necessarily, the corresponding

perfusion will.

That was the argument that we made at the

Markman hearing, and that is what we understood to be the

Markman ruling.  Literally 60 percent of what Mr. Sipes just

said he said at the Markman hearing itself.  The same types

of arguments.

So we feel like this issue has been resolved.

THE COURT:  Apotex has the same issue.

MR. DRESNER:  Yes, thank you.  Actually, we have

a similar motion.  We support his position.

What Mr. Sipes is essentially arguing is that

there be an absolute limit on the amount of ethanol in the
perfusion.  Their experts say it's two and a half percent.
That concept was rejected at the Markman hearing.  And
instead, what was adopted was an understanding that the
amount of ethanol allowed in a perfusion has to be
correlated to the amount of ethanol in the stock solution.

The products that are being accused of
infringement, not some hypothetical stock solution or not
some stock solution of the prior art that Mr. Sipes is
talking about -- doing an analysis on validity is one thing.
But when you are trying to establish an infringement of the
product of the defendants, you have got to look at the
defendants' products, the stock solution, and the perfusion
related to it.

So I agree with Mr. Hurst that it has to be
correlated with the stock solution and it has to be the same
amount that comes from that stock solution.

Thank you, Your Honor.

MR. HURST:  Your Honor, I would just echo what I
just heard, so there is no need for me to respond at this
point.

MR. SIPES:  Your Honor, just to make it clear,
this is really about summary judgment.  It is no longer
about claim construction.  I think we are now on
something -- all of our experts are applying the claim

1    construction in an effort to determine infringement.  But as

2    to the --

3                THE COURT:  Counsel for Apotex responds in a

4    very specific way.

5                MR. SIPES:  And I want to take that up.

6                THE COURT:  I think you should react to that.

7                MR. SIPES:  It is clear that they really are

8    asserting a process limitation.  They are saying because the

9    stock solution is over five percent, it cannot be the case

10   that the perfusion is essentially free, which is a process

11   limitation.  That's exactly what was rejected at the claim

12   construction.  We are not looking for an absolute upper

13   limit because, as we say, at each perfusion, depending on

14   the concentration of the perfusion --

15               THE COURT:  He talks in terms, I think properly

16   so, of hypothetically.

17               MR. SIPES:  But it's not hypothetical.  In fact,

18   what's remarkable to me is, I have always understood the law

19   to be that the claims are construed and applied the same way

20   for validity and infringement.

21               THE COURT:  Yes.

22               MR. SIPES:  That is something I learned from

23   Patent Law 101.  Each one of their experts has taken the

24   position that for purposes of invalidity, the claim as Your

25   Honor construed it reads on a perfusion that at one

milligram per milliliter docetaxel has 2.5 percent ethanol.
Each of their products at one milligram per milliliter
docetaxel has less ethanol, and they say we have too much
ethanol for purposes of infringement, but for purposes of
validity, that's essentially free. That strikes me as a
process limitation.

Compositions claim compositions of matter. Our
experts have been very faithful to that principle and Your
Honor's claim construction. We have not gone back to the
claim construction. We have applied the claim construction,
which is what Your Honor said, what is the amount of ethanol
in a perfusion that correlates to one made from a stock
solution of five percent. All the experts for purposes of
validity have achieved the same number, two and a half
percent at one milligram per milliliter docetaxel,
proportionally less as you dilute down. So we are all on
the same page for validity.

They just want to construe the claim differently
for infringement purposes. You can't do that. But, also,
it's not faithful to what was the ruling at claim
construction, which is, this has to be a composition claim.
We are going to correlate it, but there is an amount of
ethanol that is essentially free.

The experts can put on testimony to show what
the upper limit is on a perfusion when your upper limit on a

stock solution is five percent. And the experts, at least

for validity, have all agreed on what that is. That also

applies on infringement.

We shouldn't be put in a position of having the

claims narrowed for infringement purposes and broadened for

validity purposes. There is a consistent number here. That

is what our experts are doing.

MR. HURST: There is no inconsistency between

our invalidity position and our infringement position. Our

experts have taken the same position for both, frankly.

Judge, what Sanofi is asking right now is for

you to divorce the correlation between a perfusion - a stock

solution and a perfusion - absolutely divorce the

correlation, which we understood was the core ruling at the

Markman hearing.

This is Sanofi's position. You can start with a

stock solution that has way too much ethanol in it. It has

way too much ethanol. It can have 50 percent ethanol,

according to Sanofi, and we would all agree it's not

essentially free of ethanol because it's got too much

ethanol. And suddenly you water it down enough, and you

throw enough liquid in there, and suddenly the perfusion is

essentially free of ethanol. And that really is completely

divorced from the correlation between a stock and perfusion.

You never change the amount of ethanol.

1          So if the stock solution has too much ethanol,

2     the perfusion necessarily has too much ethanol.  That was

3     the core argument we made at Markman, and we did understand

4     that to be Your Honor's ruling.

5          MR. DRESNER:  Your Honor, I think Mr. Hurst

6     expressed it well.  I don't want to belabor the point.  I

7     think it is correct that Mr. Sipes is trying to divorce the

8     perfusion that is made from the defendants' product.

9          THE COURT:  What's your reaction to Mr. Sipes's

10    point that it shouldn't be the case that we are looking at

11    one position for purposes of invalidity and another for

12    infringement?

13         MR. DRESNER:  Certainly, I agree with that, Your

14    Honor.  The basis for validity is the same basis as it is

15    for infringement.  I referenced it in my earlier comments

16    because he used a prior art reference that had five percent

17    ethanol in it, suggesting that, well, that met the

18    requirement of "free of ethanol."  And he did the arithmetic

19    to bring that down to a perfusion that had one milligram per

20    milliliter of active ingredient, and showed, therefore, that

21    the maximum amount of ethanol you can have in a perfusion is

22    two and a half percent.

23         But that was something different from what we

24    made or what Hospira makes.

25         Whether or not our perfusion meets the

1    requirement of free of ethanol has to be based upon the

2    product we make and the product that we sell.  And that has

3    to be correlated to our stock solution, not to some prior

4    art stock solution.

5              MR. SIPES:  Your Honor, quickly.  This will be

6    made very clear at trial.  But the question of infringement

7    for perfusion has to be based on the properties of the

8    perfusion, not the way the perfusion is made.  It is true

9    that if you start with a more concentrated stock solution,

10   you can dilute more and end up essentially free.  That is

11   the logic of physics.  The basic mathematics tell you, as

12   you dilute, you make it more dilute.  But there is a fixed

13   correlation between stock solutions and perfusions.

14             We are all agreeing that from a composition of

15   matter perspective, a perfusion at one milligram per

16   milliliter docetaxel that has 2.5 percent ethanol is

17   essentially free.  They say, well, we can get around your

18   claim by making it a different way.  Even though we end up

19   at exactly the same perfusion, because we make it a

20   different way, we are not within your composition of matter

21   claim.

22             That just can't be the law.  That is what I

23   thought was agreed at claim construction.  But the Federal

24   Circuit has been crystal-clear on this.

25             THE COURT:  Let me give you the last word.

1          MR. HURST:  Thank you, Your Honor.

2          They defined the limitation by percentage.  Five

3     percent is the way they defined it.  That's the way they

4     defined the limitation for the stock solution.  They have to

5     live with that.

6          That's the limitation.

7          So if it's got too much ethanol, however they

8     have defined it, if it's got too much ethanol to start with

9     in the stock solution, you are giving that amount of ethanol

10    to the patient in the perfusion, so you can't have different

11    answers.  Either they are both essentially free or they both

12    are not essentially free.  And that's the correlation, Your

13    Honor, that we argued at the Markman hearing, and that's the

14    argument that we thought we prevailed upon.

15         THE COURT:  What I want to do -- I am going to

16    order this portion of the transcript -- I want to think

17    about this.  I will get back to you.  It could be that I may

18    grant your motion, without prejudice to certain things

19    happening at trial.  It may be that I am comfortable enough

20    to do that, or that I am so uncomfortable that I want to

21    hear more, and revisit the issue later on during the course

22    of trial in realtime, as things crystallize better for me,

23    or even later, during the submissions, proposed findings and

24    conclusions, or even before that, perhaps, in the form of a

25    motion to strike or whatever the case may be.

1          But there are going to be a number of

2     opportunities for me, it seems to me, to visit this issue.

3     But I want to first do it with a little more opportunity to

4     reflect back on the order and these arguments that were

5     made.

6          I am going to reserve on both Hospira's motion

7     that is filed at Docket Item 269 and Apotex has the same --

8          MR. SIPES:  Your Honor, I believe it's Apotex's

9     Motion in Limine No. 5.

10         THE COURT:  268, okay, and 269.

11         I have reserved on 268 and 269.

12         All right.  Mr. Hurst --

13         MR. HURST:  A second motion.

14         THE COURT:  Which one?

15         MR. HURST:  Motion No. 2.  It's perfusion.  For

16    the other three, we would be happy to rely on the briefs,

17    Your Honor.

18         THE COURT:  272.  Okay.

19         MR. HURST:  Thank you, Your Honor.

20         This also relates to a claim construction issue,

21    but it arises in a different way.  It was not one of your

22    Markman rulings, Your Honor.  It was an agreement between

23    the parties where we have since parted ways.

24         The word is perfusion.  And the purpose of this

25    motion is that right now, in our view, Sanofi is through

expert reports trying to construe that word perfusion with
sort of a detailed multi-layered definition that implies a
series of additional requirements relating to toxicity,
effectiveness, stability, all of which, if they wanted to
add those limitations, in our view, the time to do it was at
the Markman stage, not through expert reports later on,
because it's literally an argument about the meaning of the
word perfusion.  I guess my first position is, it's too late
for that.  If you wanted to add those requirements, you
should have done it at the Markman stage.

And the agreed definition is what is, according
to Sanofi, adding all these limitations, the agreed
definition was as simple as, a perfusion is a diluted stock
solution -- that's all it is -- suitable for administration
to patients.

"Suitable for administration to patients."
That's what we agreed to -- "and suitable for infusion to a
patient."  I am sorry about that.  I said "for
administration."  It's "suitable for infusion to patients."

Sanofi's argument is, well, to be suitable for
infusion to patients, it's got to be nontoxic, it's got to
be sufficiently effective, it's got to be stable enough.

Those three words, suitable for infusion to
patients, do not, at least to us, imply toxicity levels,
stability levels, effectiveness levels.

1              We happen to have a case that is literally on

2      point.  It was from Judge Shadur in Chicago.  And he was

3      construing the words "suitable for oral administration."  It

4      is a very similar phrase.  We agreed to "suitable for

5      infusion," honestly, Judge, never intending to imply

6      toxicity, stability, in fact, none of that.  Just:  Can you

7      give to a patient?  Period.

8              Judge Shadur, in that case the argument was

9      this:  "suitable for oral administration," the other side

10     argued to be suitable for oral administration, it's got to

11     be nontoxic, it's got to be stable, it's got to taste good,

12     it's got to be effective.  Exactly the same arguments.

13     Judge Shadur said that that simple phrase to any objective

14     reader, his phrase, "to any objective reader," does not

15     imply all these additional requirements to the phrase.

16             The point that he made is the point that applies

17     here.  A medicine doesn't have to taste good.  Everyone

18     understands that.  Medicines can taste bad.  It might be a

19     bad-tasting drug, but that doesn't mean it's not suitable

20     for oral administration.

21             The same point here.  A perfusion, Judge, all it

22     is is a pharmaceutical that is designed to give to patients.

23     You know what?  We all understand perfusions.  They don't

24     necessarily have to be stable.  They can be unstable.  And

25     that is a problem with a perfusion.  It doesn't make it not

1  a perfusion.  That perfusion might not be effective.  When

2  you give it to patients it might not work.  But that doesn't

3  make it not a perfusion.

4         It might be too toxic.  That has happened, in

5  fact.  Perfusions have been taken out of the marketplace,

6  and because they were so darned toxic, they literally

7  started to kill people, they were taken off the market.  But

8  that doesn't make it not a perfusion.

9         Our position is, number one, it's too late to

10  add a bunch of extra meanings to the word perfusion, and,

11  number two, even if it's not too late and you were to

12  entertain this argument, we think it ought to be rejected

13  because the word perfusion doesn't imply all these really

14  indefinite limitations relating to undefined stability,

15  toxicity, and effectiveness levels.

16         Thank you, Your Honor.

17         THE COURT:  Thank you, counsel.

18         MR. SIPES:  Your Honor, if I could respond.

19         The parties agreed, this is what they agreed to

20  at claim construction, rather than submitting for claim

21  construction.  It said perfusion means a solution suitable

22  for infusion into patients.  That is the agreement.  That is

23  the claim meaning, we have all agreed, all the parties, to

24  be applied here.  "Suitable for infusion into patients."

25  As their own papers show, they put in this NCI Dictionary,

perfusion is equivalent to intravenous infusion.

We are not talking about taste, Your Honor. We talking about formulating a drug to be infused into your bloodstream for purposes of chemotherapy. The question is, what is meaning of the phrase "suitable for infusion into patients"?

THE COURT: Why did the agreement break down? What happened?

MR. SIPES: Only for purposes of validity, they have come in and said if the prior art would have killed the patient, it still anticipates or renders obvious. If the prior art would have been so toxic that you couldn't administer it to patients, it still renders the claims obvious or anticipated.

THE COURT: You are saying that can't be a perfusion.

MR. SIPES: The challenge in creating this invention -- they want to say the challenge is getting it out of the needle, making it liquid. The challenge of making the infusion -- I don't know about oral products. I have questions about oral products. I don't want to take an oral product that kills me. But I will take medication that tastes bad. But I'm not going to have infusion in my bloodstream of medication that it's going to kill me, that's going to have such adverse effects that I --

1          THE COURT:  You are saying that is not suitable

2    for infusion into patients.

3          MR. SIPES:  There is even difficulty with

4    intravenous infusions getting the medication to be in

5    solution to actually get to the tumor.  There are infusions

6    that aren't effective.

7          THE COURT:  Hold on.

8          Mr. Hurst, I heard what you said when you talked

9    about infusions that have been put on the market that kill

10   people.  But that can't be a good, a desirable result.

11         MR. HURST:  It's not.

12         THE COURT:  With hindsight, you would say,

13   wouldn't you, that those infusions were not suitable?

14         MR. HURST:  I would say yes, they were

15   perfusions, though, Your Honor.  They were certainly

16   perfusions.  And that's the word in the claim.

17         THE COURT:  If you label something -- if you say

18   something, a perfusion, by definition, is suitable for

19   infusion, for induction into the human body, aren't you

20   saying that it won't kill them, inherently?

21         MR. HURST:  I am certainly saying that it won't

22   kill them, Your Honor.  But I wouldn't say that it's not

23   toxic.

24         THE COURT:  That may be.  All I am saying is,

25   your reasoning seems to be a little circular to me.  That is

1    my point.

2                I cut you off.

3                MR. SIPES:  Our point is, all we have our

4    experts doing is offering opinion testimony on what it means

5    to be suitable for infusion into patients.  It seems to us

6    that is fair testimony on the agreed claim construction.

7                If they want to come in with their experts and

8    say, that is a suitable infusion even if we gave it to

9    patients and it killed the patient, I suppose that's their

10   right, to apply the claim construction suitable for infusion

11   to patients.  I don't find it very convincing if I go to the

12   doctor and say, I don't want a medicine that is suitable for

13   infusion into me.  I am expecting the doctor to administer

14   something to me that is therapeutically acceptable.  Not

15   something that is not.

16               THE COURT:  Here is my feeling.  I would rather

17   not have an additional claim construction issue deal with.

18   If I do, I do.  It seems to me that this is something that

19   reasonable minds could agree upon.  And you did.  I'm still

20   a little at sea as to why you are now not agreed.

21               MR. HURST:  Let me give you a more concrete

22   example.

23               Clearly, a perfusion is designed to give to

24   patients.

25               Two things, just two examples.  Absolutely,

1    positively, perfusions can be toxic.  No doubt about it.

2    Cancer drugs, in fact, are designed to be toxic.  So the

3    argument that Sanofi's experts are now making is, well, the

4    prior art doesn't meet it because who knows how toxic this

5    would have been.  Obviously, it was designed for patients,

6    but who knows how toxic it would have been.

7              Our point is, that is not a limitation in the

8    claims.  Everybody understands that pharmaceuticals can be

9    toxic.  In fact, cancer drugs are designed to be toxic.

10             Another example.  Stability, Your Honor.

11   Stability.  There is a prior art reference where the

12   perfusions lasted two hours.  And Sanofi's experts are

13   saying, well, that is not a perfusion, it's got to last for

14   four hours, because the word perfusion implies that it's got

15   to last X amount of time.

16             THE COURT:  That is an additional limitation

17   that is not commonly understood.

18             MR. HURST:  The point is, we certainly never

19   agreed to these fine limitations.  That is my point.  All

20   this extra baggage is really a claim construction issue that

21   nobody ever agreed to.

22             MR. SIPES:  Let me put that in context, because

23   it's interesting he raises those.  We can talk, for example,

24   about one piece of prior art that has already come up, one

25   of the Tarr references, which is a formulation of a

taxane -- this is really a case about taxanes, it is a

particular class of compounds -- where it was a very

distinguished researcher, Dr. Yalkowsky, who was attempting

to come up with a new formulation for paclitaxel because the

existing formulation had killed the patient from

anaphylaxis.  That was one thing we saw, a problem with

anaphylaxis.

He tried a very exotic surfactant.  Among other

things, he found it didn't have sufficient stability.  It

was only two hours.  He wrote, this is not suitable for use

in an IV bath.  The art knows when it's suitable, because if

it doesn't stay in solution, it crystallizes out, then you

can't get it into the patient or it crystallizes in the

blood stream and it is not delivered to the tumor and it

causes nephritis or phlebitis, terrible problems.  It is all

about suitability.

This is not something we are reading in.  The

patent claim itself talks about the need for physical

stability, for keeping it in solution.  That was one of the

problems.  That was in the art.  People know, formulators

know what it means to be suitable for infusion into

patients.

That phrase, which we both agreed to, is not a

vague phrase.  It's understood.  We have our experts talking

about what is suitable.  The prosecution history of the

1    patent talks about what is suitable.

2             They are taking a reading of suitability -- I

3    hear their point that with cancer drugs you accept a certain

4    level of side effects.  Granted.  But you accept a certain

5    level of them.  You don't accept where they precipitate out

6    and you get no therapy and just phlebitis or nephritis.  You

7    don't accept toxic shock.

8             The other thing about that pluronic L64, the

9    Tarr reference, the amount that pluronic used was above the

10   LD50 but it killed half the patients.  Those things you

11   don't accept.  In fact, Dr. Yalkowsky wrote a subsequent

12   article where he said, we have been trying to reformulate

13   taxanes for almost ten years and they have all failed, and

14   one reason they failed is not enough stability, and another

15   is too much toxicity.  This was the problem to be solved.

16            THE COURT:  So there is not an understanding out

17   there among persons of skill as to the meaning of

18   suitability?  There is not agreement in the art?

19            MR. SIPES:  We believe there is.  And our

20   experts have put in a lot of testimony about what it means

21   to be suitable for infusion into patients.

22            There are cases.  This came up in the District

23   of Delaware, I believe it was Judge Jordan who may have had

24   a case, again, with an injectable, where they construed

25   "physically acceptable" to be suitable for, you know,

1    injection to patients, where it was, you know, a

2    non-pyrogenic, that is, causing fevers, causing side

3    effects.  "Otherwise suitable for administration into

4    patients," it appeared there was agreement over what that

5    meant.  We thought there was agreement.

6              When we agreed with them, we thought we all were

7    on the same page, what was suitable for infusion into

8    patients.

9              It is not that they have come in with prior art,

10   which even the prior art says is unsuitable.  They are

11   saying, that is suitable because we understand suitable not

12   to include the effects on the patient.

13             THE COURT:  So, then, my question to both of you

14   is, what is your understanding of persons of skill in the

15   art, persons who have skill in this particular field, what

16   is their understanding of what suitable means?

17             MR. SIPES:  My understanding --

18             THE COURT:  Not what a lawyer wants to argue to

19   me.  Do we agree?  Is there agreement out there in the

20   world?

21             MR. SIPES:  My understanding from our experts --

22   I expect you will hear differently from the other side -- is

23   that when a formulator is making a perfusion to be suitable

24   for infusion into patients for intravenous administration,

25   there is an understanding of a minimum time in which it has

1    to stay in solution so it doesn't crystallize out.  There is

2    an understanding about the level of toxicity.  Actually, we

3    have an expert toxicologist, toxicologists consult with

4    formulators when they are trying to formulate --

5                    THE COURT:  When you say a level of toxicity,

6    how is that defined?

7                    MR. SIPES:  It is actually defined beginning

8    with animal tests.  I don't want to get into too much

9    detail.

10                   THE COURT:  I don't, either.  Can we agree it's

11   at least not toxic enough to kill people?

12                   MR. SIPES:  In fact, there is a term that is

13   called the highest non-lethal dose.  That is a standard

14   toxicology term.  And I will say you got to be one-third of

15   that.  We have an expert toxicologist, Dr. Rodricks, this is

16   what he did for a living.

17                   THE COURT:  I get that.  I am trying to get you

18   to tell me what you understand as a lawyer.

19                   MR. SIPES:  That is our understanding, that

20   there are principles of toxicology, principles of physical

21   stability, of sterility, that are understood in the art,

22   that are defined.

23                   THE COURT:  So we need a non-lethal dose.  We

24   need a certain degree of stability so it doesn't diffuse and

25   can be stable enough to render some effect.

1           MR. SIPES:  Correct, sterile, sterility, and

2    things that like.  We don't inject things into patients that

3    are not sterile.

4           THE COURT:  What else?

5           MR. SIPES:  It has to be non-pyrogenic.  In the

6    area of highly insoluble cancer drugs, you have to have

7    distal tumor activity, you have to keep it in solution so

8    that it will not precipitate out at the site of the

9    injection, but will actually --

10          THE COURT:  Be delivered throughout the body.

11          MR. SIPES:  To put it in more general terms, it

12   has to deliver the drug in an effective way.

13          THE COURT:  Okay.  Four elements.

14          MR. HURST:  Did you include effectiveness?

15          THE COURT:  He said effectiveness.

16          MR. HURST:  Those four limitations that are

17   being sought to add to Claim 5, remember, the word is

18   perfusion, they are nowhere in the claims, nowhere at all.

19   And honestly, Your Honor, a person of ordinary skill in the

20   art would never add all of that to the simple term

21   "perfusion."

22          THE COURT:  What would the person of ordinary

23   skill, Mr. Hurst, understand perfusion to mean?

24          MR. HURST:  Simply something that is designed to

25   be a pharmaceutical to be infused into a patient.  It is

that simple.

Moreover, just to make it pretty clear, look, it's suitable for infusion before you test it in a human being, because, remember, you can infuse it in the patient to test it before you know how toxic it is.

THE COURT: Say that again. It's suitable before injection?

MR. HURST: Yes.

THE COURT: Even if you know it will kill the patient?

MR. HURST: It wouldn't be a pharmaceutical if you know it would kill the patient.

THE COURT: So you accept "non-lethal dose."

MR. HURST: I accept "non-lethal dose." The intent has to be suitable to treat a patient.

THE COURT: Do you accept stability? If the intent is to treat a patient, must it not be stable enough to be effective? You asked whether you include effective.

MR. HURST: No, Your Honor, I wouldn't.

THE COURT: So we are giving placebos.

MR. HURST: A perfusion can be a placebo, sure. A perfusion is simply something that you infuse into a patient. Think about the realities of what happens out in the pharmaceutical world. You create a perfusion in the lab. You have got your stock solution, your concentrate,

1    you put it in the perfusion bag.  Right now you have never

2    tested this drug in a human being.

3            Is it suitable to infuse into a human being?

4    Well, you know, you hope it is going to be fine, you hope

5    that it is going to be effective.  You inject it into a

6    human being, it has no effectiveness at all.  It turns out

7    your drug is a complete failure.  Does that mean you didn't

8    give them a perfusion?  Of course, not.  You gave them a

9    perfusion.  It just didn't work.

10           I'll give another example.  You have a stock

11   concentration.  You turn it into a perfusion and put it into

12   an IV bag, and gosh darn it, it only lasts for a half-hour.

13   Was it not a perfusion for a half-hour?  Of course, it was a

14   perfusion.  It just didn't turn out to be a very good

15   commercially useful one.

16           As another example, you have your stock

17   solution.  You create yourself a perfusion.  You deliver it

18   to patients in the hope that it's not going to be toxic.

19   Gosh darn it, everybody you give it to loses all their hair.

20   Does that mean you didn't give them a perfusion?  No.  You

21   gave them a perfusion.  It turned out to be a terrible one.

22   But it's still a perfusion.

23           THE COURT:  So your experts would say a

24   perfusion is?

25           MR. HURST:  Designed to be infused into patients

1 as a pharmaceutical.  Simple as that.  No extra baggage

2 relating to undefined toxicity levels.  No extra baggage

3 relating to how effective it has to be.  No extra baggage

4 relating to how stable it has to be.

5           Those four arguments should have been made at

6 the Markman stage if we were going to be adding all of these

7 limitation to a claim.

8           THE COURT:  I agree with that.

9           MR. HURST:  I commend Judge Shadur's opinion in

10 the Medeva case.

11           THE COURT:  I agree with your general premise,

12 and I want to get counsel to react to the examples you have

13 just used and the logic inherent in those citations.

14           MR. SIPES:  I want to take both that and the

15 case law, if I could.

16           First, I don't know what he means by, now he is

17 saying it could be infused in a patient as a pharmaceutical,

18 because that seems to me is achieved.  The language that we

19 all agreed on -- I resent this argument that he said we

20 should have raised this at claim construction.  We agreed to

21 "suitable for infusion into patients."  We have an

22 understanding about suitability.  But even if he is saying

23 it has to be a pharmaceutical, well, I know what a

24 pharmaceutical is.

25           THE COURT:  I think he just added that during

1  his most recent comment.  That wasn't the definition you

2  offered earlier.  You said a perfusion is a diluted stock --

3  I am paraphrasing -- stock solution suitable for infusion

4  into a patient.

5           MR. HURST:  That is fine.  The question we have

6  is:  What does it mean, suitable for infusion?  I am saying

7  it doesn't include all those extra things.  It's just

8  designed to be a pharmaceutical --

9           THE COURT:  I thought I understood you to say

10  that would be an acceptable definition of the word

11  perfusion.

12           MR. HURST:  Yes, as long as we didn't have the

13  word suitable, including toxicity and --

14           THE COURT:  Just what I just said.  That's his

15  position.

16           MR. SIPES:  Perfusion we are talking about here,

17  it is a pharmaceutical composition.  That is a therapeutic

18  composition which could then be safe and effective.  That is

19  what suitable for infusion --

20           THE COURT:  There is where you part ways.  I

21  don't know how you ever agreed.

22           MR. SIPES:  I think we have the better of the

23  argument, because even their own prior art, when they talk

24  about suitability for infusion into patients --

25           THE COURT:  You may have the better argument.

1       But this may be one of those rare times that I am willing to

2       hear extrinsic evidence on the meaning of a term in order to

3       help me do the claim construction.

4                    MR. SIPES:  We believe the way to do it -- our

5       experts have testified about what it means in the art to be

6       suitable for infusion into patients.

7                    Your Honor, they keep citing this one case, the

8       Medeva case, which was an oral case.  I think it's

9       questionable even on its facts.  But it was in an oral

10      product.

11                   THE COURT:  It's questionable as to whether a

12      judge's construction of a term in an entirely different

13      context -- it has no precedential value in that regard, and

14      you know that.

15                   MR. SIPES:  The Court relied on the wide range

16      of things that people will take orally.

17                   THE COURT:  Here is what I am going to do:  I

18      will do this construction in realtime.  It's a term that the

19      parties should have identified early, quite frankly.  It

20      would have been helpful to have the Court have the

21      opportunity to not have this issue to wrestle with.  But

22      it's there.

23                   MR. SIPES:  I apologize, Your Honor.  We thought

24      when we had "suitable for infusion" that that encompasses

25      that it was safe and effective to give to patients.

1          THE COURT:  I have got your claim construction

2     briefs.  And that's the way I will treat these briefs in

3     support of your various positions on this particular issue.

4          Did Apotex weigh in on this one as well?

5          MR. DRESNER:  We did not, Your Honor.

6          MR. HURST:  Your Honor --

7          MR. SIPES:  I wanted to respond to the case law.

8          There are a couple of cases on injectables, on

9     drugs that are actually injected or infused into patients.

10    There is the Pharmacia case from 2006, that is 447 F.Supp.

11    2d. 363.  This is in our papers.  We cited to it.  That was

12    dealing with one that is injected.  The parties there agreed

13    that the term there, that it would be intravenously

14    injectable, sterility, pyrogenicity, things that are, the

15    Court said, sterile, pyrogen-free, and suitable for

16    administration to humans and animals.  Clearly, the Court

17    was saying that these aspects of the biological response are

18    important and that "suitable for administration to humans"

19    is a meaningful term, a meaningful requirement of these

20    injectable products.  In that case, the Court rejected

21    stability because it said the patent there didn't talk about

22    stability.  In our case the patent talks about stability.

23         THE COURT:  There you go.  So much for

24    precedent.

25         MR. SIPES:  In the Amgen case, where the

1  Court --

2          THE COURT:  Counsel...

3          MR. HURST:  Can I ask for a clarification?

4          THE COURT:  Yes.

5          MR. HURST:  We, obviously, had no meeting of the

6  minds when we reached this agreement, as you can tell.  As I

7  understand it, we will go to trial and we will have live

8  claim construction on the word perfusion.

9          THE COURT:  Yes, that's exactly what's going to

10  happen.

11          MR. HURST:  Thank you, Your Honor.

12          THE COURT:  So this motion is, obviously, taken

13  under advisement.  Judgment is reserved.

14          MR. HURST:  Thank you.

15          THE COURT:  Mr. Hurst, you are prepared to stand

16  on your papers with regard to the other motions?

17          MR. HURST:  Yes, I am, Your Honor.

18          THE COURT:  That leaves us with Apotex having

19  some additional motions.

20          MR. PAPPAS:  Your Honor, if I may.

21          With respect to Hospira's motion to preclude

22  evidence regarding secondary considerations, I understand

23  Mr. Hurst is saying he rests on his papers.

24          THE COURT:  That's what he is saying.

25          MR. PAPPAS:  I understand.  Your Honor --

1          THE COURT:  You want to argue?

2          MR. PAPPAS:  I would like to be brief, because I

3    think we can dispose of this.  And I also want to give Your

4    Honor, if you have a chance, if you want to ask any

5    questions, we are here, I would like to be able to respond.

6          THE COURT:  Let me find the motion first, Mr.

7    Pappas.

8          MR. PAPPAS:  Very well.

9          270?

10          MR. PAPPAS:  I think so.

11          THE COURT:  Go ahead, Mr. Pappas.

12          MR. PAPPAS:  Your Honor, like I said, I think

13    this can be disposed --

14          THE COURT:  Here is the note that I made to

15    myself, for both of your benefit.  I said:  Seems plaintiff

16    is right.  This is a weight issue and is possibly MSJ,

17    motion for summary judgment.  That's the note I made to

18    myself.

19          MR. PAPPAS:  That is exactly what it amounts to,

20    Your Honor.  What I would simply say is, both --

21          THE COURT:  That means, if he is relying on his

22    papers, you have already won, potentially.

23          MR. PAPPAS:  I just want to say that both

24    Hospira and Apotex, basically what they are advocating you

25    do, in a case in which they have attacked two United States

1    patents as obvious, is disregard the entire body of Federal

2    Circuit precedent, which says that if evidence is proffered

3    by the patent holder, objective indicia or secondary

4    indicia, it must be considered.

5              And that's what we have to say.

6              But the upshot of their motion is, they want you

7    to conclude that there is nothing novel, nothing inventive,

8    and whatever was done was obvious, and therefore, from

9    there, Mr. Hurst says, therefore, Judge, you don't have to

10   hear any of the secondary indicia.

11             That is why we think it can be disposed of.

12             THE COURT:  I think you are swimming downstream

13   on this one.  We will leave it there.

14             MR. PAPPAS:  Thank you.

15             THE COURT:  Apotex has a motion with regard to

16   Dr. Kaler.  Is that still extant?

17             MR. DRESNER:  Yes, Your Honor.  But, Your Honor,

18   I took your comments at the outset of this hearing to heart.

19   What I would like to suggest is that, we have four remaining

20   matters.  One of them has already been dealt with in

21   connection with one of Hospira's motions.  We would like to

22   present and argue one of them, which Mr. Hurst alluded to

23   earlier, which is a big time issue, that is the

24   bioequivalence matter.

25             The other three motions, Your Honor, deal with

1    requests to preclude testimony from specific expert

2    witnesses.  We believe Your Honor can deal with that on the

3    papers or certainly on the fly.

4                THE COURT:  On the fly, yes.  That's consistent

5    with the notes that I have made to myself here.

6                MR. DRESNER:  Okay, Your Honor.  We would like

7    to present the bioequivalence one.

8                There is one issue in a footnote in the Dr.

9    Kaler motion that also appears in the body of the proposed

10   pretrial order that I would like to address after we address

11   the bioequivalence matter.

12               THE COURT:  I have bioequivalence.  That is 267.

13               MR. DRESNER:  Mr. McTigue will present that, if

14   that's okay.

15               THE COURT:  Mr. McTigue.

16               MR. McTIGUE:  Thank you, Your Honor.

17               So, Your Honor, that would be Apotex's Motion in

18   Limine 4.

19               THE COURT:  Yes.  And it's docketed at 267.

20               MR. McTIGUE:  Your Honor, Apotex is moving to

21   exclude evidence of bioequivalence not because there is any

22   issue between the parties over whether or not Apotex's

23   product is bioequivalent.  That's not the issue for the

24   Court to decide.

25               Bioequivalence is, in essence, an analysis of

the drug, in this case the active ingredient docetaxel, into

the patient's bloodstream.

What you have in front of you, though, Your

Honor, importantly, no claims at issue make reference to any

biological effect, much less the rate or the extent that the

API becomes available in the patient's bloodstream.

So, taking to heart what Your Honor was saying

about judicial efficiency, what we are trying to do is say,

bioequivalence is a red herring.  That is not something that

the Court has to decide.

We are actually not even here under an ANDA,

Your Honor.  This is a (b)(2).

So the fact that Apotex's product is a

free-solvent system, and the fact that Apotex's stock

solution substitutes PEG 300 for polysorbate 80, we are

under a (b)(2), not an ANDA, but we are not arguing that

somehow Apotex's product isn't bioequivalent.  We are saying

bioequivalence by itself isn't essential and it isn't

something the Court has to decide.

However, Your Honor, taking the basic and novel

properties issue straight on, the plaintiffs have said there

is three basic and novel properties.  Now, there is going to

be discussion, Your Honor, at the trial about whether or not

there are more.  And we believe that the basic and novel

properties issue is actually more expansive than how

1        plaintiffs' position BNP.

2                But their own three basic and novel properties,

3        Your Honor, the first one is the ability to increase the

4        concentration of the API in a perfusion.  That has nothing

5        to do with bioequivalence at all.  Bioequivalence, again,

6        has nothing to do with perfusions.  It's the API in this

7        case in the bloodstream.

8                Their second is the ability to create a

9        perfusion at a concentration that is physically stable.  We

10       have been talking about physical stability today, Your

11       Honor.  But physical stability has nothing to do with

12       bioequivalence.

13               And the third basic and novel property that they

14       espouse is it can be administered with reasonable

15       expectations of avoiding anaphylactic or alcohol

16       intoxication manifestation.

17               Again, Your Honor, whether or not there is a

18       side effect profile to this has nothing to do with a

19       determination on bioequivalence.  So to streamline the case,

20       Your Honor, Dr. Kaler's report discusses bioequivalence as

21       one way that they try to get to an infringement position

22       that doesn't match their basic and novel properties and is

23       not at issue in this case.

24               MR. SIPES:  Your Honor, if I may.

25               What we are going to hear, in asserting

1    bioequivalence, what they need to deal with in terms of

2    testing, in terms of representation to FDA, is the

3    additional ingredient, excipient, in their products, which

4    is PEG 300.  Because this is a perfusion, that is, an

5    intravenous infusion, the FDA war is not just about the

6    active ingredient, but the biological effect in every

7    excipient, and the effects even in the perfusion, because

8    it's all administered in the bloodstream.  It's technically

9    called, everything is, it's biologically available.  It

10   makes sense.

11          There are many issues that they are asserting in

12   defense to infringement about the effect of PEG 300 that are

13   addressed in their testing for FDA.  Let me give you one

14   example:  viscosity.  Their experts have said that PEG 300

15   has a material effect on their perfusion because it changes

16   the viscosity.  PEG 300 is more viscous.

17          They are right that viscosity is an important

18   issue with the perfusion.  If it doesn't distribute through

19   your bloodstream and it clumps in one part, it's not

20   effectively distributed throughout.  They are right,

21   viscosity is important.  For that reason, it is asserting

22   bioequivalence, they studied the viscosity of their product

23   and showed that, in fact, the presence of PEG 300 isn't

24   affecting the viscosity of the perfusion in the perfusion or

25   when administered.

1           There are a lot of properties like that.

2    Actually, Hospira hired an expert in the area of surfactants

3    with taxane, a fellow named Dr. Alex Sparreboom, who is now

4    down in Memphis.  He supervised tests involving adding the

5    PEG 300, adding the citric acid, which is another excipient

6    that Hospira uses, to look, what are the effects of each of

7    these additional excipients on the properties of the

8    perfusion, in the perfusion then as administered.

9           We are relying on all that testing and all of

10   those representations about the results of those tests to

11   FDA to show exactly what they showed FDA:  that these

12   excipients don't affect the properties of the perfusion; to

13   show that, therefore, it doesn't have the material effect on

14   the properties.  But we are doing it on a factual basis.  It

15   is not we are simply saying because they are bioequivalent

16   they infringe.  We are saying, the inquiry for Claims 2 and

17   10 of the '562 patent, those are the two claims that contain

18   "consisting essentially of," requires an analysis of what

19   effect are the unlisted ingredients, the PEG 300 in one

20   case, the PEG 300 and the citric acid in the other, on the

21   properties of the perfusion.  The testing that was done for

22   FDA is addressed to that question, because FDA wants to know

23   exactly the same answer:  What is the effect of those

24   additional excipients on your product?  That is what we are

25   doing.  That's what Dr. Kaler does.

1          THE COURT:  Mr. McTigue.

2          MR. McTIGUE:  Your Honor, first, I have four

3     small children, so I apologize for the boisterous voice I am

4     trying to talk over sometimes.

5          What he essentially said was the FDA has the

6     same concern.  That is the problem, Your Honor.  What the

7     FDA is comparing is bioequivalence of the commercial

8     products.  And what the Court said, actually, the Federal

9     Circuit in AquaTex -- and it's in our briefs -- is it's

10    erroneous, because infringement, either literally or under

11    the doctrine of equivalents, does not arise by comparing the

12    accused product with a commercialized embodiment of the

13    patentee.

14         What we are talking about is the effects -- and

15    I agree with him that there is more than his three basic and

16    novel properties.  He mentioned one.

17         THE COURT:  You are saying this is all beside

18    the point.

19         MR. McTIGUE:  That is exactly right, Your Honor,

20    because what we want to focus on is those claims.  Again, I

21    will reiterate:  None of the claims deal with

22    bioequivalence.

23         THE COURT:  If that is the case -- and I think

24    he is right insofar as his assertion with regard to whether

25    the claims deal with bioequivalence, my recollection

vaguely -- what are we talking about here?  His point is,

it's hornbook patent law as to how you prove infringement.

MR. SIPES:  If we are talking about the fact of

bioequivalence, there is only one claim element, which I

don't believe they have challenged because their experts

have relied on it, too, where bioequivalence analysis

matches the requirements of capable of being injected

without anaphylaxis, where the properties of their product,

the rate of anaphylaxis is determined by the fact that it's

bioequivalent to an existing product.  And we know the rate

of anaphylaxis for that product.  Their experts have relied

on that, too.  Their experts have said the same thing, that

because the two products are the same, we can tell the

properties of the accused product in terms of anaphylaxis

from the testing there.

So on that one, that claim element goes to the

physiological effects of the accused product.  And that is

specifically dependent upon bioequivalence.  I think there,

that's one where bioequivalence matters.  For the rest of

it, it's not bioequivalence we are relying on.  We are

relying on the testing done by the defendants of each of

their excipients that was submitted to FDA with their

assertion of bioequivalence.  But it's the testing itself of

the effects of each of those excipients.  That is clearly

proper under the case law, because it is going to the

1     question of the effect of each of these unlisted ingredients

2     on the product.

3                    THE COURT:  Mr. McTigue, do you want to react to

4     that?

5                    MR. McTIGUE:  Your Honor, I go back to the fact

6     that this isn't a case where the parties are arguing over

7     the biological effect, much less the rate or the extent to

8     which the API is delivered into the body.  None of the

9     claims --

10                   THE COURT:  You are talking about composition.

11                   MR. McTIGUE:  We are talking about composition,

12    Your Honor.  If counsel wants to talk about viscosity or

13    some of the other evidence that is out there, that is test

14    evidence, that is in addition to what their three basic and

15    novel properties are, we will have that discussion at trial.

16    But what we don't want is somehow -- and we do not subscribe

17    that somehow if you equate bioequivalence, all of a sudden,

18    that relates to the claims.  And that's the important part.

19    It doesn't impact anything that's at issue for the Court,

20    which is the claim construction.

21                   THE COURT:  I agree with that, that proposition,

22    that assertion.

23                   MR. SIPES:  I am not sure we disagree.  It's not

24    the fact of bioequivalence.  It's the testing, the

25    underlying testing.

1          THE COURT:  As counsel just argued, we can deal

2     with that at trial.

3          I think I understood you to say that.

4          MR. McTIGUE:  Yes.

5          THE COURT:  So I am not sure how -- I think I

6     will grant the motion.  I think we all understand, given the

7     discussion we have just had, what that grant intends.  I

8     will grant it as framed.

9          MR. SIPES:  Your Honor, so I can be clear.

10          THE COURT:  You can introduce evidence of

11     testing.

12          MR. SIPES:  Excellent.  In terms of the rate of

13     anaphylaxis of their product, I assume we have agreement

14     that we can rely on their assertion to FDA about the

15     physiological effects of their product.

16          THE COURT:  To the extent -- yes.  To the extent

17     that we all understand what we are doing, and that is not

18     comparing one commercial embodiment to an accused

19     composition, I think we will be fine.  And that still leaves

20     the opportunity to object in real time where that line is

21     crossed, in your view.

22          MR. McTIGUE:  Thank you, Your Honor.

23          THE COURT:  So the motion is granted.

24          MR. HURST:  Your Honor, one of the three motions

25     I relied on in the papers was a mirror-image of that.  It

1   was a mirror-image of Apotex's.

2           THE COURT:  Let's identify that now.

3           It's docketed 273.  That's granted as well.

4           Counsel for both defendants are going to stand

5   on their papers with regard to 264 -- this is Apotex --

6   their No. 1 and their No. 2, which is at 265, and their No.

7   3, which is at 266.

8           MR. DRESNER:  That's correct, Your Honor.  I had

9   pointed out, there is one matter, in the Kaler motion, which

10  is No. 1, it is a footnote.  It is not to the heart of the

11  motion.  But there is a footnote in that motion that tracks

12  a comment that was added to the draft of the pretrial order

13  that I think needs to be clarified.

14          THE COURT:  Let me get that out.  Where is the

15  footnote?

16          MR. DRESNER:  The footnote appears in the Sanofi

17  response to Apotex Motion No. 1.

18          THE COURT:  What page?

19          MR. DRESNER:  Page 4 of the response, Your

20  Honor.  It raises an issue regarding Your Honor's claim

21  construction of the expression "consisting essentially of."

22  You may recall that in Your Honor's order, the term

23  "consisting essentially of" was a disputed term.  And Your

24  Honor ruled that the term "consisting essentially of" in

25  Claims 2, 5, and 10 of the '561 patent means such-and-such.

1   Whatever it is, we don't dispute.

2           The issue is whether or not the term "consisting

3   essentially of" applies to all three of the claims that Your

4   Honor said it does.  Sanofi says, no, that was a

5   typographical error, it was an error here and the Judge did

6   not mean to include it in Claim 5.

7           It's been five months since this order was

8   issued.  Experts on both sides, frankly, have looked at that

9   expression, both in Claim 5 and not in Claim 5.  Some of the

10  experts have taken the view that it doesn't appear in Claim

11  5, and the reason is that Your Honor also construed another

12  expression that appears in Claim 5, the expression "which

13  includes."  And you concluded that that means comprising.

14          And, therefore, there has been some confusion,

15  if you will, as to whether Claim 5 is an independent claim

16  or a dependent claim.  If it is a dependent claim, then it

17  should include the "consisting essentially of" language,

18  just like Claims 2 and 10.

19          By the way, none of the three claims, 2, 5, or

20  10, actually contain those words.  They appear there by

21  virtue of the fact that all of those claims do refer back in

22  some way or another to Claim 1, which has those words in it.

23          One of our experts, during his deposition

24  testimony, raised the issue as to whether or not Claim 5

25  really is a dependent claim.  Another of our experts has

given an opinion based on it being an independent and a non-independent claim.

We take the position that Your Honor meant what you said and that Claims 2, 5, and 10 include that expression. Sanofi believes that it doesn't.

THE COURT: Okay.

MR. PAPPAS: Your Honor, first, I think it always helps to turn to the original document in a situation like this.

I really don't need to quote Judge Sleet to Judge Sleet. But what you said was, you were very clear, that's why the only explanation we have is the sentence about 2, 5, and 10 may have been inadvertent, because Your Honor was very clear, in Paragraph 3, you said, "The term 'which contains'" -- that is the language the parties hotly disputed in Claim 5, you wrote an entire paragraph: "The term 'which contains' in Claim 5 of the '561 patent is construed to mean 'comprising.'"

Not "consisting essentially of." You said: "comprising."

Indeed, you had Footnote 8. Footnote 8:

"The Court rejects Hospira's proposed construction."

What was Hospira's proposed construction? Just what counsel for Apotex said: that which contains is

open-ended, synonymous with comprising or including, and
does not exclude additional unnamed ingredients.

You rejected that.

Now, let me tell you what else.

At the Markman hearing, this argument that
counsel has just made, that Claim 5 is really dependent, not
independent, was waived.

I quote to you from the transcript, Page 116,
where Mr. Sipes said, quote -- this was when he was debating
Mr. Hurst's point about Hospira thought the prosecution
history meant that it should not be "which contains," and
you rejected that.  Mr. Sipes said, "I would point out as
well that this also makes clear that Claim 5 is an
independent claim."

I am reading this, Your Honor, because this took
place at the Markman hearing.

"But the language of Claim 5," Mr. Sipes said,
"makes that clear, too.  I don't think you will find it in
their briefs, any argument that Claim 5 is dependent.  That
is new to this area."

The argument counsel for Apotex just made was
never in their Markman briefs.  In fact, Mr. Sipes took it
on to make sure it was clear, and said, "There is no
argument about it being dependent.  It was argued at the
hearing, but it wasn't in their briefs."

1      The Court's response: "I don't think that is an

2  issue."

3      Off the table.

4      So, Your Honor, we believe you couldn't have

5  been clearer about what "which contains" means in Claim 5,

6  and that it can't mean "consisting essentially of,"

7  because, of course, Claims 2 and 10 do refer back and use

8  the words "consisting essentially of," whereas Claim 5 says,

9  "contains."

10      That was a very disputed topic.

11      So our point is simply this: That issue has

12  been waived, and second, Your Honor, we think that's an

13  explanation of your claim construction ruling that makes

14  sense.

15      Then as an alternative argument, Your Honor,

16  Claim 5 flunks both tests of whether or not it could ever be

17  construed to be a dependent claim. First of all, Claim 5

18  refers only to the compound in Claim 1, not the entire Claim

19  1. And it's not a composition. And Claim 5 does not

20  further limit Claim 1 because Claim 1 is drawn to two

21  different types of compositions, a stock solution and a

22  perfusion. And Claim 5 is a perfusion.

23      Your Honor, under any stretch of the

24  imagination, we submit you meant what you said in your claim

25  construction ruling.

1          The reason we brought it up in the pretrial

2     order, Your Honor, is because we have been schooled, by my

3     own presence in your Court and by local counsel, that you do

4     not take kindly to attempts to reargue claim construction,

5     which we believe Apotex is trying to do.  And when we saw

6     this in one of their experts' reports, that's why we brought

7     it up in the pretrial order, because if at all possible we

8     would like to leave here today with our understanding that

9     Claim 5 is as you addressed it in Paragraph 3 of your order.

10          THE COURT:  I think Mr. Pappas has correctly --

11    I will commit to this:  I will go back and reexamine this

12    issue.  But I think the footnote correctly sets out the

13    Court's view.  I generally do understand the difference

14    between "comprising" and "consisting of."  And when I go to

15    that -- I am usually very terse in my orders, as you know,

16    probably much to the annoyance of my colleagues upstairs.

17    But they haven't told me to stop it.  So I at least give a

18    quickie footnote to you from time to time.  In this case I

19    did.  That indicates to me, though I don't have perfect

20    recollection, obviously, of exactly what happened, I think

21    that helps refresh my recollection as to what it meant.  I

22    think I meant what I said.

23          MR. DRESNER:  Your Honor, just a final point.

24    Whether Claim 5 is independent or dependent is really beside

25    the point.  I don't mean to argue that too extensively.

1          THE COURT:  Not "too extensively."

2          MR. DRESNER:  The point I do want to argue is

3   whether or not Your Honor meant that, consistent with what

4   Your Honor said in the order, that Claim 5, like Claims 2

5   and 10, includes the expression "consisting essentially of."

6          The phrase that Mr. Pappas referred to that Your

7   Honor construed, "which contains," is a phrase -- you

8   correctly construed that to mean "comprising."  But that is

9   a phrase that occurs in the claim after the claim refers

10  back to Claim 1.

11         THE COURT:  Keep in mind -- I am going to cut

12  you off, because keeping in mind Mr. Pappas's I think

13  well-taken point with regard to waiver, I am not going to

14  hear you further on this, but I will go back, even in spite

15  of the fact that I think he is right on waiver, I will go

16  back and look at it.  I don't think you should anticipate

17  any change in my view.  If there is, I will issue a short

18  order.  Then you can jump on me at trial, but not until

19  then.  I think things would stand as they are today.

20         MR. DRESNER:  Thank you.

21         THE COURT:  All right.  I think we know what you

22  need to hear from me on.  I think we have gone over that.

23         MR. DRESNER:  Your Honor, can I raise a

24  housekeeping matter?

25         THE COURT:  Hold on.  Again, to recapitulate,

1    you need to hear from me on the footnote matter, if I am

2    going to change anything, on Apotex's Motion No. 2, and

3    Motions 2 and 3, and Hospira's 4 and 5.

4              Counsel, what is your housekeeping -- I wasn't

5    going anywhere just yet.  What is your housekeeping matter?

6              MR. DRESNER:  I just wanted to raise the matter

7    of the Apotex joinder motion with Hospira's motion that you

8    already granted.  I didn't hear Your Honor refer to it when

9    you talked earlier about the motions regarding inequitable

10   conduct.

11             THE COURT:  It would be the same ruling.  I

12   would see no reason --

13             MR. DRESNER:  I would assume so.  Thank you very

14   much, Your Honor.

15             THE COURT:  That's fine.  You should do that.

16   That is granted as to both parties.

17             You are all, I am sure, aware of my practice

18   with regard to objections that have been raised.  They are

19   summarily overruled, rejected, without prejudice to your

20   ability to raise them, those that you really think need to

21   be raised, other than the ones you have already raised in

22   the form of motions in limine, in realtime.

23             But those objections are overruled.  There is no

24   way that we have the time to deal with them individually.

25   And I am sure you understand that.

1          Again, I want to urge counsel, during the

2     conduct of the trial, to keep in mind that this is a Bench

3     trial.  You preserve your positions, for sure.  But in terms

4     of atmospherics or that kind of thing or things that you

5     might otherwise in front of a jury feel a jury shouldn't

6     hear, keep in mind, you have got a, by now, rather

7     thick-skinned Judge on the Bench, who is used to hearing

8     stuff that a fact-finder maybe shouldn't hear exactly.

9          So just use some perspective.  Keep some

10    perspective on things.

11         In the proposed final pretrial order, is there

12    anything we need to talk about?

13         MR. PAPPAS:  Your Honor, there is one issue we

14    would like to discuss and get Your Honor's views on it.

15         The parties have a disagreement about the

16    allocation of time.  We will get to time in a minute, I

17    guess, with Your Honor's schedule.

18         But I just want to make clear why we truly

19    need where one part of the case is 50 percent of the time.

20    We think, quite frankly, the suggestion of thirds is an

21    attempt to keep us from presenting our case.

22         Your Honor will recall by way of history that

23    initially this case was --

24         MR. HURST:  Actually, this might be -- we had a

25    discussion on this side.  We are happy with a 50-50 split.

1            MR. PAPPAS:  That sort of takes care of that.

2            THE COURT:  Remind me how many days we

3     allocated?

4            MR. PAPPAS:  Your Honor, if I can address that

5     next.

6            Initially, when it was just plaintiffs versus

7     Hospira, you put it in for seven days.  In January of this

8     year, you consolidated the cases.  And, Your Honor, we

9     agreed that consolidation made sense, particularly in view

10    of the docket issues that the Court faces.

11           THE COURT:  What is the day we start?

12           MR. PAPPAS:  We start on October 26th, at least

13    according to the current schedule we have been given.

14           Now, Your Honor, even with consolidation,

15    though, we have, we, the plaintiffs, have two cases.

16           THE COURT:  How many days do you think you need,

17    Mr. Pappas?

18           MR. PAPPAS:  We think it would take ten days.

19           THE COURT:  To try the case collectively?

20           MR. HURST:  I don't think so, Your Honor.

21           THE COURT:  How many days do you think?

22           MR. PAPPAS:  Can I tell you why I think ten

23    days, Your Honor?

24           THE COURT:  Go ahead.

25           MR. PAPPAS:  When Apotex was added, so you have

1    a new party, all right, seven days against Hospira, we are

2    only asking for three additional days.

3            THE COURT:  Only three days, Mr. Pappas?  Is

4    that all you are asking for?

5            MR. PAPPAS:  I understand, Your Honor.

6    Actually, I expect that there might be other responses from

7    the Court.  But that's fine.

8            What we have here is a situation where, with the

9    addition of Apotex, they have -- these parties' products are

10   different -- my client finds themselves in a position where

11   we have to prove not one but two infringement cases.  So the

12   effect of the consolidation, while still streamlining and

13   making sure the Court doesn't have to have two trials, we

14   have two infringement cases to try.

15           In addition, with respect to the allegations of

16   invalidity in terms of anticipation, obviousness, there are

17   more allegations.  There are some allegations between

18   Hospira and Apotex that are common.  But there are nine

19   raised, obviousness combinations raised by Hospira, four

20   raised by Apotex, and five that are common as to both.

21           Once again, where we find ourselves is, if it

22   was just Hospira, we would have nine allegations of

23   obviousness.  We have four new ones with Apotex.  With

24   Apotex, they have six alleged anticipatory references.

25   Hospira has four.  With the addition of Apotex, there are

1    two more.

2              Apotex adds the obviousness/double patenting as

3    a basis of invalidity, which Hospira does not.

4              Now, as to each of these, Your Honor, I don't

5    really want to trespass on the Court's time and argue about

6    how complex or not complex they are, the parties may differ

7    about this, but as the plaintiffs, we have to answer each

8    one of these.

9              With respect to indefiniteness, Hospira has two

10   new grounds of indefiniteness that are not raised by

11   Hospira.  With respect to best mode, Hospira does not raise

12   best mode.  Apotex raises two allegations of best mode.

13             And with respect to inequitable conduct, there

14   are three allegations that are common to Hospira and Apotex,

15   but Hospira has three of its own, Apotex has three more that

16   are different than Hospira's.

17             The only way I knew how to do it, Judge, was to

18   basically look at the issues.

19             All I am saying is, with those additional issues

20   that we have to answer, attacking the invalidity and whether

21   or not we committed inequitable conduct, and the fact that

22   the consolidation with Apotex added a second infringement

23   case, we respectfully believe that we need and are asking

24   for ten days.

25             It's always possible it may not be needed.  But,

Your Honor, the reason ten days becomes very important is because with a 50-percent now-agreed-upon allocation of time, it goes into our planning purposes for dividing the witnesses.

But I can tell Your Honor, we have streamlined our experts. They aren't going to be duplicative. They are bringing new evidence that we believe you need to hear.

But, respectfully, we simply need a chance to meet both parties. As you can see, what's already happened in terms of the work on the plaintiffs -- it's a burden we accept -- even on the in limines, we filed two but we had to respond to ten. Now, had this only been a case against Hospira, under your rule, the maximum number we would have had to respond to is five.

We are not taking issue with the fact that they filed them. All I am trying to indicate to you in as clear a way as I can is that the addition of Apotex has added issues to the case and an additional infringement case. And all -- I don't want to draw the same response.

We are simply requesting three additional days other than the seven so we can make sure we can do it all at once.

THE COURT: Hold on.

Mr. Hurst, what is your position?

MR. HURST: My view is, I have had the recent

1    experience before Your Honor where we did an ANDA case that

2    was no more complicated than this that had infringement,

3    invalidity, and we did it in five days.  There is an extra

4    party with a different product.  My expectation is it should

5    not take more than two days, a day per side.  So seven days

6    is what seems reasonable from our perspective.

7              Mr. Pappas talked a lot about the different

8    defenses that the defendants are raising.  We are

9    coordinating.  We are going to work together a lot better

10   than we did on the motions in limine, Your Honor.  We going

11   to try to streamline things so you are hearing arguments

12   about defenses just once and often possibly even from just,

13   you know, one expert will address an issue rather than us

14   putting up an expert and them putting up a duplicative

15   expert.

16             So I do think seven days is reasonable.  We will

17   work together to take our three and a half days and make

18   sure both parties can get our case in in three and a half

19   days.

20             THE COURT:  Here is what I will do.  I really

21   don't have the time.  I am going to allow the possibility,

22   depending upon how things go, that we may move a couple of

23   things to give you nine days.  I can't give you ten.  I just

24   don't have ten days to give you.  That is the best I can do.

25   That is only conditioned upon us assessing as we move along

1    how the time is going.

2            But, Mr. Pappas, normally I wouldn't give you

3    more than ten days in a case like this for a jury trial.

4    This is a Bench trial.  We should be much more efficient on

5    the presentations.  And we can work longer than if we had a

6    jury.

7            MR. PAPPAS:  We can go with nine days, and I

8    would appreciate it.

9            May I ask a clarification?  The parties may not

10   need it, but at least in terms of allocating time for our

11   witnesses and stuff, can we at least use, for both of our

12   cases against the opponents, plan to fit our witnesses into

13   4.5 days?

14           MR. HURST:  Your Honor, actually, this is a

15   very, very big issue.  I have had this --

16           THE COURT:  I thought you agreed on 50-50.

17           MR. HURST:  We did agree on 50-50.  But this is

18   a different issue.

19           The parties have a disagreement on the order of

20   proof.  Traditionally, of course, the party with the burden

21   goes first on a particular issue.  That's always been the

22   case for a lot of reasons, including it doesn't make sense

23   to allow one party to shoot at a target before the target

24   has been presented.

25           Our proposal is -- Sanofi's proposal is they go

first not only on infringement, which is their burden, but they also go first on the patent validity issues and the inequitable conduct issues, which are our burden.

So we propose the party who has the burden of proof goes first on the issue and presents the defense.

Let me say one extremely important point. Mr. Pappas just went through a series of, you know, isolated issues on obviousness when we are going to try to streamline and pull them together. He will be shooting at targets that don't exist if he goes first on it. It doesn't make an awful lot of sense.

Our proposal is the party with the burden of proof goes first on a particular issue.

THE COURT: I think it makes for a more logical presentation to the finder of fact as well.

MR. PAPPAS: Your Honor, what we were trying to do was to streamline the trial.

What Hospira and Apotex are proposing is four rounds, four rounds of the trial. Let me tell you, this is what they say. Round 1 would be Sanofi, us, presents the infringement case. Round 2 would be Apotex and Sanofi present invalidity, unenforceability, and they rebut infringement. Round 3 would be Sanofi replies on invalidity and unenforceability, or offers our defense, and then replies, has our rebuttal case, if you will, on

infringement. Then Round 4, the defendants reply on invalidity and unenforceability.

As I understand it, that's what they put in their pretrial order. This is their four rounds. And so, what we have offered as an alternative -- it's absolutely consistent with all the issues I have given you -- is that we would go first on infringement as to both parties, and to the extent the pretrial order and proposed findings of fact and conclusions of law are clear enough that we can see that they will present evidence on invalidity, such as where they are -- they take the same position, we have read their expert reports, we would put on our testimony on that.

Then the defendants would go, reply to infringement, make any other points they want to make on invalidity and the inequitable conduct case. And then the third round would simply be any rebuttal, and it would have to be proper rebuttal, by us.

I say that only, Your Honor, because it is a nonjury case. And we were just thinking of, in terms of a more orderly presentation.

Let me tell you what happened with the four rounds. Two of Apotex's experts, Kibbe and Williams, and both of Hospira's spirits, Drs. Myrdal and Calvert, plan to testify about anticipation, obviousness, indefiniteness, enablement, inequitable conduct, and their other two

witnesses, Calvert and Penson, both doctors, will testify
about some of the same issues. And some of them will be
covering infringement as well.

So what will likely happen in the four rounds is
that these experts will go on, come off, come back later, go
on, and come off.

And it's just been my understanding that often
courts like to hear from the experts to the extent they can
all at once to assess credibility.

THE COURT: That has been the practice.

MR. PAPPAS: I say that, this is a suggestion
the plaintiffs are making, understanding that we are
prepared to put on our, if you will, defenses to invalidity
and inequitable conduct out of order in a way that I, quite
frankly, wouldn't propose in front of a jury.

This is nonjury. Judge Sleet, you could keep
it --

THE COURT: You can keep it straight. That is
fair.

MR. HURST: What I just heard is a slightly
different variation on Sanofi would go first on invalidity,
and he said we just pick the core issues that we know are
common. That just means going first on invalidity. The
problem with that kind of presentation is you are shooting
at a target that has not yet been erected. There is a

1    reason the party with the burden of proof goes first.  You

2    will hear our arguments on invalidity.  You will find them

3    persuasive or non-persuasive.  You will have an idea for

4    what you find to be the most compelling.  And, frankly, Mr.

5    Pappas and his group will hear what we have to say and shoot

6    at what they find to be the most effective.

7         The party with the burden of proof typically

8    goes first, and that's all we are proposing.

9         With respect to the four rounds, Your Honor,

10   this is what we are proposing, just to simplify it.

11        Sanofi goes first on infringement because they

12   carry the burden of proof.  Then we get up and put on our

13   case on both infringement, invalidity, unenforceability.

14   Sanofi gets, obviously, to reply on invalidity and

15   inequitable conduct, and also they obviously get a reply on

16   infringement if they want one.  At that point, Your Honor,

17   the trial will be largely over.

18        If we have somebody else, my expectation for a

19   fourth round would be to say to Your Honor, here is the

20   issue that we would like to put an issue up on rebuttal,

21   Your Honor, and we would narrow it to whatever you feel

22   would be helpful, and we would ask for permission to put

23   another witness on, to the extent we get there, because, of

24   course, we wouldn't have had a chance to rebut on

25   invalidity.

1           All we are asking for is that traditional

2    burdens of proof be adhered to, and we think that's the most

3    effective way to present the case from both sides'

4    perspective.

5           MR. DRESNER:  One more point, Your Honor.  What

6    Mr. Hurst just described as putting on our case with respect

7    to our burden of proof, we would do that together.  We would

8    do that collectively.  We wouldn't be wasting time by having

9    Hospira do it and then Apotex do it.  We are going to work

10   together on this because there are, as you have heard Mr.

11   Pappas say, a whole lot of overlapping issues.

12          THE COURT:  Mr. Pappas.

13          MR. PAPPAS:  Your Honor, this is obviously a

14   matter, as are many of the things in trial, that is left to

15   your own discretion.  Obviously, whichever way you want to

16   proceed is fine with us.

17          My answer is, what I think I heard was maybe not

18   four rounds, really three rounds --

19          THE COURT:  I think that's what you heard.

20          MR. PAPPAS:  -- with the possibility of

21   rebuttal.  Your Honor, we think our proposal is better.

22          THE COURT:  Mr. Pappas, that seems to be a

23   reasonable compromise between the parties on this issue.

24   And that's what I will do.

25          MR. PAPPAS:  Your Honor, that is fine.  Our

1  presentation, just so Your Honor understands, the

2  presentation of our case on infringement and the inventors

3  and how the story took place, normally in that presentation,

4  we may discuss some of the more critical pieces of prior

5  art, just so we can explain them in the context of the

6  invention.

7         THE COURT:  That is fine.

8         MR. PAPPAS:  Because there are no bright lines

9  on this.

10        THE COURT:  I think that's right.  I think Mr.

11 Hurst is looking for mischief there.

12        MR. HURST:  Obviously, there are limits on what

13 happens, and we will see how it plays out, Your Honor.  But

14 I understand your ruling.  We are not going to jump up every

15 time they mention anything relating to invalidity.

16        THE COURT:  Thank you.  Good.

17        Counsel should keep also in mind that, while

18 teachers will tell you that repetition is a good thing for

19 learning, be careful about how much repetition you have.

20        MR. PAPPAS:  I understand.

21        THE COURT:  It can become a negative.

22        MR. PAPPAS:  Your Honor, may I raise something,

23 in light of the streamlining process and getting some

24 guidance from Your Honor?

25        This is another issue.  Hospira has put down in

1    their possible witnesses, they have listed 34 may-call,

2    live, or by deposition witnesses.

3            If these witnesses had been deposed, we don't

4    have any objection.  However, to the extent Hospira and/or

5    Apotex are going to attempt or intend to try to call live

6    witnesses that were not on their 26(a) disclosures, then we

7    will object.

8            We don't know if we are going to have an issue.

9    But we would like some guidance from Your Honor, because,

10   quite candidly, Your Honor, in getting ready for a trial

11   three and a half, four weeks from now, we don't think it's

12   fair to have to prepare potential crosses for 34 witnesses

13   that are in this "may call live" category.  It seems to me

14   at this juncture we are asking for the Court's assistance

15   here if possible to get some narrowing.

16           And maybe we don't have an issue.  Maybe the

17   only witnesses Apotex and Hospira intend to call live are

18   ones they identified on their 26(a)(1) disclosures.  If so,

19   that's fine.  But if they are intending to call witnesses

20   that they didn't put on their 26(a)(1) disclosures, then we

21   do object.

22           We would just like to know if we have an issue

23   about this and to avoid morning conferences on the first day

24   of trial.

25           MR. ALY:  Your Honor, there are a number of

1    witnesses.  The source for the number of witnesses that were

2    on that list are either our initial disclosures, people who

3    were deposed, people who are in our interrogatories, and the

4    fourth category -- I think this is where if dispute lies --

5    people who are on Sanofi's initial disclosures but then now

6    they have decided for one reason or another to not call

7    those particular witnesses in that fourth category.

8            To that extent, if that is all they are asking

9    for, is for specific witnesses that were on their initial

10    disclosures but we shouldn't call them, we have tried twice

11    to reach out to them by e-mail over the last week to say,

12    what is it that you are asking for in terms of this relief?

13    Because maybe we will agree on something and we won't waste

14    Court's time with it.  They didn't respond to either those

15    e-mails, Your Honor.  I think Mr. Pappas is correct, there

16    might be agreement here.  There might be an issue with

17    rebuttal on authentication, those kind ever things.  But in

18    general I think we are all on the same page.

19            THE COURT:  I am not going to delve into this

20    any further.  Counsel, you are going to have to talk about

21    this.

22            MR. PAPPAS:  Very well, Your Honor.  We at least

23    wanted to surface the issue.  Hopefully, we will be able to

24    work it out.

25            THE COURT:  Just for a moment, let's revisit the

1    amount of time we are going to need, and do it with this

2    information to plug into your computers.

3              What we should plan on is a 9-to-5 day, with an

4    hour for lunch.  We will all need bio breaks in the

5    morning -- I will, anyway, I will speak for me --

6              MR. PAPPAS:  We will, Your Honor.

7              THE COURT:  -- in the morning and the afternoon.

8              MR. PAPPAS:  I will speak for the plaintiffs.

9    We will.

10             THE COURT:  So we are going to get at least six

11   and a half hours of trial time a day.  Multiplied by, let's

12   use seven right now as the multiplier, whatever that comes

13   out to.  I don't know what it comes out to.

14             MR. ALY:  Forty-five and a half.

15             THE COURT:  Divided in half.

16             Mr. Pappas, you were the one who wants the

17   additional time.  What's your reaction to that?

18             MR. PAPPAS:  Your Honor, in preparation for

19   today, we have tried to get a handle on likely witnesses and

20   witnesses we think the defendants are going to call.  Our

21   best estimate at this time is we need about 30 hours,

22   counting our directs and cross, to meet both cases.

23             Again, Your Honor, that is an estimate at this

24   point, because we don't know exactly who the defendants are

25   going to call and how long the examinations will go on.  We

1    tried to make some rough estimates.

2              THE COURT:  These are guesstimates.

3              Mr. Hurst, did you want to chime in?

4              MR. HURST:  Our expectation was we could

5    actually get our case done in three and a half days, 21, 22,

6    23 hours.  That is what we thought we could do.  Obviously,

7    it does depend on how many witnesses sanofi calls.  Our

8    expectation is they probably are not going to call all seven

9    experts.  But if they were going to do that, that takes more

10   time.

11             THE COURT:  I think we are going to be fine on

12   time.  I don't think time is going to be an issue.

13             But you are going to need to talk about this

14   issue of this identification of witnesses.

15             MR. HURST:  On both sides, Your Honor.

16             We did reach one agreement, I don't want to take

17   up your time with this because we actually have an agreement

18   on it, but make a gloss on it.

19             We have agreed that two days, 6:00, two days

20   before a witness gets on the stand , that we tell each

21   other, so we will have time to prepare for that two days,

22   and that the day before we give each other, 6:00 the night

23   before we give each other any administrative exhibits we are

24   going to use and identify what exhibits we expect to use

25   with the witness.

1    I often give my witness order to the other side

2  as far as in advance as I can, and I imagine we could do

3  that because it would help streamline things from both sides

4  and reduce the workload as well.

5         THE COURT:  Mr. Pappas.

6         MR. PAPPAS:  Your Honor, we will certainly

7  cooperate in every way we can.  I think what Mr. Hurst and I

8  worked out this morning was the agreement two days before

9  you get the witnesses, the day before the exhibits, and also

10 the day before any demonstratives.

11        So the parties have reached agreement on that

12 this morning even before the courtroom was open.

13        MR. DRESNER:  Mr. Pappas is correct on that.

14 That is the agreement that we reached this morning.  If we

15 can cooperate to do something else, we will consider

16 streamlining the case.

17        MR. HURST:  We would like more notice.

18        THE COURT:  I understand that.  If you can agree

19 on additional notice -- but you have an agreement, and you

20 can certainly improve on it if you want.  That is fine.

21        All exhibits are in.  So you don't have to move,

22 unless you want to raise objections.

23        MR. PAPPAS:  Your Honor, the parties are trying

24 to work on a common, sort of a joint, I guess, exhibit list,

25 that puts them all together.  Does Your Honor have a

preference about whether you would like that list just in
written form or whether or not you want it CD form?

THE COURT: A writing, it seems to me, is fine,
with a CD.

MR. HURST: Would notebooks per witness be
useful to Your Honor?

THE COURT: Notebooks per witness are useful.
Absolutely.

MR. HURST: As opposed to giving you a huge
number of binders.

THE COURT: That's typically what I see. They
are useful. I do find them useful.

We are going to give them back to you.

What else, counsel?

MR. HURST: Last thing. Opening statements, I
understand Your Honor prefers short opening statements.

THE COURT: I do.

MR. HURST: Just some guidance on that?
Forty-five minutes? There is a lot of different defenses.
My expectation is that would be kind of useful. That range,
45 minutes, 50 minutes, does that sound reasonable to Your
Honor?

THE COURT: That sounds like just about at the
limit of where you need to be.

MR. HURST: Thank you, Your Honor.

1          I am not going to have closing speeches, just so

2     you know.

3          What else?

4          MR. HURST:  I had one more request.  This

5     particular inventor that we would love to see live here and

6     we are not sure if it is going to be possible.

7          THE COURT:  That raises one issue just for a

8     second.

9          What is your plan with regard to non-live

10    testimony?

11         MR. HURST:  My expectation is we would give it

12    to you in written form with the highlighted portions that we

13    want to designate.  And we are going to try to compress that

14    as much as possible.  If there is particular testimony --

15    and this actually related to that issue that I just

16    raised -- if there is particular testimony from a deposition

17    that we think is particularly important, we might ask for

18    leave to play a short portion.  I am talking three-,

19    five-minute type clips in court.  That was our expectation,

20    if that works for you.

21         THE COURT:  My principal concern is that you

22    don't plan on reading to me.

23         MR. PAPPAS:  Your Honor, that would be our

24    proposal as well, to give it to you in video form, certainly

25    not read to you.  But we may also have segments that we

think are important, to give you context about how the

witnesses are testifying.  So we would do the same.  But we

can't tell you about the length.  But we have our clock.  We

are going to use it very carefully.

MR. HERRMANN:  Is Your Honor counting any time

towards the deposition contributions?

THE COURT:  That I am going to view privately?

MR. HERRMANN:  Yes.

THE COURT:  No.  I am not going to count that

against the parties.  That is Court time.  I don't know how

I would even estimate that, quite frankly.

MR. HURST:  There is a particular inventor that

we would like to see live if possible here.  I guess my

question here is whether we can have some order, giving us

notice on whether that person is going to be here live

sooner rather than later, because it is particularly

important to us for trial purposes.  It's Bombra.

MR. SIPES:  We expect that Mr. Bombra will be

here.

Here is the challenge for us.  We expect him to

come.  None of them, none of the three inventors presently

work for the company, so we don't have control over them.

We expect that they will come.  They have raised issues, for

example, about travel, if they are elderly, if there is

swine flew in the United States.

1            I can't force him to come if he will not come.

2    But we are endeavoring to get Mr. Mr. Fabre's cooperation.

3    All three of the inventors are French citizens and they live

4    in France.

5            MR. HURST:  And French speakers as well, so you

6    will have translations in court.

7            MR. PAPPAS:  Which, Your Honor, just to point

8    out, and I forgot to mention, is another reason that we

9    added some time into our 30 hours, because it has been my

10   experience that when you have translators it just takes

11   longer.

12           THE COURT:  Well, it usually takes a little

13   longer.

14           MR. SIPES:  We will try to work with the French

15   speakers to expedite it as much as possible.

16           THE COURT:  We have translations all the time in

17   this Court.

18           MR. HURST:  Just on the inventors, can we get

19   notice when they know that they are actually going to be

20   coming to trial?  That is my request.  It is a big trial

21   preparation issue for us to prepare cross-examination for

22   inventors.  It takes a lot of time and effort.  And two days

23   before does not work.

24           THE COURT:  I should think that would be the

25   professional way to approach it.  You are all professionals.

1    So as soon as it is known, the status of whether the witness

2    will be live or not, that should be made known.

3              MR. SIPES:  We would certainly provide that

4    courtesy.  We would expect the same courtesy.

5              THE COURT:  That underlies this Court's

6    expectation, that lawyers will be civil with one another and

7    treat one another that way.  You are officers of the Court.

8    So you have that obligation, not just to win, but to

9    maintain your credibility with this Court.  You are going to

10   be back this way.  All of you have been here before.

11             Keep that in mind.  Certainly, Delaware counsel

12   should keep that in mind.

13             Okay.  What else?  Anything?

14             MR. PAPPAS:  Nothing from the plaintiffs, Your

15   Honor.

16             THE COURT:  Counsel, have a good day.  Take

17   care.

18             (Counsel respond "Thank you.")

19             (Conference concluded at 12:20 p.m.)

20                      -   -   -

21   Reporter:  Kevin Maurer

22

23

24

25