1          IN THE UNITED STATES DISTRICT COURT

2          IN AND FOR THE DISTRICT OF DELAWARE

3                    -  -  -

4    AVENTIS PHARMA S.A.,        :      Civil Action
     SANOFI-AVENTIS U.S., LLC,   :
5                                :
              Plaintiffs,        :
6                                :
          v.                     :
7                                :
     HOSPIRA, INC., APOTEX, INC.,:
8    and APOTEX CORP.,           :
                                 :      07-721-GMS
9              Defendants.       :      (Consolidated)

10                   -  -  -

11             Wilmington, Delaware
             Thursday, October 29, 2009
12                   9:00 a.m.
               Day 4 of Trial
13
                     -  -  -
14

     BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge
15
     APPEARANCES:
16
             STEVEN J. BALICK, ESQ.
17           Ashby & Geddes
                   -and-
18           GEORGE F. PAPPAS, ESQ.,
             CHRISTOPHER N. SIPES, ESQ.,
19           MICHAEL N. KENNEDY, ESQ.,
             MARK E. GELSINGER, ESQ., and
20           KEVIN B. COLLINS, ESQ.
             Covington & Burling LLP
21           (Washington, D.C.)

22                          Counsel for Plaintiffs

23

24

25

1

**APPEARANCES CONTINUED:**

2

       **MARY MATTERER, ESQ.**

3       **Morris James LLP**
              **-and-**

4       **JAMES F. HURST, ESQ.,**
       **IMRON T. ALY, ESQ.,**

5       **JOVIAL WONG, ESQ., and**
       **ERIC J. MERSMANN, ESQ.**

6       **Winston & Strawn LLP**
       **(Chicago, IL)**

7

                        **Counsel for Defendant Hospira**

8

       **DANIEL V. FOLT, ESQ.**

9       **Duane Morris, LLP**
              **-and-**

10      **ARTHUR DRESNER, ESQ.,**
       **RICHARD T. RUZICH, ESQ. (Chicago, IL),**

11      **KERRY B. McTIGUE, ESQ. (Washington, D.C.),**
       **IAN SCOTT, ESQ., and**

12      **MATTHEW C. MOUSLEY, ESQ.**
       **(New York, N.Y.)**

13

                        **Counsel for Apotex Defendants**

14

15                   -   -   -

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Good morning.  Please be seated,

2    counsel.  Where were we?

3               Dr. Kaler.

4               You may proceed.

5               ... ERIC KALER, having been previously

6          sworn as a witness, was examined and testified

7          further as follows ...

8                    CROSS-EXAMINATION CONTINUED

9    BY MR. HURST:

10   Q.   Good morning, Dr. Kaler.

11              Just to reorient ourselves, can we put Kaler 2

12   up on the screen, Demonstrative Exhibit Kaler No. 2.

13              Dr. Kaler, we talked yesterday about your

14   definition of basic and novel properties.  We end up with a

15   checkmark in the bottom right-hand corner.  Do you recall

16   that?

17   A.   Yes, I do.

18   Q.   No checkmarks for chemical or physical stability of

19   the stock solution.  Correct?

20   A.   That's right.

21   Q.   Mr. Young, can you please turn to Joint Trial Exhibit

22   60T, please.

23              If you need a copy, I will get you one, Dr.

24   Kaler, but I just want to reference two paragraphs in this

25   document.  It's on the screen.

1    A.    Okay.

2    Q.    Do you see at the top here the date and the To-From?

3    This is April 23rd, 1992.  Do you see that?

4    A.    Yes, I do.

5    Q.    And it's from a Mr. Dupechez to a Mr. Fabre.  Do you

6    see that?

7    A.    Yes, I do.

8    Q.    You understand they are the inventors on the '561

9    patent that you have offered opinions on?

10   A.    They are two of the three inventors.

11   Q.    Correct, two of the three.

12             Let's go back, and please blow up for me the

13   last two full paragraphs.

14             Do you see where it says, Two formulations then

15   allowed the preclinical and clinical development to go

16   forward?

17   A.    Yes.

18   Q.    And you see where it says Formulation No. 1?

19   A.    Yes.

20   Q.    And that matches up with Claims 2 and 10, in your

21   view, of the '561 patent.  Correct?

22   A.    Well, first off, I think we have to agree or establish

23   that that RP56976 is docetaxel.

24   Q.    And you understand it is docetaxel, right?

25   A.    That's my understanding.  I know it is an RP number.

1    I don't recall that it is precisely that number.

2    Q.    Is it correct or incorrect that Formulation 1 in your

3    view, with ethanol, polysorbate 80, and docetaxel falls

4    within the scope of the claims that you have offered

5    opinions on?

6    A.    Yes, it does.

7    Q.    Now go down to the next paragraph, please.

8          Do you see where it says, the important points

9    identified for these two formulations are...?

10   A.    Yes.

11   Q.    And you see the first line there, The physical and

12   chemical stability of the stock solution, do you see that?

13   A.    Yes, I do.

14   Q.    They would be the four quadrants that I put up, that

15   would be the top two boxes where we had no checkmarks for

16   your opinion.  Is that correct, sir?

17   A.    That would be correct, yes.

18   Q.    Hospira has extra ingredients beyond the three

19   ingredients listed in the '561 patent.  Correct?

20   A.    I am sorry, Mr. Hurst?  I was distracted, because

21   where you had pointed me early, it identifies the stock

22   solution as ethanol and polysorbate 80, or also just in

23   polysorbate 80 alone.

24   Q.    I was focusing on, do you see where it says, the

25   physical and chemical stability of the stock solution?

1  A.  Yes.

2  Q.  Then there is two alternatives there.  Right?

3  A.  That's right.

4  Q.  One of the alternatives, the ethanol and the

5  polysorbate 80 50-50.  Do you see that?

6  A.  Yes.

7  Q.  That's the one that you have offered an opinion on

8  that matches up with the claims in the patent.  Right?

9  A.  That's correct.  I just wanted to be clear about the

10  last one, the polysorbate 80 only.

11  Q.  I was asking about the first one.  You understood

12  that?

13  A.  Just to be clear.  I do understand that, yes.

14  Q.  Now, you understand, also, that Hospira adds

15  ingredients, two ingredients, beyond the three ingredients

16  listed in the claims that you have talked about.  Correct?

17  A.  Yes, that's correct.

18  Q.  And those two ingredients are PEG 300 and also citric

19  acid.  Right?

20  A.  That's right.

21  Q.  And you understand that PEG 300 is a solvent.

22  Correct?

23  A.  PEG 300 is a solvent, yes.

24  Q.  And so our stock solution is a three-solvent stock

25  solution.  Correct?

1    A.    It contains ethanol and PEG 300, which are solvents,

2    and polysorbate 80, which is a surfactant in the final

3    perfusion application.

4    Q.    In our stock solution, am I correct -- is this correct

5    or incorrect if you can help me, to speed things along:  Am

6    I correct that Hospira's stock solution is a three-solvent

7    system?

8    A.    I would agree with that.

9    Q.    Because it has PEG 300, polysorbate 80 and ethanol in

10   the stock solution, all three of which are solvents.

11   Correct?

12   A.    Correct.

13             THE COURT:  Is a solvent the same thing as a

14   surfactant?

15             THE WITNESS:  That is the point I was trying to

16   push back on Mr. Hurst --

17             THE COURT:  You don't have to accept his

18   characterizations, you can push back, Doctor.

19             THE WITNESS:  I understand that.  Thank you.

20             The point -- it's a very important distinction

21   to make.  The solvents in these products are PEG 300 and

22   ethanol.

23             In the stock solution, where there is also

24   polysorbate 80, it is acting as a solvent but its purpose in

25   that formulation is to serve as a surfactant in the ultimate

1    perfusion.

2              So there is that sort of dual nature that it

3    serves, whether it's in the stock solution or the perfusion

4    bag.  And I just wanted to be clear on that.

5    BY MR. HURST:

6    Q.    For a surfactant to act as a surfactant, they have to

7    be in the presence of water.  Correct?

8    A.    Well, actually, no.  Surfactants could be surface

9    active.  The name is a contraction of surface active agent.

10   So you could have a molecule that is surface active in the

11   presence of oil and a surface, whether that's solid or

12   liquid.

13   Q.    Do you remember testifying yesterday to the following

14   on Page 523 during your direct examination:  It was all

15              "Question:  All right.

16              "Answer:  So this is a stock solution.

17              "Question:  Where are the micelles?

18              "Answer:  There are no micelles in the stock

19   solution.

20              "Question:  Why?

21              "Answer:  Because there is no water."

22              Do you remember giving those answers to those

23   questions?

24   A.    Yes.

25   Q.    So, now, a surfactant can be both a solvent and act as

1    a surfactant.  True?  It can function in both roles.

2    Correct?

3    A.    Depending on the environment in which it's in, yes.

4    Q.    So in our stock solution, Hospira's stock solution, we

5    have three solvents.  You agree with that?

6    A.    I would agree with that as long as we realize that the

7    surfactant is a different kind of solvent than the PEG 300

8    and the ethanol.

9    Q.    Right now my only question is, you and I both agree

10   it's a three-solvent system in Hospira's stock solution.

11   True?

12   A.    You keep saying that --

13             THE COURT:  He has answered this question.  You

14   are not getting exactly the answer you want, Mr. Hurst.  But

15   that is in the nature of your business.

16   BY MR. HURST:

17   Q.    You understand the claims consist essentially of a

18   two-solvent system.  Correct?

19   A.    Well, the claims consist essentially of docetaxel,

20   ethanol and polysorbate 80.  So ethanol and polysorbate 80

21   are those two, yes.

22   Q.    So the answer is yes?

23   A.    The two elements.

24   Q.    And you understand that in order to get those

25   claims -- you read the prosecution history to help develop

1    your opinions in this case.  Right?

2    A.    Yes, I did.

3    Q.    You understand that in order to get those claims, the

4    applicant distinguished three-solvent stock solutions from

5    two-solvent stock solutions.  Correct?

6    A.    I believe you are talking about the Tarr reference?

7    Yes.

8    Q.    The answer is yes.  Right?

9    A.    Yes.

10   Q.    Let's take a look at Joint Trial Exhibit 59, please.

11             MR. HURST:  May I approach, Your Honor?

12             THE COURT:  Yes.

13   BY MR. HURST:

14   Q.    So you are familiar with this response to a rejection

15   from the Patent Office by I guess it was Rhone-Poulenc at

16   the time?

17   A.    Yes, I believe I have seen this before.

18   Q.    So the examiner rejected the claims and these were the

19   arguments that the applicant made to try to get the claims

20   issued.  You understood that?

21   A.    I believe that's correct, yes.

22   Q.    So let's take a look at Page 3.  The rejection was

23   over a reference called Tarr.  Is that correct?

24   A.    That's right.

25   Q.    Why don't we blow up the second paragraph -- that's

1    the paragraph.  Right.

2            This is the response to the rejection,

3    "Applicants respectfully traverse the rejection."

4            That's how they say it in patent prosecutions .

5    A.    I understand that.

6    Q.    Then it says, "The presently claimed invention teaches

7    Taxol or a Taxol derivative dissolved in ethanol and

8    polysorbate."

9            Do you see that?

10   A.    That's right.

11   Q.    That's two solvents.  Right?

12   A.    Well, one of them is a surfactant.  We have been over

13   that.

14   Q.    Let's go to the next page.  Stay there, let's go to

15   the bottom of that page and blow up the last paragraph.

16            So it says, "In contrast, Tarr teaches Taxol

17   dissolved in a three-solvent system."

18            Do you see that?

19   A.    Yes, I do.

20   Q.    And it says, "...ethanol, polysorbate and pluronic

21   L64."

22            Right?

23   A.    That's right.

24   Q.    And this is a stock solution.  Right?

25   A.    I believe it is.

1   Q.   And you know that because they list the three solvents

2   as 30 percent, ten percent, and 60 percent.  Do you see

3   that?

4   A.   Yes.

5   Q.   And that adds up to a hundred.  Right?

6   A.   Yes.

7   Q.   So that means it's not diluted.  Right?

8   A.   That's right.

9   Q.   Now go to the next page.  Why don't you blow up the

10  top paragraph.

11        Here they are talking about "consisting

12  essentially of."  Do you see that?

13  A.   Yes.

14  Q.   And they talk about whether or not the ingredients

15  that Tarr adds materially affect the basic and novel

16  characteristics of the claimed composition.

17        Do you see that?

18  A.   Yes.

19  Q.   Right now they are talking about the material -- they

20  are talking about the basic and novel characteristics of the

21  stock solution.  Right?

22  A.   Claim 1 is a stock solution claim, that's right.

23  Q.   And you didn't offer any opinions about what the basic

24  and novel properties are in the stock solution.  Is that

25  right?

1      MR. COLLINS:  Your Honor, I object.  I don't

2  know if we are revisiting claim construction or not.  It

3  seems we are going that way.

4      MR. HURST:  This goes directly to the witness'

5  understanding of basic and novel properties.  He offered

6  opinions.  That includes the patent and prosecution history.

7      So I believe this is more than fair game, Your

8  Honor.

9      MR. COLLINS:  Your Honor, I think this argument

10  was advanced at claim construction and was rejected.

11      MR. HURST:  That is not correct.  You left it

12  for this hearing.

13      THE COURT:  I don't think this goes to claim

14  construction so much.  I think its goes to the Doctor's

15  understanding of at least his opinions about what the basic

16  and novel properties of his patent are.  I don't think I

17  offered a view in the construction process.  I merely

18  construed the terms.

19      MR. HURST:  I will withdraw the question.

20  BY MR. HURST:

21  Q.    And so, but you didn't -- my last question was, and

22  I'm not sure if I got an answer, you didn't offer any

23  opinion about the basic and novel properties of a stock

24  solution; is that correct?

25  A.    I identified the basic and novel property of the

1    perfusion.

2    Q.    Okay.  So the answer is yes, you did not offer -- the

3    answer is yes; right?

4    A.    Correct.

5    Q.    Okay.  And so here, you'll see where the next sentence

6    says, present Claim one, as written, consists essentially of

7    a two-solvent system.

8            Do you see that?

9    A.    Yes.

10   Q.    And then they say for Tarr to render the present

11   claims obvious, the addition of the solvent pluronic L64 --

12   they call it solvent; right?

13   A.    They do call it a solvent, and we both know it's a

14   surfactant, but that's okay.  Call it a solvent.

15   Q.    But in the stock solution, there's no water; right?

16   A.    That's right.

17   Q.    So pluronic L64 in the stock solution is acting as a

18   solvent?

19   A.    It's functioning as a solvent.

20   Q.    Then they say the addition of the solvent pluronic L64

21   would have to not materially affect the basic and novel

22   characteristic of the claimed composition.

23            Do you see?

24   A.    Right.

25   Q.    And then they move on and they say, however, pluronic

1   L64 constitutes 60 percent of the solvent system, a

2   considerable percentage; right?

3   A.    Right.

4   Q.    And do you know how much PEG is in Hospira's solution,

5   sir?  It's over 50 percent; correct?

6   A.    It is over 50 percent, right.

7   Q.    And then they say, certainly, there is no teaching or

8   suggestion in Tarr that Tarr's composition would work when

9   missing a component which makes up over half of its solvent

10  base.

11           Do you see that?

12  A.    Yes.

13  Q.    And for PEG 300 in Hospira's formulation, you didn't

14  do any experimentation, did you, to see whether Hospira's

15  formulation would work if it was missing over half of its

16  solvent base, PEG 300; is that correct?

17  A.    That's correct, I didn't do any testing.

18  Q.    Now, sir, for your infringement analysis, you've

19  interpreted the claims more broadly than how they were

20  argued in order to get the claims in the first place through

21  the prosecution history.

22           Do you agree with that?

23  A.    I don't know that that is true, Mr. Hurst.  I would --

24  I don't know that that is true.  I think they were argued

25  pretty broadly in an equivalent way here, but I don't have

1    an opinion about that.

2    Q.    Okay.  But at least here, they made a sharp

3    distinction between three solvents and two solvents; is that

4    correct?

5    A.    Well, they distinguished the Tarr formulation from

6    their formulation in terms of how it works and then it's how

7    it works in the perfusion.  So there's more to the story,

8    but they do make that distinction.

9    Q.    We both agree claim 1 relates to a stock; right?

10   A.    Well, claim 2, yes.  Depending on claim 1, right, as a

11   stock solution.

12   Q.    Claim 2 is dependent on claim 1; right?

13   A.    Yes.

14   Q.    But we both agree that both claim 1 and claim 2 relate

15   to a stock; right?

16   A.    Yes.

17   Q.    And here they're talking about a stock; right?

18   A.    Yes.

19   Q.    And hear the distinction they draw is between a

20   two-solvent system and a three-solvent system; right?

21   A.    Yes.

22   Q.    Thank you.  Now, in terms of the breadth of how you're

23   arguing the claims compared to how they were argued in the

24   prosecution history, they were arguing that a Tarr-type

25   formulation wouldn't fall within the scope of the claims

1    there?

2              THE COURT:  The doctor isn't arguing anything.

3    Don't mischaracterize it.

4              MR. HURST:  I was saying "applicants."  Did I

5    say "doctor"?

6              THE COURT:  You said how he's arguing.  He's not

7    arguing.  He's testifying in response to your questions.  He

8    isn't making an argument.

9              MR. HURST:  I think I said applicants were

10   arguing.

11             THE COURT:  I misheard.

12             MR. HURST:  It might have been me misspeaking.

13             THE COURT:  I don't think I did.  But go ahead.

14             MR. HURST:  It's possible.

15   BY MR. HURST: .

16   Q.   Applicants were arguing here that the claims didn't

17   cover a Tarr-type formulation; isn't that correct?

18   A.   That's true.  They're arguing that Tarr doesn't make

19   their claim obvious.

20   Q.   Okay.  And let's put up Kaler 6, please.

21             Now, you understand that etoposide is a prior

22   art formulation; is that correct?

23   A.   Yes, I do.

24   Q.   And it has polysorbate 80 and ethanol in it; is that

25   correct?

1    A.    It does.  It does not have docetaxel in it.

2    Q.    Right.  That's true.  But if you were to swap out

3    etoposide with docetaxel, we could call it an etoposide-type

4    formulation.  That would be a fair way to put it; right?

5    A.    Well, these are the carriers in the etoposide

6    formulation.  I will give you that.

7    Q.    All right.  Now, in addition to the polysorbate 80 and

8    ethanol, which matches up with claim 1, there's also citric

9    acid, benzyl alcohol and polyethylene glycol; correct?

10   A.    Correct.

11   Q.    Now, as you understand the situation and as you

12   construe the claims, those three ingredients do not impact

13   the basic and novel properties that you've identified for

14   the claims of the '561 patent; correct?

15   A.    I'm a little confused by that.  Could you -- maybe I

16   just missed a question.  Could you repeat it?

17   Q.    Sure.

18            MR. COLLINS:  Mr. Hurst, I'm sorry.  Can we just

19   have clarification as to what this formulation is?  I'm not

20   sure this is the formulation he has been questioned about

21   and offered opinions.

22            MR. HURST:  He has offered opinions in the

23   etoposide formulation in the context of his expert reports

24   and this also relates to his understanding of basic and

25   novel properties, your Honor.

Kaler - cross

1        THE COURT:  What are we looking at?

2        MR. HURST:  This is --

3        THE COURT:  I asked, what are we looking at?

4   That's your question?

5        MR. COLLINS:  Yes.

6        THE COURT:  I am asking, what are we looking at?

7        MR. HURST:  This is a depiction of the

8   formulation for the prior art compound called etoposide that

9   we talked about yesterday, your Honor.

10       THE COURT:  Do you agree that this is the

11  depiction of the formulation that was discussed yesterday?

12       THE WITNESS:  I actually didn't see it discussed

13  yesterday, and I don't remember off the top of my head all

14  of the formulations I've looked at.

15       THE COURT:  I don't know why you put this in

16  front of the witness and asked him to comment on it

17  authoritatively after what he just said.

18       MR. HURST:  I will tie it up, your Honor.

19       Can you go to -- page through until I see

20  etoposide, please?  Stop right there and blow up table one

21  for me, please.

22  BY MR. HURST:

23  Q.    This is one of the articles that you reviewed during

24  your work in this case; is that correct, Dr. Kaler?

25  A.    Yes, it is.

1   Q.      And you see the list of ingredients there?

2   A.      Yes.  And this is -- part of my problem with your

3   previous slide actually is that it had an error.  You

4   identified polysorbate 300, and it's polyethylene glycol

5   300, and that was one of my causes of confusion.

6   Q.      I think the slide matches up.  But, in any event,

7   you'll agree -- we'll just use this, this is fine.  Citric

8   acid, benzyl alcohol, polysorbate 80 polyethylene glycol and

9   absolute ethanol, those are the ingredients in the prior art

10  compound, etoposide; is that correct?

11  A.      That's true.

12  Q.      And so in addition to solvents listed in claim 1,

13  there's citric acid, benzyl alcohol and polyethylene glycol;

14  is that correct?

15  A.      That's correct.

16  Q.      And as you understand the situation, the role of these

17  extra ingredients would not impact the basic and novel

18  properties that you've identified in this case for claim 1

19  of the '561 patent; is that correct?

20  A.      Well, again, the '561 patent is about a different

21  active than etoposide.  So we're apples and oranges here in

22  terms of comparing a formulation.

23  Q.      You had your deposition taken in this case?

24  A.      Yes, I did.

25          MR. HURST:  Okay.  Can we see 427, line 12,

1  please?

2           (Videotape deposition excerpt played as

3  follows.)

4           "Question:  As you understand the role of these

5  extra ingredients in the etoposide formulation, the citric

6  acid, the benzyl alcohol and the PEG 300, those three

7  ingredients, as you understand the situation, would not

8  impact the basic and novel properties that you've identified

9  for claim 1 of the '561 patent; right?

10          "Answer:  In the perfusion bag, yes.

11          "Question:  That's what you say matters, right,

12  the perfusion bag?

13          "Answer:  Right.

14          "Question:  Okay.  So you don't need that

15  qualification.  It's just a yes, isn't it?

16          "Answer.  Yes."

17  BY MR. HURST:

18  Q.   Now, you gave that answer to that question?

19  A.   I believe I did, yes.

20  Q.   Okay.  So let me talk about a different topic.

21          Yesterday, you opined that Taxotere is covered

22  by the claims; is that correct?

23  A.   I did, yes, sir.

24  Q.   All right.  And the premix bottle, you're familiar

25  with the premix bottle that Taxotere -- let me break it

1   down.

2              It first comes in two vials; right?

3   A.    Yes.

4   Q.    And then they get mixed together into a premix bottle;

5   right?

6   A.    Yes.

7   Q.    And is it your view that the premix bottle is covered

8   by the asserted claims that you are opining on?

9   A.    We call it stock solution, but, yes.

10  Q.    Okay.  The premix is a stock solution?

11  A.    Right.

12  Q.    And just like Hospira, the premix has extra

13  ingredients in it, is that correct, beyond the two in the

14  claims?

15  A.    Well, it has water.

16  Q.    It has water, right, and it also has citric acid; is

17  that correct?

18  A.    The Taxotere formulation, as manufactured now, I

19  believe does also have citric acid in it.

20  Q.    Okay.  And so those two ingredients, they impact the

21  stability of the stock solution, you'd agree; right?

22  A.    Well, I think I've testified that the presence of the

23  citric acid doesn't alter the basic and novel properties of

24  a perfusion.

25  Q.    I was asking about the stock solution.

1    A.    Stock solution, same thing.

2    Q.    So my question, I guess, is, would you at least

3    agree -- well, then, the water.  Would you agree that the

4    water in the premix stock solution impacts the stability of

5    that stock solution?

6    A.    In the sense that if you took the water out, you'd

7    have different stability than if you had the water in.  Is

8    that your question?

9    Q.    Yes.

10   A.    Then, yes, it would.

11   Q.    And, in fact, that premix only lasts about eight

12   hours; is that right?

13   A.    I don't recall the label instructions, but it is a

14   specific time.  Probably eight hours is a fair

15   representation.

16   Q.    And that's not particularly long for a stock solution.

17   You would agree with that, wouldn't you?

18   A.    No, I don't know that.  And, again, I'm not a medical

19   expert, but I would imagine that stock solutions are made

20   and used relatively rapidly afterwards.  I wouldn't imagine

21   you'd leave them sitting around for very long.  But, again,

22   I don't know that.

23   Q.    Do you know that Hospira's stock solution lasts for

24   two years?

25   A.    Yes.

1  Q.   Okay.  Let's turn back to Joint Trial Exhibit 059.

2  And can you please turn to Page 4?

3          Now, this is what -- this was the argument we

4  reviewed with respect to the stock solution a few minutes

5  earlier; right?

6  A.   Yes.

7          MR. HURST:  Can you blow up the next paragraph?

8  BY MR. HURST:

9  Q.   Do you see where it says, "in addition"?

10 A.   Yes.

11 Q.   Now they are talking about the perfusion; right?

12 A.   Let me just read.  Just a second, please.

13          Yes, okay.  You're right.

14 Q.   And what they say is that they're distinguishing Tarr,

15 because they're saying that it's not sufficiently stable

16 when diluted to form an injectable solution.

17          Do you see that?

18 A.   Yes.

19 Q.   Okay.  Now, if you go to the next page, why don't you

20 blow up -- I think everything on the page, we can probably

21 see it.

22          Can you read that okay?

23 A.   I can read it from the paper copy you gave me.  Thank

24 you.

25 Q.   Okay.

1    MR. HURST:  Can you see okay, your Honor?

2   BY MR. HURST:

3   Q.    Now, so, what they did is, they ran some tests; right?

4   They replaced the active ingredients in Tarr with Taxotere;

5   is that right?

6   A.    Yes.

7   Q.    And otherwise it was all the same ingredients as the

8   Tarr formulation; is that correct?

9   A.    I believe that's correct.

10   Q.    And the chart here at the bottom has the Taxotere

11   results; is that correct?

12   A.    It appears to be, yes.

13   Q.    And they say that this stock solution they report

14   lasts four hours and 30 minutes.

15           Do you see that?  I'm sorry.  It's a perfusion.

16   I called it a stock.

17   A.    Yes, it's a perfusion.  Thank you.

18   Q.    This perfusion remains physically stable for four

19   hours and 30 minutes.

20           Do you see that?

21   A.    Yes.

22   Q.    And so this actually relates to the quadrant at the

23   bottom right that relates to your opinion; is that correct?

24   A.    The bottom right, yes.  Physical stability of the

25   perfusion.

1  Q.     Right.  And they say that's not enough; right?  They

2  say that's not long enough?

3  A.     Right.  The inventors have claimed about eight hours

4  as long enough.

5  Q.     Okay.  And they say actually right there, they say, as

6  shown, a diluted solution containing .8 milligrams per

7  millimeter of Taxotere and Tarr's three-solvent system

8  showed signs of precipitation after four hours and

9  30 minutes; right?

10  A.     Right.

11  Q.     So the perfusion lasted that long and then it crashed

12  out?  It precipitated?

13  A.     Right.  That's a more technical term.  Yes.

14  Q.     Now, as I said, you've stated that it was your opinion

15  that Taxotere falls within the scope of the claims; is that

16  correct?

17  A.     That's correct.

18  Q.     Let's take a look at the Joint Trial Exhibit 70,

19  please.

20          MR. HURST:  May I approach, your Honor?

21          THE COURT:  Yes.

22          THE WITNESS:  Thank you.

23          THE COURT:  We have it already.

24          MR. HURST:  I'm sorry.

25  BY MR. HURST:

1  Q.    Now, do you recognize this as the Taxotere product

2  insert?

3  A.    It's appears to be, yes.

4  Q.    Okay.  Take a look at the third page, please.

5  A.    I'm sorry.  Which page?

6  Q.    The third page.

7  A.    Okay.

8  Q.    And let's blow up the -- I'm sorry.  The fourth page.

9  My mistake.

10        Let's blow up the paragraph that says stability

11  right above dosage forms and strengths.

12        Do you see where it says Taxotere infusion

13  solution?

14  A.    Yes.

15  Q.    You understand that to be the perfusion; right?

16  A.    That's true, yes.

17  Q.    And they say if stored between, and they give some

18  temperatures there, is stable for four hours; right?

19  A.    That's what it says.

20  Q.    And that's less than the four hours and 30 minutes

21  that was referenced in the prosecution relating to the Tarr

22  formulation; is that right?

23  A.    The four hours is less than four-and-a-half hours,

24  right.

25  Q.    It actually says you should use this within four

1    hours, including the one-hour I.V. administration; right?

2    A.    That's right.

3    Q.    Now, you testified also that Hospira's product falls

4    within the scope of the claims; right?

5    A.    Yes.

6    Q.    Now, your counsel didn't ask you any questions about

7    how long Hospira's product remains physically stable, did

8    he?

9    A.    I don't recall that he did, no.

10   Q.    But it's your view that if a perfusion lasts less than

11   four-and-a-half hours, it's not covered by the claims.  Is

12   that your view?

13   A.    Well, we've been talking about this a lot before.  The

14   inventors -- the '561 patent identifies physical stability

15   and the time scale they give for physical stability is eight

16   hours, so I'm basing my understanding of adequate physical

17   stability in the eight-hour range.

18   Q.    Okay.  So you have no opinion regarding whether any

19   perfusions that last or are physically stable for less than

20   eight hours do or do not fall within the scope of the

21   claims; correct?

22   A.    I identify the eight-hour time period as adequate.

23   It's a bits of a gray area.  If it's -- if it's a very short

24   time, it's not adequate physical stability.  If it's close

25   to eight hours, it's adequate physical stability.  And, you

1    know, where in that -- it's simply a gray area in that time

2    frame.

3    Q.    Let's take it a step at a time.  Say I have a

4    perfusion that lasts only three hours.  You're comfortable

5    saying that falls outside the scope of the claims in the

6    '561 patent; right?

7    A.    I believe two or three hours would not be adequate.

8    But, again, you know, I don't administer perfusions.

9    Q.    And so between, let's say, four and six hours, you

10   have no opinion, do you, on whether a perfusion that lasts

11   that long would fall within the scope of the claims;

12   correct, sir?

13   A.    It might or might not, so I don't have a yes or no

14   opinion about it.

15   Q.    Okay.  And you don't know how long Hospira's perfusion

16   lasts, do you, sir?

17   A.    No, I don't.

18   Q.    And so when yesterday you gave the opinion that

19   Hospira's perfusion meets the claims, you also didn't know

20   how long the perfusion lasted, did you, sir?

21   A.    That's true.  I assumed that it lasts long enough.

22   Q.    You assumed it lasted eight hours, didn't you?

23   A.    Yes.

24   Q.    And that was the basis of your opinion; right?

25   A.    In terms of the adequate physical stability, yes.

1          MR. HURST:  Could I have a moment, Your Honor?

2          THE COURT:  Yes.

3          (Pause.)

4     BY MR. HURST:

5     Q.    One last topic.

6          You know that today Taxotere includes citric

7     acid.  Correct?

8     A.    I believe that the commercial product as sold today

9     contains citric acid.

10    Q.    Just like Hospira's product.  Right?

11    A.    Well, I don't know the concentration of citric acid in

12    Taxotere.  So I don't know if it's the same or not.

13    Q.    And you understand that the reason -- you understand

14    the timing and when it was added to the product?

15    A.    You asked me questions about that during my

16    deposition, and I don't recall the precise dates.  But I

17    know we went through an exchange, I believe, that was around

18    the late 1990s.

19    Q.    Why don't we look at Hospira's Trial Exhibit 344. .

20         This is a letter from Rhone-Poulenc to the FDA

21    dated November 17, 1997.  Right?

22    A.    Yes, sir.

23    Q.    And it relates to the change in their formulation.

24    Correct?

25    A.    That's correct.

1   Q.    And if you take a look at Page, my page is marked 13,

2   but how about we use a Bates stamp:  5501.  Blow up the

3   composition there.

4           Do you see where they talk about the change in

5   the formulation in the first paragraph?

6   A.    Yes.

7   Q.    And the second sentence of the paragraph beginning

8   with Taxotere solutions, you will see, The only difference

9   between the two formulations, do you see that sentence?

10  A.    Yes, I do.

11  Q.    And they talk about the fact that they use a different

12  grade of polysorbate 80 containing 1.4 milligrams of citric

13  acid?

14  A.    That's right.

15  Q.    So they added citric acid.  Right?

16  A.    Well -- let me sort of cut to the chase with my

17  problem with this.

18          I don't know what the other grade of polysorbate

19  80 contains, if that's free of citric acid.  But they

20  certainly are calling it out now.  So I presume they are

21  making that change.  But I just don't fully know the

22  situation before then.

23  Q.    That's fine.  But they are calling out the citric acid

24  here.  Right?

25  A.    They certainly are.  I agree.

1  Q.    That citric acid improved the physical and chemical

2  stability of the formulation.  Correct?

3  A.    I believe it could improve the chemical stability.  I

4  don't know that it improves the physical stability.

5  Q.    And it also improves the physical stability of the

6  perfusion which falls within your quadrant.  Correct, sir?

7  A.    I can't -- I don't know that it improves the physical

8  stability.

9  Q.    Let's take a look at Hospira Trial Exhibit 0345.  Why

10  don't we just go to the next page.

11          That is the cover page of an article.

12          You will see here in the title it talks about

13  Docetaxel and a Formulation Update?

14  A.    Yes.

15  Q.    There is two authors there, I want to just focus on

16  the second author.  There is a footnote.  Can we see the

17  footnote?  It's Wendy Palmby.  Do you see that she is

18  scientific communications for Aventis Pharmaceuticals?

19  A.    That's her affiliation, that's right.

20  Q.    Let's go, please, to Page S19 -- that's S12.

21          That's right.

22          See where it says, Docetaxel, Pharmaceutical

23  Issues there?

24  A.    Yes.

25  Q.    And they say, "Recently a new and more physically and

1     chemically stable formulation of docetaxel was developed for

2     use in Europe and in the United States."

3            Do you see that?

4     A.     Yes.

5     Q.     And they talk about the fact that it -- the newer

6     formulation is more stable. Right?

7     A.     That is what it says, yes.

8     Q.     You will see in about the middle, on the right side,

9     "This newer formulation..."

10            Do you see that?

11     A.     Yes.

12     Q.     "This newer formulation also offers a longer shelf

13     life of 18 months for the 20-mg vial and 24 months for the

14     80-mg vial," and they compare that to the older versions,

15     right?

16     A.     For the stock solution's shelf life, yes.

17     Q.     So we are in the top two quadrants for the stock

18     solution at this point. Right?

19     A.     Yes.

20     Q.     That compares to 12 months and 15 months without the

21     citric acid. Right?

22     A.     Right.

23     Q.     If you go, however, to, "More importantly..."

24     A.     "Most importantly," you mean.

25     Q.     Yes.

1    "Most importantly, the newer formulation confers

2    greater stability of the final dilution for infusion."

3         Do you see that?

4    A.    Yes.

5    Q.    That would be in your quadrant, right?  Physical

6    stability?

7    A.    Right.

8    Q.    And it says, "The previous formulation required

9    immediate administration upon mixing the final dilution for

10   infusion."

11        Do you see that?

12   A.    Yes.

13   Q.    That means you mixed the perfusion and the

14   instructions were use it right away?

15   A.    Right.

16   Q.    And they changed the instructions.  Right?

17   A.    Yes -- well, I think the next line says, "although the

18   manufacturer continues to recommend it be used as soon as

19   possible following the dilution."

20        I don't know that they are changing that

21   product.  It says they are continuing to recommend.

22   Q.    We will talk about it.  Then it says, "It may be

23   stored up to four hours now."

24        Do you see that?

25   A.    Yes.

1  Q.    So that's -- immediate is different than four hours.

2  Right?

3  A.    That's true.

4  Q.    And so, if we talk a look at the Physicians' Desk

5  Reference for these two products -- when I say these two

6  products I mean the old formulation versus the new

7  formulation with the citric acid.

8             Let's take a look at Hospira Trial Exhibit 346.

9             MR. COLLINS:  Your Honor, I object.  There has

10 been no foundation made as to what is in the old formulation

11 and the new formulation and it's not clear from this

12 article.

13            THE COURT:  Sustained.  You can establish it,

14 what is in and what is not.

15 BY MR. HURST:

16 Q.    Let's take a look at the first exhibit that we just --

17 let me ask you this:  Have you ever come across any

18 information suggesting that there was citric acid in the

19 original formulation of docetaxel?

20 A.    I don't know that I have.  I haven't specifically

21 looked for that.

22 Q.    And you have been working on the case a while.  Right?

23 A.    Most of the year, yes.

24 Q.    And you -- I was the first person to bring to your

25 attention the citric acid change.  Right?

A.     I --

Q.     At your deposition, as far as you recall?

          MR. COLLINS:  Your Honor, there has been no

foundation laid that there was a change.

          THE COURT:  I think he is trying to establish

that at the present time.

          MR. COLLINS:  Okay, Your Honor.

          THE WITNESS:  I may have been -- I just don't

recall, Mr. Hurst.  That may have been the first time.  I

may have been aware of it in passing before.  I just don't

remember.

BY MR. HURST:

Q.     I refreshed your recollection at the deposition that

the only change was the addition of citric acid.  Do you

recall that, sir?

A.     I believe that's correct.  I am a little vague on it.

But I would accept that characterization.

Q.     Let me try to make sure you are fully refreshed here.

Go to 119, Line 4 of your deposition, to 21.  And we can

blow that up.

          I will read it to you:

          "Question:  The only difference between the two

formulations is that the partially demineralized grade of

polysorbate containing 1.4 milligrams of citric acid per

gram" -- this is from the first letter that we looked at.

1    Then there is a parenthetical, and it goes on to say, "-- is

2    used to prepare the formulation pre solution."

3                Do you see that?

4                "Answer:  Yes, I do.

5                "Question:  Does that help to refresh your

6    recollection on that?

7                "Answer:  It does.  Thank you.

8                "Question:  So the old formulation doesn't have

9    citric acid and the new formulation does have citric acid.

10   Correct?

11               "Answer:  Yes."

12               Do you recall giving those answers to those

13   questions?

14               THE COURT:  Counsel, if you want to object you

15   need to open your mouth.

16               MR. COLLINS:  Objection, Your Honor.  I would

17   like to at least have the witness --

18               THE COURT:  Dr. Kaler, do you need to see it?

19               THE WITNESS:  I would be more comfortable.

20               THE COURT:  Show it to him.

21   BY MR. HURST:

22   Q.    119, Line 4, through 21.  "The only difference," do

23   you see that?

24   A.    Right.

25   Q.    "The only difference between the two formulations is

1   that a partially demineralized grade of polysorbate 80

2   containing 1.4 milligrams of citric acid per gram," then

3   there is a parenthetical, and then it goes after the

4   parenthetical, "is used to prepare the Formulation 3

5   solution."  Do you see that?

6           "Answer:  Yes, I do.

7           "Question:  Does that help to refresh your

8   recollection on that?

9           "Answer:  It does, thank you.

10          "Question:  So the old formulation doesn't have

11  citric acid, the new formulation does.  Is that correct?

12          "Answer:  That's correct."

13          Did you give those answers to those questions?

14  A.    Yes, I did.

15  Q.    So let's take a look at Hospira Trial Exhibit 346.

16  This is the Physicians' Desk Reference from 2000.  Right?

17  A.    Yes, it looks to be.

18  Q.    Let's take a look at the second-to-last page.

19          Why don't you blow up just the first couple

20  paragraphs in the top right-hand corner.

21          Now, you see where it talks about the creation

22  of the premix solution and then the fully prepared Taxotere

23  infusion solution on the fourth line?

24  A.    Yes.

25  Q.    That's the perfusion.  Right?

1   A.      Right.

2   Q.      And it says, "Should be used as soon as possible after

3   preparation."

4           Right?

5   A.      Yes.

6   Q.      That is consistent with the article that we just read

7   in terms of immediate use.  Right?

8   A.      Yes.

9   Q.      So now let's take a look at Hospira Trial Exhibit 347.

10  I have a copy, if you want one.

11  A.      Actually, I would like paper copies of both of these,

12  please, the 2000 and the 2001.  I asked for that because the

13  format is different of these entries.

14  Q.      They changed the format.  You are right about that.

15          Go seven pages in.  This is 2001, a year later?

16  A.      2001, seven pages in.

17  Q.      Why don't we blow up, there is a stability section

18  down there.  You see where it says, "Taxotere infusion

19  solution, if stored between certain temperatures, is stable

20  for four hours."

21          Do you see that?

22  A.      Yes.

23  Q.      Then in contrast to 2000, there is an instruction here

24  about how quickly you should use it.  Right?

25  A.      Yes.

1    Q.    And it's different, isn't it?  It's longer?

2    A.    It's longer.

3    Q.    Now, it says you should use it within four hours,

4    including one hour I.V. administration?

5            Right?

6    A.    Right.

7    Q.    Last topic, Doctor.

8            Let's take a look at Joint Trial Exhibit 107.

9            Now, Dr. Kaler, this is another of a series of

10   reports that Hospira prepared during the preparation of

11   their pharmaceutical formulation.  Do you understand that?

12   A.    I will accept that, yes.

13   Q.    And in preparing for your opinions, you did not review

14   or rely on these.  Is that correct?

15   A.    I do not believe I did rely on this particular

16   document.

17   Q.    In fact, you didn't cite any of Hospira's testing

18   reports in any of your opinions in this case.  Correct?

19   A.    Well, I certainly cited the Hospira reports that

20   Hospira contracted with Dr. Sparreboom to report.  And I

21   cited a lot of reports.  I don't recall whether I cited any

22   of the ones you are referring to or not.

23   Q.    While you bring that up...

24           Dr. Sparreboom's report related to micelle size.

25   We talked about that.  Right?

1  A.    That was one of his reports I relied on, yes.

2  Q.    And he actually didn't do any physical stability

3  testing of perfusions.  Correct?

4  A.    I honestly don't recall if he did or not.

5  Q.    But you didn't cited them to the Court yesterday.

6  Correct?

7  A.    I did not cite any to the Court yesterday, that's

8  correct.

9  Q.    That kind of testing can be done, where you take a

10 formulation with and without the ingredients in question and

11 then just see which one lasts longer in a physical

12 perfusion.  Right?

13 A.    That's how the test would be done, yes.

14 Q.    And it -- I guess it takes what, a few hours, eight

15 hours?

16 A.    It takes how long it takes, yes.

17 Q.    It takes however long it lasts.  Right.

18        Did you ask at any point in time whether or not

19 that would be a good idea to do that testing on Hospira's

20 product to see whether the citric acid in PEG would increase

21 the physical stability of the perfusion?  Did you at any

22 point in time suggest that that would be a good test to do?

23 A.    No, I didn't.

24 Q.    Let's take a look at Joint Trial Exhibit 107.  And I

25 mean of the study.

1    Do you see where it says, To assess the

2  docetaxel formulations at initial time point?

3  A.    Yes.

4  Q.    Let's go to the next page.  Why don't we blow up Table

5  2.

6    Now, yesterday we were talking about Formula 1

7  versus Formula 6.  Do you recall?

8  A.    Yes.  That was a different testing document.  So they

9  may or may not be the same.

10  Q.    You suggested the possibility that Formula 1 might be

11  Taxotere.  Do you recall that?  I know you didn't say that.

12  You said it might be?

13  A.    It might be, yes.  I think that polysorbate number is

14  a little bit too high.

15  Q.    It's not.  Can you confirm from looking at this it's

16  not Taxotere, or do you need more?  I can give you more.

17  A.    Frankly, I thought at ten mgs per ml polysorbate 80 in

18  Taxotere would be 260, not 520, but I could be wrong.

19  Q.    Take a look at the next page, 4 of 5, 3 of 5, let's

20  see 4 of 5.

21    Can you blow up table 5, please?

22    Okay.  Do you see where it says Taxotere at the

23  bottom, 80 milligrams?

24  A.    Yes.

25  Q.    And you see, Formulation 1 is the one you were

1    questioning, whether it might be Taxotere?

2            Do you see?

3    A.    Yes.

4    Q.    And you see that they have different pHs, those two,

5    Formulation 1?

6            MR. COLLINS:  Objection.

7            THE COURT:  What's the basis?

8            MR. COLLINS:  It has not been established that

9    Formulation 1 is Taxotere.  In fact, Dr. Kaler questioned

10   that.

11           MR. HURST:  I'm saying, it's not.  I'm trying to

12   show him that it's not Taxotere.

13           THE COURT:  All right.  Overruled.

14           MR. COLLINS:  Okay.

15           THE WITNESS:  In that case, I agree.  If you

16   read table one or column one as not Taxotere, I don't think

17   it's Taxotere either.

18   BY MR. HURST:

19   Q.    Okay.  You know what, we were maybe miscommunicating.

20   I thought you were trying to say it was.

21           Do you see the pH difference here, 7.7 versus

22   4.5?

23   A.    Sure.

24   Q.    Formulation 1 does not include citric acid; is that

25   right?

1    A.    Double-sided pages make it hard.  I'm sorry.

2              Formula 1 does not contain citric acid.  That's

3    correct.

4    Q.    And what citric acid will do is drop the pH; is that

5    right?

6    A.    Well, any acid will drop the pH.

7    Q.    Including citric acid?

8    A.    Including citric acid.

9    Q.    Do you see that 7.7 is higher, 4.5.  That's because

10   Taxotere has citric acid in it; right?

11   A.    Citric acid will lower the pH, yes, and so Taxotere

12   containing citric acid will have a lower pH than Taxotere

13   not containing citric acid.

14   Q.    All right.  Now let's take a look at table 2 again.

15   Okay.  So claim 1, 2 and -- well, let's just stick with

16   claim 1.  It's the independent claim.

17             Claim 1 lists three ingredients, right?

18   Docetaxel, polysorbate 80, and ethanol; right?

19   A.    Ethanol.  Right.

20   Q.    You'll agree with me, Formula 1 matches up with claim

21   1; right?

22   A.    I would, yes.

23   Q.    And Column 6, in terms of the number of ingredients,

24   that matches up with Hospira's product; right?

25   A.    Let's me just see.  Docetaxel, polysorbate 80, citric

1    acid, alcohol, yes.

2    Q.    That's formula six; right?

3    A.    Formula six would describe a Hospira product.

4    Q.    Okay.  So let's take a look at the last page of the

5    document, it's 5 of 5, and blow up impurity profile there.

6            Okay.  Now, you see that this is impurity

7    profile of docetaxel formulations at initial time point

8    compared with the API and innovator samples.

9            Do you see that?

10   A.    Okay.

11   Q.    Now, there's no indication that this is -- yesterday

12   you called accelerated stability testing being cooked, which

13   I think is a fine description, but that's what you called

14   it.

15           Do you remember?

16   A.    I called it cooked, yes.

17   Q.    So if I found one, there's no heat.  Do you see that?

18   There's no reference to there being heat applied; is that

19   correct?

20   A.    I think there's no cooking.

21   Q.    All right.  And also you mentioned the fact that the

22   accelerated stability testing took place four weeks out.

23           Do you recall that?

24   A.    Yes.

25   Q.    And this is at the initial time point.  As soon as you

1    create the mixture; is that correct?

2    A.    It is, but I'm sorry.  I really have not read it.  Can

3    you just give me a minute-and-a-half to read this?  I would

4    be able to give you a better answer.

5    Q.    Sure.

6    A.    Thank you.

7                 (Pause while witness reviewed exhibit .)

8                 THE WITNESS:  Okay.  Thank you.

9    BY MR. HURST:

10   Q.    Is this the first time you've read this report?

11   A.    Yes.  I don't recall seeing this before, although, you

12   know, I've seen a lot of documents.

13   Q.    Okay.  But this wasn't a report that you considered in

14   developing and offering your opinions in this case; is that

15   correct?

16   A.    No, it was not.

17   Q.    Okay.  So let's take a look at the API line, API-2.

18   A.    Okay.

19   Q.    You understand that's the active ingredient; right?

20   A.    Yes, I believe that's true.

21   Q.    And so as pure as people want to try to make an active

22   ingredient, sometimes there are some impurities in it.  You

23   understand that; right?

24   A.    Absolutely.

25   Q.    So the starting point here is .25, do you see that,

1    total percent impurity?

2    A.    Yes.

3    Q.    Okay.  Now, Formula 6 is the one that matches up with

4    Hospira's product; is that right?

5    A.    Okay.

6    Q.    Do you agree?

7    A.    Yes.

8    Q.    All right.  And so it goes from -- right after the

9    initial mixing, it goes from .25 to .30.

10            Do you see that?

11   A.    Yes.

12   Q.    And then Formula 1 is the one that matches up with

13   claim 1 of the '561 patent; correct?

14   A.    Yes.

15   Q.    And it goes from .25 to .96.  Do you see that?

16   A.    Yes.

17   Q.    So that's almost one-percent impurity right after it's

18   mixed; correct?

19   A.    That appears to be the case.

20   Q.    Okay.  And do you know what the FDA limits are on --

21   when I asked that question yesterday, I got an objection, so

22   I will move on.

23            Let's go to the --

24            THE COURT:  What's critical is you got an

25   objection sustained.

1    MR. HURST: That's what I meant. If it had been

2    overruled, I wouldn't have said that.

3    THE COURT: I didn't think you would.

4    MR. HURST: Okay. Let's go to the two

5    paragraphs above "conclusion."

6    BY MR. HURST:

7    Q.    Do you see where it says, the worst formulations seem

8    to be Formula 1 and 4?

9    A.    Yes.

10   Q.    And, again, Formula 1 matches up with claim 1; right?

11   A.    Yes.

12   Q.    And with a total impurity level reached above

13   .9 percent. Do you see?

14   A.    Yes.

15   Q.    And they talk about the fact that the impurity results

16   showed some of the docetaxel formulations may have started

17   degradation from the initial time point, meaning as soon as

18   they were mixed together. You understood it that way;

19   right?

20   A.    I think that's probably fair, yes.

21   Q.    But then Formula 6, this is Hospira's formulation with

22   the extra PEG and citric acid; right?

23   A.    Right.

24   Q.    And it says at the initial time point, the Formula 6

25   did not produce any significant impurity when compared with

1    API sample.

2              Do you see that?

3    A.    Yes.

4              MR. HURST:  I have no further questions for now,

5    your Honor.  Thank you.

6              THE COURT:  All right, Mr. Hurst.

7              Mr. Collins, redirect.

8              MR. DRESNER:  Your Honor?

9              THE COURT:  I apologize.

10             MR. DRESNER:  I do have a few questions.  Thank

11   you, your Honor.

12   BY MR. DRESNER:

13   Q.    Good morning, Dr. Kaler.

14   A.    Good morning.

15   Q.    You understand that the Apotex product is not the same

16   as the Hospira product, correct?

17   A.    I do understand that.

18   Q.    You've analyzed them both?

19   A.    I have.

20   Q.    Can we take a look at your Demonstrative Exhibit

21   PDX-4-11?  This is your depiction of the premix made with

22   the products that Apotex intends to sell; is that correct?

23   A.    That's right.  And I believe when I presented this

24   yesterday, I also verbally indicated it contained water.

25   Q.    Yes.  That's correct, it does contain water.  Thank

1  you.

2         But my focus is on the polysorbate, the ethanol

3  and the PEG 300, and there was a similar slide for the

4  Hospira product, and I think you agreed, did you not, that

5  these three elements in this premix constitutes a

6  three-solvent system?

7         My question to you is, do you agree that in the

8  Apotex premix, it includes a three-solvent system?

9  A.    And, again, we could -- we could replow the discussion

10  I had with Mr. Hurst about the polysorbate 80 role, but as

11  long as we agree that the polysorbate is a surfactant, we

12  can move forward.  Ethanol and PEG 300 certainly are

13  solvents, and what's interesting about the Apotex premix is

14  that you have water present.

15        So the surfactant may or may not be doing its

16  surfactant duty in that -- in that premix.  I don't know

17  that anybody has tested for the presence --

18  Q.    Excuse me.  Are you finished?

19  A.    I'm sorry.

20  Q.    I just want to make sure you're finished, Doctor.

21  A.    No, I'm good, and I will try to answer your question

22  more correctly.

23  Q.    So I understand your qualification that polysorbate 80

24  functions both as a solvent and as a surfactant under

25  different circumstances?

1    A.    That's correct.

2    Q.    Okay.  In this depiction, if I understood you

3    correctly from your testimony yesterday, you're not

4    depicting any micelles in this premix structure; is that

5    correct?

6    A.    That's right.  I don't know whether micelles are

7    present in this premix.

8    Q.    Okay.  So then in the premix, polysorbate 80 is

9    functioning as a solvent?

10   A.    It could be -- I'm sorry.  Because the water is

11   present and ethanol and PEG 300 are present at high

12   concentrations, and they're water soluble, the solvents in

13   the water may or may not allow the micelles to form.  So I

14   just don't know whether the polysorbate 80 is forming

15   micelles in the premix or not.

16   Q.    Okay.

17   A.    I just don't know.

18   Q.    So your point is you don't know that this is

19   functioning as a surfactant?  This, meaning the polysorbate

20   80?

21   A.    Right.  Whether or not it is --

22   Q.    But here it's functioning as a solvent and it could

23   very well be functioning as a solvent?

24   A.    It could be.

25   Q.    Okay.

1  A.    Or it could be forming some weak micelle structure.

2  The physical organization surfactants in these kind of

3  aqueous solvent mixtures is an area of research.  People

4  have looked at it.  It's -- it varies, depending on the

5  composition.  You really have to do tests to know, and I

6  didn't do those tests.

7  Q.    All right.  Are you suggesting -- let me understand,

8  Dr. Kaler, that this depiction may not be accurate?

9  A.    I depicted it this way, to indicate the absence of

10 micelles.  If you force me to say whether I think there are

11 micelles present, there are not.  I think there probably

12 aren't, and that's why I do it this way.

13 Q.    Okay.

14 A.    So this is my best -- based on my knowledge of these

15 kind of solutions, my best estimate of a depiction of what

16 the solution would be like.

17 Q.    That's fair enough.

18        You also have not done any testing on the time

19 to crystallization in the premix, assuming there's water

20 present; is that correct?

21 A.    Well, there is water present in the premix.

22 Q.    Yes.

23 A.    Yes.

24 Q.    Yes.

25 A.    And so if the question is, have I measured time to

1    crystallization, the answer to that is, no, I have not.

2    Q.    So you don't know the stability of this premix?

3    A.    I have not tested it in -- I haven't tested the

4    stability and I don't recall right now seeing information

5    about your premix stability, although I think there may be

6    some in your NDA.

7    Q.    All right.  Can we go to the next slide, your

8    PDX-4-12?

9          Now, this is your depiction of the perfusion

10   that's made with the Apotex intended products; correct?

11   A.    That's right.

12   Q.    And similarly, a similar question for you here with

13   regard to the stability of the Apotex perfusion.  You have

14   not done any testing, so you don't know the stability or the

15   time to crystallization here either; is that correct?

16   A.    I didn't do any testing of this, that's correct.  I

17   didn't do testing.

18   Q.    Okay.  I think you indicated, but correct me if I'm

19   wrong, that docetaxel is highly insoluble in water, and I

20   think you used some reference to micrograms per millimeter

21   range; is that correct?

22   A.    That is correct.

23   Q.    Would it be in the two to three micrograms?

24   A.    I actually don't recall the precise number.  It's in

25   the -- a few micrograms.  I don't remember the number.

1    Q.    That's fair.

2              And ethanol, do you know the solubility of

3    docetaxel in ethanol?

4    A.    I don't remember the number, but it's substantial.

5    Q.    It's much higher, somewhere on the order of milligrams

6    per millimeter?

7    A.    I have not looked at those numbers in awhile, but I

8    would accept it.  It's high.

9    Q.    Okay.  And PEG 300, similarly, in milliliters per

10   liter?

11   A.    Yes, but I believe the solubility of docetaxel in PEG

12   300 is less than the solubility of docetaxel in --

13   Q.    I'm sorry?

14   A.    It is less -- docetaxel is less soluble in PEG 300

15   than it is in ethanol.

16   Q.    Oh, yes.  But still substantially more than in water

17   and, you know, in the order of milligrams per millimeter, so

18   thousands of times more than water?

19   A.    I would accept that.

20   Q.    Okay.  You said yesterday that -- and I think you

21   indicated again today -- that the perfusions described in

22   the '561 patent are physically stable for up to eight hours;

23   correct?

24   A.    That's a basic and novel element of that invention,

25   yes, sir.

1    Q.    Okay.  And I think you also said that if the micelles

2    in the perfusion fail to carry the docetaxel, then the

3    docetaxel, which is highly insoluble in water, they fall

4    out, they crystallize, and they come out of solution; is

5    that right?

6    A.    Yes.  A good way to think about it is that the

7    docetaxel can leak out of micelles, and when it's exposed to

8    water, or an aqueous solution, it crystallizes.

9    Q.    You also indicated yesterday that the system in the

10   perfusion with the micelles and the surfactant molecules and

11   the docetaxel molecules, that's a dynamic system.

12              MR. DRESNER:  Can I have that slide back up

13   again?  I'm sorry.  PDX-4-12.

14   BY MR. DRESNER:

15   Q.    You indicated that you showed this as a static system?

16   A.    Right.

17   Q.    But it's not really a static system.  There are a lot

18   of things going on here?  Molecules are moving back and

19   forth, molecules of the surfactant are moving and changing

20   and molecules of the docetaxel are moving and changing; is

21   that correct?

22   A.    That's correct.

23   Q.    And, in fact --

24   A.    Well, I am sorry.  I agreed with you a little bit too

25   quickly.

1          The polysorbate 80 molecules are certainly

2     positioning in and out of the micelle.  I would expect that

3     the residence time of the docetaxel in a micelle is quite

4     long.  There is very little driving force or desire, if you

5     can let me answer that way, for docetaxel to go into the

6     aqueous phase.

7     Q.    If I can refer to something you said specifically.

8               Can we have Page 528 of yesterday's transcript.

9               If we can focus on the first little paragraph,

10    Line 8.  If we could read that.

11              I think you said, "The docetaxel that is

12    solubilized in that core" -- that is the core of micelle.

13    Correct?

14    A.    Right.

15    Q.    " -- can be above the level that the micelle can

16    carry.  And so over a period of hours, it can come out of

17    the micelle and precipitate."

18              Correct?

19    A.    Correct.

20    Q.    So the docetaxel molecules that are in the core can

21    also come out?

22    A.    Right.  And I was just earlier trying to make the

23    point that the surfactant molecules can go in and out of the

24    micelle in small fractions of seconds, microseconds,

25    milliseconds, and the docetaxel I think is there for a much

1  longer time.  It's just different time scales for two

2  events.

3  Q.   I created a slightly altered demonstrative of your

4  exhibit, PDX-412.  And I would like to show it to you and

5  use that as a basis for discussion.  Can we have Kaler

6  Cross 1.

7          In Kaler Cross 1, what I am suggesting here is,

8  following your testimony of yesterday and your discussion

9  just now, even though it's a short period of time, the

10 docetaxel molecules, which I have colored as little gold

11 balls as you have, can come out of the micelle structures,

12 and we have indicated one of them is missing, and come into

13 the phase around the micelles.  Correct?  Short period of

14 time, I think you said, but that they can come out?

15 A.   That could happen.  But the only quarrel I would have

16 with your drawing is that the docetaxel concentration in the

17 aqueous phase, as we have already established, is extremely

18 small.  So if you took a snapshot like this that contained

19 five micelles, you might have one docetaxel, you might have

20 zero.  You certainly wouldn't have three.  It's just the

21 scale of the docetaxel concentration.

22 Q.   Just a representation.

23 A.   I understand.  But an accurate representation is good.

24 Q.   There are other molecules in that phase around the

25 micelles.  Correct?

1   A.   Right:  Water, ethanol and in your product PEG 300.

2   Q.   Water, ethanol, and PEG 300?

3   A.   Right.

4   Q.   And the docetaxel hates the water?

5   A.   It does hate the water, we have established that.

6   Q.   And it's highly solubilized with ethanol and highly

7   solubilized in PEG 300?

8   A.   Right.

9   Q.   So isn't it possible that, indeed, when one of these

10  docetaxel molecules comes out of the micelles and into this

11  phase, it will be, even for a short period of time,

12  solubilized by either the ethanol or the PEG 300?

13  A.   I think that's extraordinarily unlikely.

14  Q.   Possible?

15  A.   You know, I am tempted to say anything is possible.

16  But I am not sure I am going to agree that that is possible.

17  The thermodynamics is important, how these solvent molecules

18  are arranged.  Ethanol and polysorbate -- I am sorry -- PEG

19  300 are going to go into the water and be dispersed.  For

20  what you are describing to happen, I would have to have

21  docetaxel, and for reasons unknown, recruit some ethanol or

22  PEG 300 molecules to be associated with it, it's

23  entropically very unlikely.

24  Q.   I understand your brief chemistry discussion.  My

25  point is, I think you agree with me, is that because of the

1    extremely high ability for docetaxel to associate with or be

2    solubilized by, another way of saying it, with the ethanol,

3    and with the PEG 300, as opposed to the water, which is a

4    substantial amount of that perfusion, there a fair chance

5    that, indeed, that can happen?

6            MR. COLLINS:  Objection.  That was just asked

7    and answered.

8            THE COURT:  Overruled.

9            THE WITNESS:  I will give you basically the same

10   answer.  The perfusion bag is a very high concentration of

11   water.  It's ninety-something percent water.  In your

12   product, the ethanol and PEG 300 are -- I don't have the

13   numbers off my head -- a couple of a percent in the water.

14           So you have taken water, in which docetaxel is

15   not soluble, added a few particulars of these water-soluble

16   solvents, you are not going to dramatically change the

17   solubility of docetaxel in there.  Will it increase a little

18   bit?  Maybe.  But it's still at the microgram-per-milliliter

19   level, I believe.

20   Q.   You have answered my question, Dr. Kaler.  I

21   appreciate that.

22           Can we go to PDX-4-29.

23           New subject for you, Dr. Kaler.

24   A.   Okay.

25   Q.   This is a depiction of what you described yesterday as

1    the Hospira stock solution, if you will, at least on the

2    left side.  Right?

3    A.    Right.

4    Q.    You understand that the Apotex product is quite

5    different from this?

6    A.    That's right.

7    Q.    Can we have a depiction of the Apotex two vials.

8          You know that in the proposed Apotex product the

9    docetaxel is, in fact, dissolved in PEG 300 in a separate

10   concentrated vial, the stock solution, if you will?

11   A.    That's right.

12   Q.    And the premix is made when the second vial containing

13   the diluent, consisting of the polysorbate, the ethanol and

14   the water, are mixed with the first volume?

15         MR. COLLINS:  Objection.  We would just like

16   copies of these exhibits if you are going to be questioning

17   the witness about them.

18         MR. DRESNER:  Sure.

19         Actually, I think this was one of the slides

20   from my openings.  But we are going to get you copies.

21   BY MR. DRESNER:

22   Q.    So while we are getting copies for Mr. Collins, in the

23   Apotex proposed products, you understand that the docetaxel

24   is completely dissolved in the PEG 300?

25   A.    That's true.

1  Q.    And, by the way, you understand that, I assume,

2  because you have reviewed the (b)(2) application and it has

3  described that?

4  A.    Yes.  That's how I know that.

5  Q.    So the point is, it's different, and you don't have a

6  depiction of what you described with regard to the Hospira

7  product for the Apotex product, and this is the best

8  description for that system.  Are you comfortable with that?

9  A.    Well, system is not defined here.

10         I looked -- for the copying analysis that I made

11  of the Hospira product, I looked at their stock solution.

12  You have a two-vial system.  You don't get a stock solution

13  until you make your premix.

14  Q.    That's another issue for some discussion at another

15  time.

16         But in the Hospira depiction, you indicated PEG

17  300 and citric acid, I think you used the expression was a

18  "filler"?

19  A.    Yes.

20  Q.    I mean, clearly, PEG 300 is not functioning here as a

21  filler.  It is the primary solvent in which docetaxel is

22  completely dissolved?

23  A.    In your Vial 1, that is true.  And that's why I didn't

24  have a similar drawing for your Apotex product.

25  Q.    Thank you.

1    A.    I understand that.

2    Q.    Can I now move to PDX-4-9.

3              This is your exhibit, your demonstrative.

4              This is your list of the basic and novel

5    properties.  Correct?

6    A.    That's true.

7              MR. COLLINS:  Objection.  This was not used in

8    his direct examination.  There was another slide similar to

9    this, but not this slide.

10             MR. DRESNER:  Can we move to 4-10.

11             THE COURT:  Sure.

12             MR. DRESNER:  Is this the slide that was used in

13   the direct testimony?

14             MR. COLLINS:  Yes.

15             MR. DRESNER:  Thanks.

16   BY MR. DRESNER:

17   Q.    And you cited in this slide portions of the '561

18   patent, beginning in Column 2, I think it was Line 37.  You

19   cited that in the bottom.  Correct?

20   A.    That's correct.

21   Q.    So let's take a look at the first paragraph.  In the

22   first paragraph, it states, in fact, that "The perfusions

23   prepared from the above stock solutions, and containing a

24   concentration of active principle of, e.g., 1 mg/ml, which

25   is a preference, or less, contain less than 50 milliliters

1    per liter and preferably less than 35 milliliters per liter

2    of surfactant and of ethanol, which represents a reduction

3    of 40 percent relative to the prior art."

4    A.    That's right.

5    Q.    Is this the paragraph upon which you base your

6    understanding of one of the basic and novel properties of

7    the '561 patent?

8    A.    Yes, it is.

9    Q.    Does the patent, indeed, indicate that what's

10   preferable here is a reduction in the surfactant and the

11   ethanol?

12   A.    Yes.

13   Q.    There's no mention of PEG 300?

14   A.    No.  PEG 300 isn't mentioned in this patent.

15   Q.    There's no mention of other excipients with respect to

16   the '561 patent?

17   A.    That's true.

18   Q.    So your focus on a basic and novel property is limited

19   to the reduction of the surfactant and ethanol; is that

20   correct?

21   A.    Well, I think it's also important to realize that the

22   -- that the -- this basic and novel property also addresses

23   getting the docetaxel active concentration up to one mg per

24   ml.

25   Q.    Correct.  But relative to the surfactant and the

1    ethanol, not relative to other excipients?

2    A.    Well, there aren't any other excipients discussed.

3    Q.    Okay.  In your report, Dr. Kaler, you had broadened

4    this expression similar to what is shown on PDX-4-9 even

5    though you didn't discuss it explicitly yesterday; is that

6    correct?

7    A.    What is on P DX-4-9?

8    Q.    Would you like to see it?

9    A.    Please.

10   Q.    In fact, if it would be helpful, we have a composite

11   --

12   A.    Oh, no, no.

13   Q.    You can read Paragraph 1.

14   A.    I'm good, actually.  Right.  And you're right.  4-9, I

15   paraphrased the discussion.  In 4-10, I used the direct

16   patent language and I think 4-10, because it comes directly

17   from the patent --

18   Q.    It's more accurate?

19   A.    Yes.  4-10.  It's not subject to my interpretation.

20   Just what the patent says.

21   Q.    Okay.  So that's a more accurate representation of

22   what you believe the basic and novel properties of the

23   invention are?

24   A.    It's --

25             MR. COLLINS:  Objection.  There has been no

1    representation by Dr. Kaler that that is the basic and novel

2    properties.  He relied on the other slide.

3              MR. DRESNER:  Okay.

4              THE COURT:  Go ahead.

5              MR. DRESNER:  I'm cool with that, your Honor.

6              THE COURT:  Okay.

7    BY MR. DRESNER:

8    Q.    Final question, Dr. Kaler.  You had indicated in your

9    testimony, with respect to one of the limitations that

10   appear in each of the asserted claims of the '561 patent,

11   the limitation relating to reasonable expectation of

12   administering the formulation without anaphylactic or

13   alcohol intoxication manifestations, and I believe you

14   indicated that you had relied on Dr. Burris' testimony or

15   his reports for your position that that limitation is met;

16   is that correct?

17   A.    That's correct.

18   Q.    By the way, were you in the courtroom when Dr. Burris

19   was testifying hear the other day?

20   A.    I was, yes, sir.

21   Q.    You heard his testimony?

22   A.    Yes.

23   Q.    And it's still your opinion that you are relying on

24   his position with regard to your views on that limitation?

25   A.    Yes, it is.

1    MR. DRESNER:  Thank you very much.  Your Honor,

2  I have no more.

3    THE COURT:  All right, counsel.  Redirect?

4    MR. COLLINS:  If we could pull up Kaler Cross 1.

5  I don't know, Mr. Brooks, if you have that?  Get that pulled

6  up?

7                    REDIRECT EXAMINATION

8  BY MR. COLLINS:

9  Q.    Dr. Kaler, you were asked on cross-examination about

10  this demonstrative that's a takeoff of what you discussed

11  yesterday?

12  A.    Yes.

13  Q.    Do you recall that?

14        What would happen if you put docetaxel and

15  ethanol in PEG without the polysorbate 80?

16  A.    Oh, it would precipitate.

17  Q.    Just crash right out?

18  A.    Casually speaking, yes, crash right out.

19  Q.    Could you then perfuse that into a patient?

20  A.    No.

21  Q.    Would that be suitable for administration into a

22  patient?

23  A.    No.

24  Q.    What's the magic or the gee whiz, as Mr. Hurst

25  referred to, with respect to the '561 patent?

1   A.    It's the fact that you have polysorbate 80 molecules

2   that carry docetaxel.

3   Q.    And keep it stable long enough to be perfused?

4   A.    That's what makes the invention work.  The presence of

5   these micelles.

6   Q.    The gee whiz.

7              MR. COLLINS:  If we could, Mr. Brooks, pull up

8   JTX-070, please.  Mr. Brooks, if we can go to Page --  it's,

9   like, the fourth page, Section 2.10, stability.

10  BY MR. COLLINS:

11  Q.    Do you recall --

12  A.    I'm sorry, Mr. Collins.  Is this the 2000 or 2001?

13  Q.    I'm sorry, professor Kaler.  This is the Taxotere

14  prescribing information, the current information, JTX-070.

15  A.    Okay.  Thank you.  I apologize.  These documents are

16  beginning to all look the same.

17  Q.    No, I understand.  And if you can get to Section 2.10,

18  it's also shown on the screen as well.

19  A.    Let me use the screen.

20  Q.    Do you have an opinion as to whether -- you see there

21  it's a reference to four hours of stability and it's

22  referring to the perfusion?

23  A.    Right.

24  Q.    And do you have any idea if there's any safety margin

25  built into that?

1    A.    I would certainly believe there is a safety margin

2    built into that.

3    Q.    And what is your opinion, then, as to the basic and

4    novel property of the claimed invention relative to the

5    physical stability of the perfusion?

6    A.    Well, I think if the -- the physical stability were

7    eight hours, identifying half of that time in order to

8    provide a safety margin and a label would be a good idea.

9              MR. COLLINS:  Mr. Brooks, if we can pull up

10   PDX 4-10, please.

11   BY MR. COLLINS:

12   Q.    So, Professor Kaler, the eight-hour requirement that

13   you set out comes directly from the patent?

14   A.    That's right.

15   Q.    And that's called out here on the slide, column 2,

16   lines 37 to 51?

17   A.    Correct.

18             MR. COLLINS:  Mr. Brooks, if we can pull up the

19   patent again, JTX 003, the '561 patent.  If we can go down

20   to the end of column 2, Example 1.

21   BY MR. COLLINS:

22   Q.    At the very bottom of the page, line 66, it's talking

23   about the perfusion is stable for more than 21 hours?

24   A.    That's right.

25   Q.    What kind of stability is being discussed there?

1    A.    That's physical stability.

2          MR. COLLINS:  Mr. Brooks, if we can go to column

3    3, Example 2, the last line of Example 2.  The perfusion is

4    stable.  This solution is stable for more than 21 hours.

5    BY MR. COLLINS:

6    Q.    Do you see that?  It's highlighted on the screen.

7    A.    Yes, I see that.

8    Q.    What kind of stability is being discussed there?

9    A.    Again, physical stability.

10         MR. COLLINS:  If we can go to Example 3, Mr.

11   Brooks.

12   BY MR. COLLINS:

13   Q.    The last line, the solution is stable for at least

14   96 hours.

15   A.    Yes.

16   Q.    Do you see that?  What kind of stability is being

17   discussed there?

18   A.    Physical stability.

19         MR. COLLINS:  Mr. Brooks, if we can pull up

20   table 1.

21   BY MR. COLLINS:

22   Q.    Stability over on the right-hand column, do you see

23   that?

24   A.    Yes, physical stability.

25   Q.    That's discussing physical stability?

1    A.    Yes.

2    Q.    Where is chemical stability discussed?

3    A.    It's not discussed in this patent.

4    Q.    All right.  Did the inventors consider it a basic and

5    novel property?

6    A.    No, they did not.

7    Q.    Does it have to have adequate stability, chemicals?

8    A.    It has to have adequate chemicals.

9    Q.    But it's not the novel --

10   A.    No.  No.  This patent is about physical stability.

11   Q.    Of the perfusion?

12   A.    Of the perfusion.

13   Q.    Professor Kaler, you were questioned about citric acid

14   a fair amount on cross-examination.

15   A.    Yes.

16   Q.    Do you recall that?

17   A.    Yes.

18   Q.    Do you know if the prescribing information we just

19   reviewed for Taxotere even mentions citric acid?

20   A.    Does it mention citric acid?

21   Q.    Yes.

22   A.    No, I don't think it does.

23   Q.    Do you know if polysorbate 80 comes in grades that can

24   include citric acid?

25   A.    I believe it does, yes.

1    Q.    Do you have any knowledge as to what the make up of

2    the polysorbate 80-grade is that's in a Taxotere

3    formulation, the Sanofi-Aventis Taxotere?

4    A.    The product that's sold today?

5    Q.    Yes.

6    A.    I believe contains citric acid.

7    Q.    All right.  And is it possible to add citric acid to a

8    formulation that includes polysorbate 80 that does not

9    already have citric acid?

10   A.    Of course, yes.

11   Q.    Is that what Hospira has done in this case?

12   A.    I believe that is the case, yes.

13   Q.    All right.  Does the patent, when it's discussing

14   polysorbate 80, suggest any grade of citric acid?

15   A.    No, it doesn't.

16   Q.    So it can have citric acid or it can't?

17   A.    That's right.

18   Q.    So for claims that say comprising or which comprise,

19   it doesn't matter?

20   A.    It doesn't matter.

21   Q.    And for consisting essentially of as long as it

22   doesn't affect the basic and novel property of the physical

23   property, it doesn't matter?

24           MR. HURST:  Objection.

25           THE COURT:  Sustained.  Leading, Mr. Collins.

1       MR. COLLINS:  I understand.  I understand.

2       If we can have Kaler 6 pulled up on the screen,

3  I believe it was part of Mr. Hurst's cross-examination.

4  BY MR. COLLINS:

5  Q.    Do you remember being questioned, Professor Kaler,

6  about this slide?

7  A.    Yes.

8  Q.    And about this formulation?

9  A.    Yes.

10 Q.    And there was some suggestion that it was the

11 etoposide formulation?

12 A.    Right.

13      MR. COLLINS:  Can we make a split screen with

14 this and JTX-215 or somehow pull -- actually, let me do it

15 this way.  I will cut to the chase.

16 BY MR. COLLINS:

17 Q.    Do you see it lists citric acid, benzyl alcohol,

18 polysorbate 80, polysorbate glycol --

19      MR. HURST:  I'm going to object to him using

20 this.

21      THE COURT:  You to this slide's use.

22      MR. COLLINS:  I did.  I wanted to clarify --

23      THE COURT:  I'm going to sustain the objection.

24 You can ask the question using a different exhibit, but

25 that's not fair.

1    MR. COLLINS:  Fair enough, your Honor.  Can we

2    pull up JTX-215?  If we can blow up at the bottom.

3    BY MR. COLLINS:

4    Q.    Dr. Kaler, do you remember being questioned by Mr.

5    Hurst with respect to this formulation?

6    A.    Yes.  Yes.

7    Q.    I think this is referred to as the etoposide

8    formulation?

9    A.    Yes.

10   Q.    And do you know how the amount of polysorbate 80

11   that's in the etoposide formulation, if it correlates at all

12   to the amount that's in the Taxotere formulation?

13            MR. HURST:  Beyond the scope, your Honor.

14            THE COURT:  I think it is.  It's beyond the

15   scope of both cross-examinations.  It really is.  Sustained.

16            MR. COLLINS:  If we can pull up JTX-059, please.

17   BY MR. COLLINS:

18   Q.    Professor Kaler, you were questioned about this

19   response from the applicants in the patent prosecution.  Do

20   you recall that?

21   A.    Yes.

22   Q.    And if we can turn to Page 5, please.

23            MR. COLLINS:  Mr. Brooks, if we can blow up the

24   table.  And if we can highlight the five milligrams per ml

25   Taxotere solution in the second table.

1    BY MR. COLLINS:

2    Q.    Professor Kaler, were you here yesterday for Mr.

3    Fabre's testimony?

4    A.    Only for a very small part of it.

5    Q.    All right.  Do you have an understanding, then, as to

6    whether the Taxotere that's called out here is a reference

7    to docetaxel generally, or to the Sanofi-Aventis Taxotere

8    formulation?

9    A.    I believe it is -- refers to docetaxel, but I do not

10   know that.

11   Q.    Okay.  Let's look at the next line.  It talks about

12   the solution contains Tarr's three-solvent system.  Do you

13   see that?

14   A.    Yes, I do.

15   Q.    Is that the sanofi Taxotere system?

16   A.    No.

17   Q.    So the stability data that's referenced here relates

18   to just a docetaxel formulation in the Tarr system.

19   Correct?

20   A.    That's correct.

21   Q.    And that's not the claimed invention, is it?

22   A.    No, it's not.

23            MR. COLLINS:  Your Honor, if I may have just a

24   moment to confer with my co-counsel.

25            (Pause.)

1    MR. COLLINS:  No further questions.

2    THE COURT:  All right.  Thank you, Dr. Kaler.

3  You are excused.

4    THE WITNESS:  Thank you, Your Honor.

5    THE COURT:  We will take a break before the next

6  witness.

7    (Witness excused.)

8    (Recess taken.)

9    MR. COLLINS:  Plaintiffs call Alan Myerson.

10    Your Honor, before we start, there may be an

11  occasion where Professor Myerson asks to step down.  May we

12  have permission to have Mr. Myerson step down and use the

13  white board?

14    THE COURT:  Yes.

15    MR. COLLINS:  Would you like it over here or

16  there?

17    THE COURT:  Here is fine.

18    ... ALLAN S. MYERSON, having been duly

19      sworn as a witness, was examined and testified as

20      follows ...

21    MR. COLLINS:  Your Honor, may we hand out the

22  witness books?

23    THE COURT:  Please do, yes.

24    MR. COLLINS:  May I proceed, Your Honor?

25    THE COURT:  Yes, you may.

**DIRECT EXAMINATION**

**BY MR. COLLINS:**

Q.   Would you please state your full name?

A.   Allan S. Myerson.

Q.   What is you your job, please?

A.   I am the Philip Danforth Armor Professor in the Department of Biological and Engineering at the Illinois Institute of Technology in Chicago, Illinois.

Q.   And how long have you been at IIT?

A.   Approximately ten years.

Q.   Can you please give us an overview of your educational background?

A.   Yes.  I have a Bachelor's degree in chemical engineering from Columbia University in 1973, a Master's degree in chemical engineering from the University of Virginia in 1975, and a Ph.D. in chemical engineering from the University of Virginia in 1977.

Q.   Since receiving your Ph.D. degree in 1977, have you served as a professor?

A.   Yes.  I have been a professor continuously since January of 1977, so approaching 33 years.

Q.   How would you describe generally your expertise as it pertains to this litigation?

A.   My general area of expertise is crystallization from solution with an emphasis on issues related to solubility,

1    solution structure, nucleation, which is a formation of new

2    crystals, and solution stabilization, with an application to

3    the development of pharmaceuticals and pharmaceutical

4    products.

5         MR. COLLINS:  Mr. Brooks, could we pull up

6    JTX-236, please.

7    BY MR. COLLINS:

8    Q.   Professor Myerson, is this your CV?

9    A.   Yes, it's the first page of my CV.

10   Q.   If we could turn to Pages 29 and 30 of your CV.

11        Mr. Brooks?

12        I believe, Professor Myerson, you have a hard

13   copy in front of you as well.

14   A.   Yes.

15   Q.   Pages 29 and 30, you list a number of consulting

16   arrangements or engagements.  Can you please describe your

17   consulting work generally?

18   A.   Yes.  I do and have over the years done quite a bit of

19   consulting work for various companies.  In the last 15 or 20

20   years, a number of these or many of these have been

21   pharmaceutical companies, and particularly in the areas of

22   my expertise, which I have described.

23   Q.   Have you worked and consulted with formulators?

24   A.   Yes.  I actually work and consult with formulators

25   very regularly.  Of the consulting assignments, probably the

1   most relevant to this litigation, I was a consultant for

2   approximately eight or nine years to Baxter Healthcare,

3   particularly in a program where they were developing

4   injectable drugs.  The heart of the program was actually

5   issues related to solubilization of poorly soluble drugs,

6   stabilization, again, for direct I.V. administration.

7           Actually, at the same time I also served on the

8   Scientific Advisory Committee for Baxter's global health

9   care business, for drug delivery.  So on the Scientific

10  Advisory Board, we heard all the issues related to their

11  development of I.V. products, which is primarily what Baxter

12  was involved in developing during that period.

13  Q.    In your consulting, do you provide expertise related

14  to crystallization of active pharmaceutical ingredients?

15  A.    Yes.

16  Q.    Solubility of poorly soluble active ingredients?

17  A.    Yes.  In the last ten years that has become a

18  particularly important area in the pharmaceutical industry.

19  Q.    What about physical stability of I.V. formulations?

20  A.    Yes, quite often.

21  Q.    Have you ever recommended a substitution or change of

22  an excipient or surfactant or some other element of the

23  formulation?

24  A.    Yes, I have.

25  Q.    Can you please describe that?

1    A.    Well, one of the problems that's often come up with

2    formulations, which are solutions, that is, where the active

3    pharmaceutical ingredient have dissolved in the solution, is

4    this physical stability issue that we have been discussing

5    in this case.

6            That is, the active pharmaceutical ingredient

7    will crystallize or precipitate, either on storage or even

8    worse sometimes when it is injected into the person, it

9    actually will precipitate in a person's bloodstream, which

10   is generally a bad thing.

11           And, so, some of the issues that we are often

12   interested in is finding excipients that are suitable that

13   will inhibit the formation of these crystals for long

14   periods of time, to allow the drug to both be stored and

15   injected, or after injected in a person get to the right

16   place before it would precipitate.

17   Q.    For how long have you done this consulting work?

18   A.    This type of work, probably for about the last 20

19   years or so.

20   Q.    And mostly with pharmaceutical companies?

21   A.    Of this particular type of work, yes.

22   Q.    If we can turn to Pages 26 and 29 of the CV, JTX-236.

23   If you can turn to those pages in your witness book.

24           I see you are an inventor on a number of United

25   States patents?

A.     Yes.  I am the inventor on 33 United States patents.

Q.     Any relating to pharmaceuticals that are worthy of

note and pointing out today?

A.     Yes.  If we look, actually, on Page 28, I have a

series of patents, starting with No. 22, and then related

patents to No. 22 are actually No. 24 and No. 27, and No.

28.

          This is a rather esoteric subject, but it ended

up being useful.

          We discovered that certain intensity laser

pulses could induce the crystallization of materials in a

very controlled way.

          And for protein crystals, which are used in drug

discovery, they take protein crystals and they measure their

structure, it's called structural genomics, it's very hard

to make these protein crystals large enough to study in a

controlled way.

          These patents allowed protein crystals to be

made of drugs more efficiently and to be studied.  In fact,

these were licensed to companies, I believe there is a

company in Japan making use of this in their structural

genomics program.

          In addition, a patent that is closer to the

issue of litigation here or series, starting with 25, patent

No. 25, 32 and 33, actually all deal with -- again, it

1    sounds very, very esoteric -- but these all allow methods

2    for making very small crystals.

3              One of the issues with poorly soluble drugs

4    these days is trying to develop ways to solubilize them.

5    One approach is the use of nanocrystals, or nanocrystal

6    suspensions, as a method for administration.  And these

7    patents address the formation of nanocrystals as to some of

8    their applications.

9    Q.   Let's move on to some of your publications.  You seem

10   to be a prolific author and have a number of applications.

11   Are there any worth pointing out to the Court today?

12   A.   Yes.  I have over 150 publications.  I will just point

13   out a couple that I think are particularly relevant to this

14   case.  Publication 106, for example, and related

15   publication --

16   Q.   106 is on Page 12 of your CV?

17   A.   Yes.

18             Also, if we could take No. 131, because they are

19   related and I would like to talk about them together.

20             We have heard in this case about the issue of

21   physical stability of perfusions.  What we mean there is how

22   long does it take for crystals to form.  Now, the technical

23   term for the formation of crystals is called nucleation,

24   which is the formation of the crystal.  And the time it

25   takes for a crystal to form from a homogeneous solution is

1    called the nucleation induction time.

2              In 106 we published a paper -- because you have

3    to look at this in a statistical way, understanding the

4    statistics of nucleation induction time, and in 131 we did a

5    very complicated experiment to measure nucleation induction

6    time in single solution droplets that were levitated without

7    a container.  But again, the fundamental research related to

8    a very real problem, which is:  What is the distribution of

9    nucleation induction times or how long does it take

10   something to crystallize from a solution when you are

11   storing it?

12   Q.    Are you a member of any professional organizations?

13   A.    Yes.  I am a member of the American Chemical Society,

14   the American Institutes of Chemical Engineering, and the

15   American Society of Engineering Education.

16   Q.    Are you an editor on any peer-reviewed journals in

17   your area of expertise?

18   A.    Yes.  I am one of the founders and associated editor

19   of an American Chemical Society journal called Crystal

20   Growth and Design.

21   Q.    Have you received any awards relating to your area of

22   expertise that are worth pointing out today?

23   A.    Yes, I have.

24   Q.    Mr. Brooks, if we could pull up Page 2, please.

25              If you could identify what you think is

1    important?

2    A.    Probably the one that I would mention is No. 4, which

3    is an award from the American Chemical Society in Separation

4    Science and Technology, which I was awarded in 2008.  The

5    citation recognized my contribution to crystallization

6    science and technology as it applied to the chemical and

7    pharmaceutical industry.

8    Q.    Professor Myerson, have you ever testified as an

9    expert in patent cases before?

10   A.    Yes, I have.

11   Q.    Have you ever been accepted as an expert in the United

12   States District Court for the District of Delaware?

13   A.    Yes.  I testified in a trial in 1991 in Delaware

14   before Justice McKelvie.  I actually was an expert in a

15   trial before Justice Sleet, but I ended up not testifying,

16   several years ago.

17          THE COURT:  We enjoy the elevation.  It has not

18   happened.

19          "Judge" is fine.

20          THE WITNESS:  Judge.

21   BY MR. COLLINS:

22   Q.    Professor Myerson, have you ever been retained by my

23   friend Mr. Hurst or his firm as an expert?

24   A.    Yes.  I have been retained by Winston at least twice,

25   I believe.  I believe Mr. Hurst was the lead counsel on one

1    of those cases.

2    Q.    In patent cases?

3    A.    Yes.

4          MR. COLLINS:  Your Honor, at this time we would

5    move to admit Professor Myerson as an expert based on his

6    education, training, and 32-plus years as an expert in the

7    area of solubility and solution structure, physical

8    stability, nucleation, crystallization, particularly in the

9    area of active pharmaceutical ingredients.

10         MR. HURST:  No objection, Your Honor.

11         MR. DRESNER:  No objection, Your Honor.

12         THE COURT:  Thank you.  The Doctor is accepted

13   as an expert in those areas.

14   BY MR. COLLINS:

15   Q.    Professor Myerson, you have reviewed the patents in

16   this suit.  Correct?

17   A.    Yes, I have.

18   Q.    You are familiar with the '512 patent?

19   A.    Yes.

20   Q.    And you have offered opinions on that?

21   A.    Yes.

22   Q.    You are familiar with the '561 patent.  Correct?

23   A.    Yes.

24   Q.    Did you review the Court's claim construction order?

25   A.    Yes, I did.

1  Q.    Did you review both defendants' New Drug Applications?

2  A.    Yes, I did.

3  Q.    Have you formed any infringement opinions?

4  A.    Yes, I have.

5  Q.    What are they?

6  A.    That both Hospira's and Apotex's perfusion infringe

7  Claim 7 of the '512 patent, and that Hospira's stock

8  solution and Apotex's premix infringe Claim 33 of the '512

9  patent.

10 Q.    What was the methodology that you used in forming

11 these opinions, these infringement opinions?

12 A.    I reviewed the patent in suit.  I reviewed the Court's

13 claim construction.  I looked at the elements of the claims.

14 And I compared that to the Hospira and Apotex's products as

15 described in their drug applications.

16 Q.    Have you formed any other opinions in this case?

17 A.    I have written responsive reports relating to

18 invalidity.

19 Q.    What about with respect to secondary considerations

20 such as whether Taxotere is covered by the claims of the

21 '512 patent?

22 A.    Yes, I have analyzed Taxotere.  And it's my opinion

23 that Taxotere is covered by the claims that I mentioned of

24 the '512 patent.

25 Q.    Before we delve right into your infringement opinions,

1    I want to make sure we are clear on sort of the background.

2    Have you formed any opinions concerning the state of the

3    relevant art as of 1991 regarding the solubility of taxanes

4    without ethanol?

5    A.    Yes.

6    Q.    What is your opinion in that regard?

7    A.    As was discussed with Professor Kaler in the previous

8    testimony, taxanes are very insoluble drugs, almost

9    completely insoluble in water.  We are talking about

10   millionths-of-a-gram-level, micrograms.

11             They are known to be soluble in organic solvents

12   such as ethanol.

13             The relevant art at that time implied that

14   ethanol was required to formulate and solubilize taxanes.

15   Q.    What is the basis for that conclusion?

16   A.    It's looking at the patents and papers from that

17   period that I reviewed as part of my analysis.

18   Q.    Was there anything in the prior art that taught low

19   ethanol taxane formulations?

20   A.    No.

21   Q.    Do you have an opinion as to what led to the

22   understanding that high ethanol concentrations were required

23   to solubilize taxanes?

24   A.    Well, the initial work that was done on paclitaxel,

25   certainly, and the development of a paclitaxel formulation.

1    Q.    What is meant by the dissolution kinetics of taxanes

2    and surfactants?

3    A.    Well, let's start with what's meant by dissolution

4    kinetics.  Again, scientists and engineers use words that

5    sound more complicated than they really are.

6          Dissolution kinetics means how fast something

7    dissolves, a solid dissolves.  For example, if you take salt

8    and put it in water and measure how long it takes, that

9    would be the dissolution kinetics of salt into water.

10         If you do that, you know, if the water is hot,

11   the salt dissolves really fast, and if the water is cold the

12   salt dissolves slower, meaning that there is a temperature

13   effect there.

14         In the case of Taxotere or docetaxel, I should

15   say, the interesting point was that, we know now, that while

16   docetaxel is soluble in polysorbate 80, it takes a very,

17   very long time to dissolve.  So if you actually took some

18   docetaxel and put it in polysorbate 80 and watched it, you

19   would think it wasn't going to dissolve because it would

20   just be sitting there.  But if you came back in a day or

21   two, it would all have dissolved because the kinetics or

22   rate of the dissolution is very slow.

23   Q.    Taxanes out of polysorbate.  Are they a powder?

24   A.    Yes.  Actually, taxanes, as they're used, are a

25   crystalline powder.

1  Q.    And polysorbate 80 is a liquid?

2  A.    Yes.  Polysorbate 80 is a liquid.  It's a viscous

3  liquid, but it's still a liquid, so, of course, you're

4  adding a solid to a liquid and waiting for it to dissolve.

5  Q.    Okay.  Have you helped prepare some slides that would

6  expedite your testimony today?

7  A.    Yes, I have.

8  Q.    And you are familiar with the elements, the claims on

9  which you've opined for infringement?

10 A.    Yes.

11         MR. COLLINS:  Mr. Brooks, if we can pull up

12 slide PDX-8-1, please.

13 BY MR. COLLINS:

14 Q.    And if you can describe briefly what you are intending

15 it to depict with PDX-8- 1?

16 A.    Sure.  If we look at claim 1, we start with a

17 composition, the word "composition," which is meaning this

18 is a claim for a composition of matter.

19 Q.    Just so we're clear, I'm sorry to interrupt, the

20 infringement goes to claim 7?

21 A.    That's correct.  But since claim 7 is a composition of

22 claim 6, and claim 6 a composition of claim 1 they're all

23 dependent on each other.

24         So starting with the claim language, so we

25 have a composition claim, and the word "comprising" is in

1    there.  And my understanding as a non-lawyer as what

2    comprising means, is it means it must contain the

3    composition described in the claim, that other things can be

4    there.

5              So we have a composition comprising.  And if we

6    look at the claim 7, as defined by claim 6 in claim 1, there

7    are three elements in this claim.  It has to have docetaxel,

8    which is our active ingredient.  That docetaxel has to be

9    dissolved in polysorbate and the composition needs to be

10   essentially free of ethanol.

11   Q.    And in large measure, the fight on infringement, this

12   claim is related to element 3?

13   A.    That's right.  I don't think there's a lot of

14   contention on element 1 or element 2, but the very

15   contentious issue is the definition of essentially free of

16   ethanol.

17   Q.    And this claim 1 is a composition claim?

18   A.    Yes, it is.

19   Q.    And you understand that to be different from a method

20   claim?

21   A.    Yes.

22   Q.    And what are the products that you are -- that you

23   believe infringe claim 7 that are being proposed to be

24   marketed by the defendants?

25   A.    Excuse me?  I didn't hear you.

1    Q.    I'm sorry.  What defendants' products do you believe

2    infringe claim 7?

3    A.    The perfusion made by the product described in

4    Apotex's NDA and Hospira's NDA.

5    Q.    And is it your understanding that perfusions made from

6    the defendants' products contain polysorbate?

7    A.    Yes.

8    Q.    And is it your understanding that perfusions made from

9    the defendants' products contain docetaxel?

10   A.    Yes.

11   Q.    What definition for essentially free of ethanol did

12   you apply in your infringement analysis?

13   A.    I used the Court's claim construction, which I think

14   is on the next slide.

15         MR. COLLINS:  Mr. Brooks, if we can pull up

16   PDX-8-2.

17   BY MR. COLLINS:

18   Q.    And is that the construction that you faithfully

19   applied in your infringement analysis?

20   A.    Yes, it is.

21   Q.    What definition or construction did you use for the

22   term stock solution?

23   A.    I also used the Court's claim construction.

24   Q.    And just so we're clear, so essentially free has a

25   construction that applies to both the stock solution and a

1  perfusion?

2  A.    That's correct.

3  Q.              MR. COLLINS:  And if we can go to the next

4  slide, Mr. Brooks, 8- 3.

5  BY MR. COLLINS:

6  Q.    The definition that's shown on the slide there for

7  stock solution or construction, is that what you used?

8  A.    Yes.

9  Q.    For stock solution, is there any duration or limit in

10 terms of time?

11 A.    No.

12 Q.    Well, how did you go about determining whether the

13 accused perfusions contain -- met the limitation of claim 7?

14 A.    I think I have an illustration.

15              MR. COLLINS:  Sure.  If we can go to the next

16 slide, PDX-8-4.

17              THE WITNESS:  The first point was is to use the

18 Court's essentially free definition.  And in their

19 invalidity argument, the defendants' experts, both Hospira's

20 and Apotex's experts, have opined that a stock solution was

21 five percent by volume ethanol and two milligrams per

22 millimeter of docetaxel is essentially free of ethanol.  And

23 actually I agreed with that opinion.

24              But once you define that, once you say that that

25 is true, that defines a stock solution which has, in my

1    opinion, the minimum amount of docetaxel that can be present

2    in such a stock solution that would still be called a

3    concentrated solution and the maximum amount of ethanol that

4    can be defined.

5              Once you do that, it follows, by simple

6    mathematics, when you do it many different ways, what

7    essentially free will mean in any perfusion.

8              And so where I say there, if you just want to do

9    a simple 1-to-1 dilution and follow from there, that if a

10   perfusion was 2.5 percent by volume ethanol and one mg per

11   ml docetaxel is essentially free of ethanol, and, therefore,

12   if you go to the dosing information just for comparison, if

13   we have .74 mgs per ml, which is the maximum dosing level

14   for docetaxel in a perfusion, as described in the proposed

15   labeling information by both Apotex and Hospira, that

16   perfusion would have 1.85 percent by volume ethanol.

17             So, to me, that 1.85 is the maximum ethanol you

18   can have in a perfusion if you are dosing at .74 mgs per ml.

19   And so it's an absolute number.  You can make a comparison

20   with anybody's perfusion that way.

21   Q.   Professor Myerson, you mentioned the prescribing

22   information.

23             MR. COLLINS:  Mr. Brooks, can we pull up JTX-37,

24   please?  It's the prescribing information for Hospira's

25   proposed perfusion.  If we can go to Page 0048944, please.

1  If we can blow it up, dilution for infusion.

2  BY MR. COLLINS:

3  Q.    I want to make sure we're clear, Professor Myerson, in

4  terms of how you make up the infusion.

5        Do you simply take the one vial of Hospira's

6  formulation, withdraw it and put it into the perfusion bag?

7  A.    Well, actually, what you need to do is figure out what

8  the dose is going to be for the particular person that you

9  are giving.  Okay?

10        So, for example, in Hospira's product,

11  their largest vial, I will just use that as an example, is

12  16 milliliters of a stock solution with each millimeter

13  containing ten milligrams of a millimeter of docetaxel.  So

14  the total amount of docetaxel in the vial is 160 milligrams,

15  right.  So when, as we'll see later, and the doctors have

16  discussed, when you decide how much docetaxel to give to a

17  person, it depends on how big they are and things of that

18  nature.

19        So if you need to give them less than

20  160 milligrams, you would take part of the vial out and put

21  that in the perfusion bag.  You don't necessarily take the

22  entire vial and put it in; you just figure out how much you

23  need for that particular person.

24  Q.    So, Professor Myerson -- and Mr. Brooks, if we can

25  highlight the words, "withdraw the required amount."

1  A.  Yes.

2  Q.  And how do you understand that is done?

3  A.  That's done with a syringe.

4  Q.  All right.

5  A.  Calibrated syringe.

6  Q.  All right.  And the concentrate that, or stock

7  solution that you are withdrawing from, I mean, is it a

8  homogeneous solution?

9  A.  Yes.  A stock solution, by its definition, would be a

10  homogeneous solution, homogeneous meaning that you cannot

11  separate any of the components from the solution just by

12  physically taking them out.

13  Q.  So, hypothetically, if you withdrew half of it --

14  A.  Yes.

15  Q.  -- and put that into the perfusion, you would have

16  half of the docetaxel --

17  A.  Correct.

18  Q.  -- that was in your original vial.  Half of the

19  ethanol?

20  A.  Correct.

21  Q.  And half of the polysorbate?

22  A.  That's correct.

23  Q.  And those ratios never change?

24  A.  Right.  In a homogeneous solution, even if you dilute

25  it later, the ratio of the -- the components of the stock

1    solution are invariant, so docetaxel, the polysorbate ratio

2    is always the same, whether it's in the stock solution or

3    the perfusion.  And the ratio of ethanol to docetaxel is

4    always the same.

5    Q.    And the same analysis would apply to Apotex's premix?

6    A.    Yes.

7    Q.    Okay.  And that's their stock solution?

8    A.    Yes.

9    Q.    And that's because where it's mixed, the two vials are

10   mixed, that's -- if you want to explain that?

11   A.    The Apotex system, we're taking two vials to make a

12   stock solution Apotex which has all the components in the

13   homogeneous solution.

14         MR. COLLINS:  Mr. Brooks, if we can bring up

15   PDX-8- 5, please.

16   BY MR. COLLINS:

17   Q.    So, Professor Myerson, you've helped create this

18   illustration.  I'd like you to explain it.

19   A.    Previously, I said that the experts for Hospira and

20   Apotex had all agreed that you could call two mgs per ml of

21   docetaxel with five-percent ethanol, and five percent

22   surfactant, as a stock solution essentially free of ethanol.

23         So here we just see simple calculations of

24   diluting that into three different dilution ratios and

25   looking at the concentration of ethanol present in each of

1    those.  And I chose three.  The first one, just one mg per

2    ml, because it's very simple.  And the second, .3 and .74,

3    because that's a dosing range that's used for docetaxel.

4            And so, again, this gives us our absolute limits

5    on the amount of ethanol that could be present in a

6    perfusion to be given to a patient using the prescribing

7    information of both Hospira and Apotex.  And we see that for

8    the .74 mgs per ml, perfusion is 1.85-percent ethanol is the

9    absolute max, to be considered essentially free.  And for

10   the .3 mgs per ml, perfusion is .75 percent ethanol.

11           MR. COLLINS:  Your Honor, may I have leave to

12   leave the podium?

13           THE COURT:  Yes.

14   BY MR. COLLINS:

15   Q.    I just want to make sure we're clear.  Up here, all

16   the experts agree, Professor Myerson.

17   A.    Yes.

18   Q.    Everyone agrees here.

19           THE COURT:  So for the record, Mr. Collins,

20   you're "here" is where?

21           MR. COLLINS:  Here is the upper left-hand corner

22   of PDX-8-5.  It's a box that says "Agreed."

23   BY MR. COLLINS:

24   Q.    It's a stock solution of two mgs per ml of docetaxel,

25   50 mls of ethanol and 50 mls of a surfactant.  And then if

1    you move to the right-hand part of the screen, you've

2    basically taken half of the stock solution?

3    A.    That's correct.

4    Q.    And put that into a perfusion bag?

5    A.    Correct.

6    Q.    And on the lower part of PDX-8-5, you've given the

7    upper bound and the lower bound for the concentration of

8    Taxotere or the proposed defendants' proposed perfusions

9    that would be administered according to their prescribing

10   information?

11   A.    That's correct.

12   Q.    And that analogy just falls out of the math that

13   starts with a baseline?

14   A.    That's correct.

15              MR. HURST:  Leading.  Leading, your Honor.

16              THE COURT:  Yes.  Mr. Collins, please don't

17   lead.

18   BY MR. COLLINS:

19   Q.    If we can move on to PDX-8-6, please.

20              Professor Myerson, what are you showing on this

21   slide?

22   A.    This is Hospira's perfusion at the maximum labeled

23   docetaxel concentration.  Again, so this is what Hospira has

24   listed in their NDA as what the concentrations of everything

25   would be at the maximum dosing level of .74 mgs per ml.

1    Q.    And how does that line up with whether it's

2    essentially free of ethanol in the perfusion?

3    A.    Well, as we see, the ethanol concentration is

4    17 milliliters per liter, which is the same thing as saying

5    1.7 percent.  And so this amount of ethanol, 1.7 percent, is

6    actually less than the 1.85 percent I showed in the previous

7    slide.  And we have an illustration of this on the next

8    slide, which makes it simpler.

9            Okay.  So here we have at the top, we have the

10   stock solution.  Okay?  So we have ten mgs per ml docetaxel,

11   the ethanol, the surfactants and the other excipients.

12   Okay?

13           We have a standard of essentially free of

14   1.85 percent ethanol in this concentration of a perfusion,

15   and so if we dilute this to this concentration of a

16   perfusion, .74, we see that the ethanol is 1.7 percent,

17   which is less than 1.85.  So in my opinion, this means it's

18   essentially free of ethanol.

19   Q.    If we move on to PDX-8-8, Mr. Brooks?

20   A.    And this is just the same calculation for Hospira,

21   just showing this for the lower limit of the dosing

22   information, .3 mgs per ml.  And in that case, essentially

23   free, .75 percent ethanol.  In this case, it's .7 percent.

24   Again, my opinion, essentially free.

25   Q.    And I know there has been a lot of math discussed by

1    both parties with respect to this.  Is there another way to

2    look at Hospira's formulation?

3    A.    Sure.

4    Q.    Can we go to PDX-8-9, please?

5    A.    Well, I mean, this is interesting, and, in fact, Mr.

6    Hurst used something like this in his opening.

7              If we take Hospira's ten mgs per ml stock

8    solution, which has 23 percent ethanol in it, and dilute it

9    to two mgs per ml, it has 4.6 percent ethanol.  Now,

10   everybody in this case has already said that two mgs per ml

11   and five-percent ethanol is essentially free of ethanol.

12             So this is essentially free of ethanol.  All

13   right?  And so if we keep diluting it, of course, we get the

14   other numbers that we see, one mg per ml, 2.3 percent here.

15   One mg per ml, 2.5 percent.  It just shows if you take this

16   and dilute it to this and compare it to the original

17   standard, it is less.

18   Q.    Do the ratios of docetaxel and ethanol ever change?

19   A.    No.  Those ratios have to be invariant because you're

20   just taking something and diluting it.

21   Q.    And you're aware that Hospira's expert, Dr. Myrdal,

22   disagrees with your conclusion?

23   A.    Yes, I am aware of that.

24   Q.    And I'd like you to explain to us why you are right

25   and he's incorrect?

1  A.     Well, if you -- if you apply actually -- it's

2  interesting.  If you apply Dr. Myrdal's analysis or

3  Hospira's analysis or Apotex's analysis, it's possible to

4  have two perfusions made from different stock solutions that

5  have the same amount of ethanol in them, one of which would

6  be essentially free, and one of which would not be

7  essentially free -- okay -- because they change the

8  definition, but depending on how much docetaxel and how much

9  ethanol is in there.  I mean, the key -- the key point is

10  the ratio.

11              And once you figure out that two mgs per ml

12  is the minimum amount of docetaxel you can have in a stock

13  solution, and five percent is a maximum ethanol you can have

14  in a stock solution, you have an invariant ratio.  You can

15  always apply that.  It's very consistent.

16              The other way, you know, it just really depends

17  on where you started.  And so, again, you can come to this

18  conclusion, that one is essentially free and the other one

19  isn't, and they both have the same amount of ethanol.

20              So I found that logically inconsistent.

21  Q.     Well, I know you've prepared a slide to address Dr.

22  Myrdal's analysis.

23  A.     Yes.

24  Q.     Why don't we pull up PDX-8-10 and why don't you walk

25  us through that, Professor Myerson.

A.    Yes.   Dr. Myrdal wanted to use a different method,

which is not unusual, which is the total amount of ethanol

that a person will get when they are being infused.  Again,

that's a reasonable calculation.

         So if we want to calculate that, okay, and I'm

just taking it directly from Dr. Myrdal's calculation, we

know that the labeled dose for docetaxel is 60 to a hundred

milligrams per meter squared and you talk to the doctor.

That's how they prescribe based on the surface area of a

person.

         Now, Dr. Myrdal said a typical man is about

1.8 meters squared and I don't disagree with that.  So that

says that the minimum amount, the lower amount of docetaxel

that would be dosed to a man would be 108 milligrams, and

the maximum amount dosed to a man would be 180 milligrams.

         And so if we take that, we can then easily

calculate how much the absolute amount of ethanol that would

be given to a person based on the products that are here.

Q.    Sure.   And you mentioned calculate.

         MR. COLLINS:  Your Honor, if we would have the

Court's permission to have professor Myerson to step down

and go to the white board?

         THE COURT:  Sure.

BY MR. COLLINS:

Q.    Doctor Myerson, you mentioned calculate a couple

1    times.  You mentioned Dr. Myrdal's analysis.

2    A.    Sure.  Often these calculations are surprisingly

3    simple.  Here, we have, if we take Hospira's product,

4    Hospira's documents, it has ten milligrams per ml dose

5    pattern.  Fine.

6              We want to give a person 108 milligrams of

7    docetaxel.  And so in showing those little vials, you want

8    to know how much to pull out of that vial and put in a

9    perfusion bag.  So we know we want ten milligrams of

10   docetaxel.  If we divide that by ten milligrams per ml, we

11   find out we need 10.8 milliliters of the stock solution.

12   Okay?  So that's how much we have to pull out of the vial.

13   Very straightforward.

14             Now, how much ethanol is there going to be?

15   Well, we know that the Hospira material has 23 percent

16   ethanol.  Okay?  So if we take 10.8 ml, and we say, okay,

17   each ml is 23-percent ethanol, we have 0.23 ml ethanol per

18   ml of solution.

19             And if we multiply 10.8 times .23, we end up

20   with the final number, okay, which I believe I have on the

21   next slide -- okay -- which is 2.5 mls, the amount

22   administered to a patient.  Okay?

23             And I apologize for my handwriting.  My students

24   have been complaining about that for many years.

25             THE COURT:  It's much better than mine.

1    THE WITNESS:  Of course, we can do the same

2    calculation for the maximum dose.  There, we're just going

3    to multiply 18 ml times 0.23 ml per ml, and we get the

4    bottom number, 4.1 ml.  Okay?

5         And we can do the same calculation for a stock

6    solution that I had before up, the two mgs per ml stock

7    solution that we said is essentially free.  And if you do

8    that, 2.7 compared to 2.5, 4.5 compared to 4.1.

9         So, again, the absolute amount of ethanol that's

10   administered is less.

11   Q.   Your ultimate conclusion, then, with respect to the

12   Hospira?

13   A.   It satisfies the essentially free of ethanol

14   limitation.

15   Q.   Did you do a similar analysis for the Apotex product?

16   A.   I did.

17        MR. COLLINS:  Mr. Brooks, if we can pull up PDX-

18   8-12.

19        THE WITNESS:  Okay.  The Apotex product as we

20   heard previously is a two-vial product and my analysis is

21   based on the concentration of what we call the premix, which

22   is after we mix vial one with vial two.

23        MR. COLLINS:  And, Mr. Brooks, if we can go to

24   PDX-8-14.

25        THE WITNESS:  Again, this is the same -- same

1  type of analysis I showed previously, about Apotex, stock

2  solution starts at ten mgs per ml again, has a certain

3  amount of ethanol in it.  If we dilute it to the .74 mgs per

4  ml perfusion, it has very little ethanol.  .45 percent, far

5  below 1.85 percent, which is the essentially free

6  definition.  We can do the same calculation for the lower

7  dosing amount, which is in the next slide.

8            Okay.  So here, I went back to the -- I'm sorry.

9  I went back to the calculation of the absolute amounts, as I

10 showed previously.

11 BY MR. COLLINS:

12 Q.   Okay.  And this is basically Dr. Myrdal's analysis?

13 A.   Yes.  Actually, Dr. Myrdal did the calculation and I

14 agree with it.  And it is, again, it shows that the amount

15 of ethanol administered to a patient at the minimum or

16 maximum dose is far below the amount I calculated for

17 essentially free.

18 Q.   And just for the record, you're referring to PDX-8-

19 15?

20 A.   Yes, that's correct.

21 Q.   Did you perform an analysis or conclusion as to

22 whether the Taxotere perfusion meets this limitation?

23 A.   I did.

24            MR. COLLINS:  If we can go to PDX-8-16.

25 BY MR. COLLINS:

1    Q.    What is your conclusion?

2    A.    That the Taxotere perfusion, again, meets the

3    essentially free limitation.

4    Q.    And if we go to PDX-8-17, I believe it's there?

5    A.    Right.  So in Taxotere formulation, we take the -- the

6    stock solution, make it a perfusion.  It has .89-percent

7    ethanol at the higher dosing level, again, compared to 1.85.

8    Again, meets the essentially free limitation.

9    Q.    And, again, just to remind us, Professor Myerson, the

10   maximum concentration or percent of ethanol in the perfusion

11   at the highest Taxotere concentration is what?  What's the

12   highest amount of ethanol?

13   A.    Oh, 1.85 percent.  Essentially free is 1.85 percent.

14   The Taxotere perfusion has .89 percent ethanol at the higher

15   dosing amount of .74 mgs per ml.

16   Q.    Therefore?

17   A.    Therefore, it is essentially free.

18   Q.    Did you form any opinions as to whether the

19   defendants' products infringe claim 33?

20   A.    Yes, I have.

21   Q.    And if we could go to PDX-8-19.

22         If you could just walk us through your analysis

23   of this?

24   A.    Yes.  Claim 33 is, again, another dependent claim,

25   which the claim depends on claim 32, which depends on claim

1    24.  And claim 24 starts out as defining a stock solution,

2    which the Court has construed as a concentrated solution,

3    comprising -- and, again, the word "comprising" in a

4    composition claim, my understanding is it means it must have

5    the claimed composition, but other things can be present,

6    and it requires that we have docetaxel.  Well, element 1 is

7    a stock solution itself.

8              Element 2, concentrated solution, element 2 is a

9    concentration of docetaxel, between 10 and 200 mgs per ml.

10   And element 3 is dissolved in polysorbate.

11   Q.   And you've reviewed the Hospira and Apotex's NDA's?

12   A.   Yes, I have.

13   Q.   And your conclusion is they meet these limitations?

14   A.   Yes, they do.

15   Q.   And if we can go to PDX-8-20.

16   A.   This is Hospira's stock solution.  So it's ten mgs per

17   ml, certainly greater -- certainly in the range of 10 to

18   200.  It's a stock solution because it's a concentrate

19   solution, and it dissolved in polysorbate 80.  And so it

20   meets the limitations of the claim.

21   Q.   The same question for Apotex's premix, PDX-8-21.  Does

22   it meet the limitations, all the limitations of claim 23?

23   A.   Yes.  Again, it has ten mgs per ml, which is in the

24   range of 10 to 200, dissolved in polysorbate, and it's a

25   stock solution, so it meets the limitations of the claim.

1    Q.    Okay.  The same questions about whether Taxotere is

2    covered by claim 33.  If we could move on to PDX-8-dash 22.

3    A.    Yes, Taxotere has a stock solution of 40 mgs per ml

4    here, and it's dissolved in polysorbate.  And so it's both a

5    stock solution dissolved in polysorbate, so it meets the

6    limitation of the claim.

7    Q.    Just two just very brief questions before I rest.

8                   MR. COLLINS:  Can we pull up Hospira's opening

9    slide 53?

10   BY MR. COLLINS:

11   Q.    And you were here for the opening statements; correct?

12   A.    Yes.

13   Q.    And have you had a chance to consider the slide

14   presented by Hospira in opening, what's shown on the slide

15   here as 53?

16   A.    Yes.

17   Q.    What was your reaction to this when you saw it?

18   A.    Well, on reflection, I have a couple points about the

19   slide.

20                   If we look at the first vial, actually, if

21   we look at the product Hospira has said they want to sell,

22   the maximum size stock solution they're going to sell is 16

23   ml, and if they have 23-percent ethanol and 16 ml, which

24   means the four mls would be 3.68 mls if this was actually a

25   bottle of Hospira's maximum size.

1    So it's not, but -- so to understand what is in

2  this bottle, then, I have to recalculate how much -- you

3  know, it's a -- say, an example bottle that might be bigger.

4  Okay?  So how much is in here?

5    Well, if there are four mls of ethanol in here

6  and we divide that by .23, we come out with 173 mgs --

7  17.3 milliliters in the vial, with a 173 mgs of docetaxel.

8  Okay.  So that's point one.

9    Point 2 is, we talked about before, you would

10  only -- you wouldn't take this whole bottle out necessarily

11  and put it in here or in here, because it depends on what

12  you are going to dose.

13    So if you were going to dose a very big man,

14  maybe you would take it all in here and you would have a

15  four ml.  But if you were going to dose a small woman, you

16  might take half of this out.  And if you took half of it

17  out, these would only have two mls in there.

18    The percentages are certainly correct.  Okay?

19  But these absolute amounts don't necessarily have to be the

20  same unless you use the entire vial.

21    The second point is, of course, that Hospira's

22  and Apotex's experts have said that something with two mgs

23  per ml docetaxel and five-percent ethanol is essentially

24  free of ethanol.  And this has two mgs per ml docetaxel and

25  less than five-percent ethanol.

1    So actually, Mr. Hurst's example, according to

2    his own experts, is essentially free, right here.

3    So those are my comments about that example.

4    Q.    But this slide does not accurately show their product,

5    does it?

6    A.    Well, that is also correct.

7    Q.    One last question.

8    MR. COLLINS:  Mr. Brooks, if we can pull up JTX-

9    070, please.

10   BY MR. COLLINS:

11   Q.    And if we can go to Page 4 which deals with the

12   stability information that you were in the courtroom when

13   Dr. Kaler was testifying; is that correct?

14   A.    Yes.

15   Q.    And I think he was questioned with respect to the

16   stability that's in the Taxotere label.  Were you here for

17   that?

18   A.    Yes, I was.

19   Q.    And the label says four hours.

20   A.    Yes.

21   Q.    Do you have any opinion as to what is meant in terms

22   of physical stability for the perfusion?

23   THE COURT:  Hold on.

24   MR. HURST:  With that particular question, I

25   don't have an objection.

1          THE COURT:  All right.

2          MR. HURST:  I thought it was going somewhere

3     else, your Honor.

4          THE COURT:  Do you have the question in mind,

5     Doctor?

6          THE WITNESS:  Can I hear it again, please?

7          THE COURT:  Would you repeat it, Mr. Collins?

8          MR. COLLINS:  Sure.  If I can recall it.

9          THE COURT:  Do you need to have it read back?

10         MR. COLLINS:  Could I just -- if I could have it

11    read back, please?

12         MR. HURST:  I've been reminded, this is an issue

13    relating to the other patent, the '561 patent, and he did

14    not offer any opinions on the '561 patent, so for that

15    reason, it's all outside the scope of his report.

16         MR. COLLINS:  That's just not true, your Honor.

17         THE COURT:  Okay.

18         MR. COLLINS:  I'm looking at professor Myerson's

19    second report.

20         THE COURT:  All right.

21         MR. COLLINS:  It's talking about the --

22         THE COURT:  What page are you on?

23         MR. COLLINS:  27.

24         THE COURT:  Let Mr. Hurst catch up with you

25    there for a minute.

1          MR. HURST:  27, which report?

2          MR. COLLINS:  Your Honor, may we have a moment

3     to confer?

4          THE COURT:  Sure.

5          (Pause while counsel conferred.)

6          MR. HURST:  I will maintain my objection, your

7     Honor.  The page I was shown did not refer to the other

8     patent.

9          MR. COLLINS:  Your Honor, they've injected in

10    the case the stability of our formulation and I just --

11    Professor Myerson has an opinion on it and it's in his

12    report, on Page 27 of his second report.  And I was just

13    going to have him --

14         THE COURT:  You can't agree whether it's on --

15         MR. HURST:  He does not offer opinions on the

16    other patent, and the paragraph that I was shown does not

17    mention the '561 patent.

18         THE COURT:  Does he offer opinions on the

19    stability issue?

20         MR. HURST:  Absolutely, he does not offer

21    opinions on how long Hospira's perfusion remained stable.

22    As I understand it, nobody on their side has offered any

23    opinions on that issue, your Honor, including Dr. Myerson.

24         MR. COLLINS:  Your Honor, he has a very clear

25    opinion on what it means to have physical stability.

1          THE COURT:  Let's have a sidebar.  Let me take a

2   look at the report, see what we have.

3          (Sidebar conference held as follows.)

4          THE COURT:  We're at paragraph 59.  All right.

5   Let's see.

6          So Mr. Collins has provided me with a copy of

7   Dr. Myerson's expert report, dated -- it's dated 7/24/09.

8   Paragraph 59, the first sentence reads, the stability of the

9   perfusion is an issue because of the low solubility of

10  docetaxel.

11         There are other sections of the paragraph that

12  specifically refer to the issue of stability.  For instance,

13  normally, if it is desired for a solution to be stable for

14  at least four hours, then it goes on and on.

15         Now, what is your objection?

16         MR. HURST:  Here's my objection.  Right now, in

17  the evidence, your Honor, no expert has offered an opinion

18  how long Hospira's product remained stable.  Dr. Kaler

19  argued that there was -- there's an eight-hour requirement.

20  It has to be eight hours to meet the claims, but he did not

21  offer an opinion how long Hospira's perfusion remained

22  stable.

23         My worry is that there's going to be an effort

24  now to have Dr. Myerson offer an opinion on how long

25  Hospira's product remained stable.

1      MR. COLLINS:  I'm not going to ask that

2  question.  I just wanted to ask a clarifying question as to

3  what he meant by physical stability.

4      MR. HURST:  That's -- we were trying to talk

5  about that on the side.  I wasn't getting that clarity.

6      THE COURT:  Sometimes you just need the potted

7  plant to sit and listen to you, wearing the robe.  That's

8  all.

9      MR. HURST:  Thank you, your Honor.

10      (End of sidebar conference.)

11      THE COURT:  With the agreement that we arrived

12  at, I will overrule the objection.

13  BY MR. COLLINS:

14  Q.   Professor Myerson, what is meant by physical stability

15  of the perfusion?

16  A.   In this case, physical stability of the perfusion

17  refers to how long the perfusion will last before a solid

18  precipitates out, and that's the time that takes.

19      And why that's important, of course, is the

20  activity of the drug depends on it being dissolved, number

21  one.

22      Number two, you don't want to inject

23  somebody with a solution of particles.

24  Q.   And with respect to the patent that you've analyzed

25  and offered opinions on, do you have an opinion on what that

1    time frame is?

2    A.    Yes.

3    Q.    And what is it?

4              MR. HURST:  Objection.  Beyond the scope of his

5    report, Your Honor.  This is exactly what we talked about.

6              THE COURT:  It is.  Sustained.

7              MR. COLLINS:  I will pass the witness, Your

8    Honor.

9              THE COURT:  Mr. Hurst?

10             MR. HURST:  We can start or take lunch.

11             THE COURT:  Counsel, what is your pleasure?

12             MR. HURST:  There is a too-much coffee break

13   that I wouldn't mind taking lunch right now, Your Honor.

14             THE COURT:  Let's take a recess.

15             (Luncheon recess taken.)

16             THE COURT:  Please take your seats.

17             MR. COLLINS:  Your Honor, before I truly pass

18   Professor Myerson off to Mr. Hurst, I wanted to raise one

19   brief issue with you.  There was a ruling sustained at the

20   end of my examination on an opinion that the ruling was not

21   in Professor Myerson's report.

22             I have had a chance to revisit that.  It is

23   clearly in his report.  I asked Mr. Hurst to withdraw his

24   objection.  He has not.  We can do this at a sidebar.  I

25   think it is clearly in the report.

1          MR. HURST:  If we can go to sidebar, Your Honor.

2

3          (The following took place at sidebar.)

4          MR. HURST:  It is just that this is a key issue.

5          THE COURT:  What is the objection?

6          MR. HURST:  The objection is this:  He is asking

7    to put into evidence testimony from this witness on

8    infringement of Hospira's product relating to stability when

9    he did not offer any infringement opinions with respect to

10   this particular patent.

11          What he is doing is -- I can show Your Honor,

12   this is where it is.  This is a rebuttal report on validity.

13   This relates to inequitable conduct.  And here is what he is

14   doing.  Here he talks about the Tarr emulsion.

15          THE COURT:  Page 47.

16          MR. HURST:  He says, In any case --

17          THE COURT:  49.

18          MR. HURST:  The issue relates to this:  There is

19   no evidence in the record that in Hospira's product the

20   physical stability of the perfusion lasted more than eight

21   hours.  The witness said that was the requirement.  They

22   offered no evidence in the infringement report that our

23   particular product has eight hours of perfusion.  It seems

24   to me to try to get it in this way -- then he says, without

25   a citation or anything, if a formulation is labeled for four

1    hours, the average time to crystallization must be at least

2    twice this amount.

3            That has nothing to do with our particular

4    product.  He didn't offer any opinions as to our particular

5    product.

6            MR. COLLINS:  There is no hard-and-fast limit.

7    But the label is being used by defendants as some sort of

8    measurement as to whether they infringe or not.

9            THE COURT:  You need to address his argument,

10   Mr. Collins.

11           MR. COLLINS:  This expert does have

12   experience --

13           THE COURT:  Did he talk about it in his report?

14   Other than this oblique fashion.

15           MR. COLLINS:  Yes, he did.  I couldn't find it

16   quick enough, Your Honor.

17           In the earlier paragraph we were looking at,

18   Your Honor, he explicitly mentions that if solutions take

19   four hours then the nucleation time must have to be at least

20   eight hours if not more.  So this expert based on his

21   experience has an opinion that if a formulation is labeled

22   for four hours it must mean eight hours.  That is basically

23   his opinion.

24           We were precluded from offering that based on

25   the objection.  The representation was it wasn't in his

1    report.  I think they are going to use that to basically

2    move for some sort of judgment because we haven't put on

3    evidence, when, in fact, we do have the evidence coming from

4    Professor Myerson.

5              MR. DRESNER:  Your Honor, I was just going make

6    a point, Your Honor, that this witness has never opined on

7    the '561 patent.

8              THE COURT:  That is sort of where both counsel

9    have tried to focus my attention.  That is what I am trying

10   to get you to focus yours.

11             MR. COLLINS:  Professor Myerson does have

12   opinions on both patents, actually.

13             THE COURT:  He may have.  But we have that

14   thing, that Rule 26 out there, that sort of does -- you know

15   what it does.

16             MR. COLLINS:  I understand.

17             Professor Myerson does have opinions on the

18   '561.  They are mostly in the validity context.  But this

19   argument that is being raised as to stability and whatever

20   it requires is expressly addressed by Professor Myerson in

21   his three reports, actually, in multiple places, and he said

22   if it is labeled for four hours that really means eight

23   hours.

24             THE COURT:  You are saying you want him to be

25   able to testify to that as an expert in the subject area as

1    a general proposition.

2                MR. COLLINS:  Yes.

3                THE COURT:  Not specific to the '561 patent.

4                MR. COLLINS:  Yes.

5                MR. DRESNER:  Much a Apotex's and Hospira's

6    products in particular.

7                MR. HURST:  But the part -- he read from 59.

8    It's in the section, the asserted claims on the '512 patent

9    are nonobvious.  He did not offer any infringement opinions

10   with respect to our product on this issue.  It is that

11   straightforward.

12               THE COURT:  Let me get both counsel to respond

13   to the general assertion that he seeks from the gentleman as

14   an expert in the particular science that we are discussing,

15   as to the general scientific principle regarding stability.

16   Do you resist that?

17               MR. HURST:  I do resist that principle,

18   particularly because he is testifying, he will imply that

19   our product infringes.  I did not prepare to cross-examine

20   him on that particular point because it was never part of

21   his --

22               THE COURT:  I will let you continue.

23               You are saying he should not be permitted to

24   offer an opinion on whether either of the defendants'

25   products infringe for this reason, for the reasons asserted

1    here.

2                    MR. DRESNER:  That's correct, Your Honor.

3                    THE COURT:  That seems fair.

4                    I don't think you would resist that, Mr.

5    Collins.

6                    MR. COLLINS:  I do not, Your Honor.

7                    THE COURT:  Here is what they are trying to do.

8    We are talking about general science.

9                    MR. COLLINS:  We are.

10                   THE COURT:  And the properties of compositions

11   and things.  That's what he wants to have him talk about.

12                   He can't ask him I think the ultimate question

13   that he might have otherwise been able to ask him about the

14   '561 patent.  Certainly, that objection would be well taken.

15                   Do you still object to him -- I don't think you

16   resist the notion that he is an expert in the particular

17   area of science that we are talking about.

18                   MR. HURST:  Your Honor, I do, just for this

19   reason:  This is in his invalidity report.  The way the

20   argument is going to go is, when we move for judgment for

21   the lack of evidence, of any evidence at all, that our two

22   perfusions meet his eight-hour requirement, they are going

23   to cite his testimony and they are going to say Dr. Myerson

24   provided testimony about general scientific principles,

25   which we didn't have an opportunity to prepare to cross, and

1    say for that reason we have enough evidence to show

2    infringement.

3          We think that is inappropriate.  This is going

4    to be the core foundation of their infringement case right

5    now.  And they are trying to put it in through an invalidity

6    paragraph in an opinion.

7          MR. HURST:  The opinions expressed there by the

8    witness had nothing to do with infringement, Your Honor,

9    even on these general principles.  They had to do with

10   invalidity.  That is not the issue that he ought --

11         THE COURT:  I agree with that.  My question is

12   this, counsel:  Are you asking me to stick my head in the

13   sand on science and what scientific principles are that are

14   not in controversy?

15         MR. HURST:  There is absolutely controversy,

16   Your Honor.

17         The principle that he is offering right now, to

18   let you know, this is absolutely in controversy.  He is

19   implying that if your label says four hours, that means you

20   get to eight hours.  That is what he wants to argue.  We

21   disagree with that.  Our perfusion, in fact, our testing

22   shows that --

23         THE COURT:  Do you have somebody to talk about

24   that?

25         MR. HURST:  Our next witness in our -- she is

1    going to talk about, if we get there, she is going to say

2    our perfusion testing shows it goes up to six hours.

3              THE COURT:  I am go going to let this testify.

4    I think it would be imprudent of me, given the availability

5    of all of us right now, to do so otherwise.  In point of

6    fact, I agree with you, and in the post-briefing analysis

7    you will address this and we will have the benefit of a full

8    record.

9              I am telling you, previewing for all of you now,

10   I am going to reserve on your JMOLs.  You need to preserve

11   your issues.  But I am not going to rule on them, unless

12   there is something so obvious, and I don't think there is in

13   the case.  Maybe as it develops it will become such that I

14   am comfortable ruling.  I have been known to do that.  That

15   is not my present plan.

16             On this particular issue, I would expect that I

17   am going to be able to benefit from a better record, from

18   having heard from your experts.  If I exclude it now -- I

19   may have to come back and revisit this at some point.  We

20   may all have to come back and revisit it.

21             I am going to let him discuss these general

22   scientific principles, within the context of the '561

23   patent.  That is the guidance you have.

24             MR. COLLINS:  Yes, Your Honor.

25             MR. HURST:  Because this is a new issue to us

1    that we haven't prepared to cross-examine --

2              THE COURT:  I will give you some leave.

3              MR. HURST:  I will not be prepared -- I need to

4    talk to my scientists.  Can we have him potentially come

5    back if we need him to?

6              MR. COLLINS:  Yes, Your Honor.

7              THE COURT:  Okay.

8              (End of sidebar conference.)

9              MR. COLLINS:  May I proceed, Your Honor.

10             THE COURT:  Yes.

11   BY MR. COLLINS:

12   Q.    Professor Myerson, do you have an opinion whether if a

13   formulation is labeled for four hours how long the average

14   time to crystallization must be?

15   A.    Yes, I do.

16   Q.    What is your opinion?

17   A.    I think my opinion would be, and I think I testified

18   to this in my deposition, it would be on the order of eight

19   hours.

20             The issue is that the stability of solution,

21   they don't all fail at once.  They fail in a distribution of

22   times.  If you were going to tell somebody it is stable for

23   four hours and you didn't want something to fail a very high

24   percentage of the time, the actual average failure time

25   would have to be significantly longer.

1          Typically, in these experiments I call

2    nucleation induction time experiments, the, what we call

3    standard deviation, the variability in the time, is on the

4    order of the time itself.

5          So that if you said something was going to last

6    four hours, you would probably measure -- you need at least

7    an eight-hour average to get a series of experiments to feel

8    good about saying the stability time that you could use that

9    would be four hours.

10   Q.   One final question, Professor Myerson.  You were

11   referring to crystallization.  Is there another term for

12   that?

13   A.   Yes.  People use the term precipitation

14   interchangeably often with crystallization.

15   Q.   Stability means the same thing?

16   A.   When you are talking about stability of a solution,

17   the physical instability, is it precipitation, that's the

18   same thing, yes.

19          MR. COLLINS:  Pass this witness.

20          MR. HURST:  Thank you, Your Honor.

21                     CROSS-EXAMINATION

22   BY MR. HURST:

23   Q.   Good afternoon, Dr. Myerson.  How are you?

24   A.   Good, thank you, Mr. Hurst.

25   Q.   Can we please go to Plaintiffs' Demonstrative Exhibit

1  8-2.

2          Dr. Myerson, this is one of the demonstrative

3  exhibits that you used during your testimony.  Correct?

4  A.   That's correct.

5  Q.   And it's the claim construction?

6  A.   Yes.

7  Q.   For a stock solution it's no more than 5 percent

8  ethanol by volume.  Do you see that?

9  A.   Yes.

10 Q.   Earlier you testified that Taxotere is covered by the

11 claims.  I think you meant Taxotere perfusion.  Isn't that

12 right?

13 A.   That's correct.

14 Q.   Why don't we take a look at JTX-221.  I am looking at

15 the depiction on the bottom, and I am essentially just using

16 this as a demonstrative exhibit.  You understand that

17 currently sanofi sells their product in two separate

18 bottles.  Right?

19 A.   That's correct.

20 Q.   They mix them together into a premix.  Is that

21 correct?

22 A.   That's correct.

23 Q.   And that premix is what sanofi has considered their

24 stock solution in this case.  Is that correct?

25 A.   Depending on what patent, what claim we are talking

1    about, that's not necessarily correct.

2    Q.    Do you consider the premix a stock solution?  Can it

3    be?

4    A.    As I defined it in Claim 33 of the '512 patent, yes,

5    because it meets the elements of that claim.  So for that

6    particular claim, that is a stock solution.

7    Q.    So this premix has 12 percent ethanol.  Is that

8    correct?

9    A.    Now you are asking me about the stock -- the initial

10   solution?  We are talking about the premix?

11   Q.    I hope I didn't confuse you.  You first take two

12   bottles and put them together into a premix.  Right?

13   A.    That's correct.

14   Q.    Can I call that the premix to make sure we are talking

15   about the same thing?

16   A.    Yes, lets call that the premix.

17   Q.    That premix qualifies as a stock solution under the

18   claims, correct, in your view?

19   A.    We would call that a stock solution as well, that's

20   correct.

21   Q.    And sanofi's premix has 12 percent ethanol.  Correct?

22   A.    Do you have the elements, the composition of the

23   diluting material somewhere?

24   Q.    You need to be reminded?  I can help you out.

25   A.    I would prefer to see that, yes.

1  Q.    That is fine.  Plaintiffs' Demonstrative Exhibit 8-17.

2  Does that help you out, up on the left here?

3  A.    Right.  That's right.  That's the docetaxel, and it

4  has approximately 12 percent ethanol.

5  Q.    So sanofi's premix is not essentially free of ethanol.

6  Correct?

7  A.    That's correct.

8  Q.    Let's go to Plaintiffs' Demonstrative Exhibit 8-7.

9  Now we get to Hospira's stock solution, that is part of what

10 you put in Plaintiffs' Demonstrative Exhibit 8-7.  Correct?

11 A.    That's correct.

12 Q.    And our stock solution is up here on the left.  Right?

13 A.    That's correct.

14 Q.    And you put for the ethanol milliliters per liter.

15 Right?

16 A.    That's correct.

17 Q.    That converts to 23 percent.  Right?

18 A.    That's correct.

19 Q.    So Hospira's stock solution is not essentially free of

20 ethanol.  Correct?

21 A.    That's correct.

22 Q.    Let's take a look at Myerson Demonstrative Exhibit 5.

23 Now, what I put up here is the two claim constructions for

24 the stock solution and the perfusion.  Do you see that?  Do

25 you see the claim construction at the top?

1    A.    Yes.

2    Q.    Now, on the left, I have the three presentations for

3    Hospira, the 20 milligram, the 80 milligram and the 160

4    milligram.  Do you see that?

5    A.    Yes.

6    Q.    And each of those has 23 percent ethanol.  Correct?

7    A.    That's correct.

8    Q.    And so then I put the amount of ethanol actually in

9    each bottle at 23 percent, 0.46, 1.34, 3.68.

10   A.    Correct.

11   Q.    Yes?

12   A.    Yes.

13   Q.    You agree that they are all essentially free of

14   ethanol.  Right?

15             Strike that.

16             You agree that none of the three presentations

17   are essentially free of ethanol.  Correct?

18   A.    Of the stock solutions, that's correct.

19   Q.    Okay.  Now, the Court's construction of perfusion is

20   the same amount of ethanol as a stock solution with no more

21   than 5 percent ethanol by volume.

22             Do you see that?

23   A.    Yes.

24   Q.    If we put the Hospira 20-milligram presentation and we

25   dilute it into a perfusion bag, we will get the same amount

1    of ethanol as that stock solution.  Correct?

2    A.    The total amount of ethanol will be the same as the

3    ethanol in the stock solution, that's correct.

4    Q.    So if I start with .46 milliliters of ethanol in the

5    stock, and I dilute it, it doesn't matter how much I dilute

6    it, I will always have .46 milliliters.  Right?

7    A.    That's correct.

8    Q.    And you read the patent.  Correct?

9    A.    I did.

10   Q.    In the discussion of the essentially free of ethanol,

11   you saw in the patent that there is some discussion about

12   intoxication manifestations?

13   A.    I am sure that there is, that's correct.

14   Q.    That's one of the bases for why it's a good thing to

15   be essentially free, to avoid intoxication manifestations.

16   Right?

17   A.    That is the testimony that I have heard, yes.

18   Q.    And it's actually in the patent, too.  Right?

19   A.    Yes.

20   Q.    So if .46 milliliters ethanol 23 percent is too much

21   in the stock solution, it would also be too much when you

22   put that same amount in the perfusion.  Right?

23   A.    In terms of alcohol intoxication?

24   Q.    Right.

25   A.    I have no opinion about that.

1    Q.    One of the things that you pointed out in your direct

2    testimony is, well, you don't have to give a whole bottle?

3    Right?  You can give a part of a bottle or more than one

4    bottle to a patient.  Correct?

5    A.    That's correct.  The amount that you give -- that you

6    take out of a vial depends upon how much docetaxel you wish

7    to dose the patient.

8    Q.    But that wouldn't change this analysis.  Right?  It

9    would still be the same amount whether you gave a bottle and

10    a half, half a bottle, into the perfusion, the amount of

11    ethanol would always remain the same between the two.

12    Correct, sir?

13    A.    That's right.  Except the numbers wouldn't be the same

14    numbers as you have up here, which is what I previously

15    pointed out.

16    Q.    Right.  That's fine.  Let's do one so we both can

17    follow.  Say we give, for the 20-milligram presentation, say

18    we give two bottles.  Right?

19    A.    Yes, I understand, yes.

20    Q.    That would be .92 milliliters of ethanol.  Right?

21    A.    That's right.  If you took two bottles and you put

22    those in a perfusion bag, you would have .92 total ml's of

23    ethanol.

24    Q.    Under the construction of perfusion, it talks about

25    having the same amount of ethanol as a stock solution.  Do

1    you see that?

2    A.    I do.  But in this whole analysis, you are connecting

3    the two things as a process.  This is a stock solution, and

4    you have to have, the first part is you have to do the

5    process of taking that stock solution and making a

6    perfusion, which is not what the claim construction says.

7    Q.    Sir, it's actually an amount.  Right?  It's a level.

8    Saying the same amount as the corresponding stock

9    solution --

10   A.    It doesn't say corresponding.  It says for a perfusion

11   the same amount of ethanol of a stock solution with more

12   than 5 percent ethanol by volume.  It doesn't say the same

13   stock solution.  It doesn't say the corresponding stock

14   solution.

15             That's just putting the same process limitation

16   on it.

17   Q.    We will probably leave that for the legal briefs

18   later.  And I want to talk to you about that.

19             But getting back to the issue in terms of the

20   same amount.  Say you get half a bottle.  Say you get .23

21   milliliters of ethanol.  That would still be 23 percent

22   ethanol.  Right?

23   A.    That's right.

24   Q.    If I get a half bottle into perfusion and diluted it,

25   it would still be .23 milliliters.  Right?

1  A.    We have no quibble with the fact that whatever you

2  take out of the bottle --

3  Q.    Is that correct, Dr. Myerson?  Is it correct if I

4  start with .23 milliliters and then I put it into the

5  perfusion, it would still be .23?  Right?

6            MR. COLLINS:  Your Honor, I would just ask that

7  the witness be allowed to finish his response before being

8  cut off.

9            THE COURT:  Fair enough.

10           Do you understand the question just posed?

11           THE WITNESS:  I do understand the question.

12           What I was starting to say is, as I testified in

13  my direct, it's quite obvious that whatever you take out of

14  the bottle, the stock solution bottle or the premix bottle,

15  and put in the perfusion is what's in the perfusion.

16           I have no quibble with that concept.

17  BY MR. HURST:

18  Q.    So when you read the Court's claim construction, you

19  focused on the use of the phrase "a stock solution."  Right?

20  A.    That's correct.

21  Q.    And what you read that to mean is you could use a

22  hypothetical stock solution that you chose to use.  Correct?

23  A.    Actually, the way I understand this, or the way I

24  attempted to apply this, to me, when you have a composition

25  claim, it should define some specific range of numbers.  And

1    so, to my mind, the key issue was defining that range.  And

2    to define that range, to me, you would look for the minimum

3    amount of docetaxel that could be present in a stock

4    solution and the maximum amount of ethanol.  You need to

5    calculate the ratio, the amount, or any way you want.  That

6    would give you an absolute number to always compare every

7    other perfusion to.

8              That was my way of interpreting this

9    "essentially free" claim.

10   Q.    Okay.  Did you understand my question, sir?

11   A.    I thought I answered it, actually.

12   Q.    All right.  When you did your analysis, you didn't

13   focus on the accused stock solution for the perfusion; is

14   that correct?  You did not; correct?

15   A.    I certainly focused on it on deciding whether it

16   infringed or not.

17   Q.    And you decided it did not?

18   A.    The stock solution itself --

19   Q.    Does not infringe?

20   A.    Does not infringe, that's correct.

21   Q.    So when you were doing your analysis, you disconnected

22   the stock solution from the perfusion; is that right?  You

23   did not use Hospira's stock solution, you used a different

24   one; right?

25   A.    I'm not -- I don't think I'm understanding where

1    you're going or what you are asking at this point.

2    Q.    Let me try it again.  When you saw the phrase, a stock

3    solution, you decided all you have to do is define a

4    hypothetical stock solution with five-percent ethanol

5    regardless of whether it matched up with the accused

6    product; correct?

7    A.    Well, okay.  That's not the whole -- that's not the

8    whole analysis.

9          Certainly, what I attempted to do was to use the

10   Court's claim construction, which had two parts.  The --

11   yes.  Stock solution no more than five percent ethanol by

12   volume, and for perfusion, the same amount of ethanol for

13   stock solution, no more than five percent by volume, and

14   define what that meant in light of the '512 patent.  Okay.

15         Now, if you are asking me -- and I did that,

16   came up with a standard, and then compared those to the

17   Hospira product.

18   Q.    All right.  You gave your deposition in this case?

19   A.    Yes, I did.

20   Q.    And why don't we just play it.  Deposition, Page 74, 2

21   through 20, please.

22         (Deposition videotaped excerpt played as

23   follows.)

24         "Question:  Do I understand you to say that the

25   amount of ethanol in a perfusion must be the same as the

1    stock solution from which it is made?

2              "Answer:  That's not what I just said, no,

3    because that's not what the construction of the Court is.

4              "Okay.  Using a construction of the Court, all

5    you have to do is define a hypothetical stock solution with

6    five-percent ethanol.  And if the perfusion has the same

7    amount of ethanol as that stock solution, then it reads on

8    the claim, I mean, because otherwise you're putting a

9    process limitation if you connect the perfusion to the

10   actual stock solution it was made from.  It has to be made

11   from that stock solution."

12   BY MR. HURST:

13   Q.    Okay.  Did you give that answer to that question, sir?

14   A.    Yes.  And I believe that's exactly what you just said

15   two minutes ago.

16   Q.    Well, sir, so what you did is, you went out and you

17   searched for an example of a stock solution that had five

18   percent rather than using Hospira's actual stock solution;

19   correct?

20   A.    I didn't search, because in your invalidity argument,

21   you gave me the stock solution and said it was essentially

22   free from ethanol.  That's where I got it.  I didn't go

23   searching for it.

24   Q.    You could have picked a different one; right?

25   A.    Well, I liked the example that you gave me, so I

1    decided it was a very nice example to use.

2    Q.    All right.  Well, let's talk about that.  You chose an

3    example in a prior art patent; right?

4    A.    Again, I don't think I chose it.  I think -- I think

5    you and your experts chose it, but I chose to use it after

6    you chose it.

7    Q.    Okay.  Well, let's talk about it.  Let's go to the

8    '470 patent.  It's JTX-009.

9              MR. HURST:  May I approach, your Honor?

10             THE COURT:  Yes.

11   BY MR. HURST:

12   Q.    Now, this is, in fact, a patent from the prior art;

13   right?

14   A.    That's correct.

15   Q.    Okay.  And the example that you used for your analysis

16   was composition, the composition example in column 10 of the

17   patent, which is -- you have it.

18             Do you see that there?

19   A.    Yes.

20   Q.    And why don't we blow that up.

21             It talks about the product of a Formula 1

22   obtained in one is dissolved in Emulphor.

23             Do you see that?

24   A.    Yes.

25   Q.    Okay.  And the way -- at that point, the example is

1    not essentially free of ethanol; right?

2    A.    At that point, there's no ethanol in it.

3    Q.    All right.

4    A.    So --

5    Q.    And the ethanol 1 c.c.

6    A.    Okay.

7    Q.    So it's a 50/50 solution; right?

8    A.    Okay.  There we are.  Okay.  Yes.

9    Q.    Okay.

10   A.    At that point, 50/50 solution.

11   Q.    All right.  So that's not ethanol-free; right?

12   A.    That's correct.

13   Q.    And you didn't use that as the basis for your

14   calculation?

15   A.    No.

16   Q.    And so then -- and the next step is the solution is

17   then diluted by adding a physiological saline?

18             Do you see that?

19   A.    Yes.

20   Q.    And that adds 18 c.c.?

21   A.    Yes.

22   Q.    So it's 1 c.c. of ethanol over 20?

23   A.    Yes.

24   Q.    And that's five percent; right?

25   A.    Yes.

1  Q.    And during direct, you noted that -- you noted during

2  direct that Hospira's experts and Apotex's expert agreed

3  that this was essentially free of ethanol; is that right?

4  A.    That's correct.

5  Q.    And that is because under the Court's claim

6  construction, if it has five-percent ethanol or less, it's

7  essentially free of ethanol; right?

8  A.    Right.  But they also agreed it's a stock solution.

9  Q.    And it is a stock solution; right?

10  A.    Well, you just made my argument for me.  Of course,

11  it's a stock solution essentially free of ethanol.

12  Q.    And so you then took -- now, the key to your analysis,

13  though, is the one -- the 40 milligrams.

14          Do you see that?

15  A.    I don't know it's the key.  It's part of the

16  composition.

17  Q.    Right.  But that -- whether that number was 80 or 20,

18  if that number changed, this would still be five-percent

19  ethanol; correct?  Am I right?

20  A.    If the number -- if that number changed, it would

21  certainly still be five-percent ethanol.  I don't disagree

22  with that.

23  Q.    You do the math.  It's two milligrams per millimeter

24  here; right?

25  A.    That's correct.

1  Q.    Right.  If that number had happened to be 80, it would

2  be four milligrams per millimeter; right?

3  A.    That is certainly correct as well.

4  Q.    And if it was 60, it would be three milligrams per

5  millimeter; right?

6  A.    Very good.

7  Q.    Okay.  But the key to your analysis, however, is that

8  that number just happened to be 40 in this example; right?

9  A.    Again, your indication is it's the key.  It is what it

10  is.  It is what it says.

11  Q.    Okay.  Let me try to take a look at your math, if I

12  can.

13         Why don't we pull up Myerson 3.

14         Okay.  Now, you gave an opinion on what it means

15  to be essentially free of ethanol during your direct

16  examination; rights?

17  A.    Yes, I did.

18  Q.    And the number you gave was 1.85 percent; is that

19  right?

20  A.    1.85 percent for the .74 mgs per ml.

21  Q.    Right.  So if you go above that number, you're not

22  essentially free of ethanol if you go below, are you?

23  A.    Yes.  For that -- that concentration, docetaxel.

24  Q.    Right.  And so to get the 1.85 percent that you are

25  defining as ethanol free, you started with the example in

1   the '470 patent, the two milligrams per millimeter; is that

2   right?

3   A.    That's correct.

4   Q.    And because it happened to say 40, the math worked out

5   that this was two milligrams; right?

6   A.    Well, it worked out -- it worked out because, as I

7   explained previously, that is the minimum amount of

8   docetaxel that could be considered a stock solution, and so

9   the minimum and the maximum allows you to get that

10  calculation with an absolute number.

11  Q.    Okay.  So, now, you took that stock concentration

12  docetaxel and you divided by the perfusion concentration of

13  docetaxel in our product -- right -- in Hospira's product?

14  A.    I don't think you said that very clearly, but I

15  calculated what the concentration would be after you diluted

16  it.

17  Q.    In our product?  In our perfusion?

18  A.    In your perfusion.

19  Q.    Yes.  I may not have said it very clearly.

20  A.    Yes.

21  Q.    So then what you did was -- and there's a range here;

22  right?  There's a range?

23  A.    Right.  The dosing information is from .3 to .74, so I

24  calculated the concentration at .3 and at .74.

25  Q.    So let's just go to the high end.

1    A.    Right.

2    Q.    So you got this from our prescribing information;

3    right?

4    A.    Right.

5    Q.    That second column.  The first column you got from the

6    '470 patent?

7    A.    Right.

8    Q.    The second column you got from the prescribing

9    information; right?

10   A.    Yes.

11   Q.    Okay.  I want to take the high end, make sure -- the

12   math is simpler.  We're going to skip the .3.  Either one

13   will work out the same way, I think.

14              So to get the dilution factor, you divided 2 by

15   .74; is that right?

16   A.    Yes.

17   Q.    And then you got a dilution factor of 2.7; right?

18   A.    Correct.

19   Q.    Okay.  And then you took that dilution factor and you

20   went back to the five-percent ethanol stock solution of the

21   '470 patent; right?

22   A.    Correct.

23   Q.    And then you divided by the dilution factor; right?

24   A.    Correct.

25   Q.    So you took five percent, you divided by 2.7, and

1    that's how you got 1.85 percent; right?

2    A.    Correct.

3    Q.    And that's how you got your definition of essentially

4    free of ethanol in the '561 patent; correct?

5    A.    '512 patent, but, yes, correct.

6    Q.    My apologies.  '512 patent.

7                Now, if -- let's go to Myerson 8-4.

8                If the example in the '470 patent had been three

9    milligrams per millimeter rather than two milligrams per

10   millimeter, you would have come up with different numbers;

11   am I right?

12   A.    If I had used a different -- a different initial

13   concentration of docetaxel in the stock solution, it would

14   make a difference into the final calculation, because as I

15   testified previously, the ratio of the two that allows you

16   to do the calculation.  So certainly by changing the

17   concentration of docetaxel and keeping the ethanol

18   concentration the same, you've changed the ratio, which is

19   going to -- which would change your definition of what

20   essentially free would have to mean.

21               But, again, I looked -- I liked the two

22   particularly because it struck me as that's the minimum

23   number that you could have in a stock solution.

24   Q.    Just restating my question --

25               THE COURT:  Counsel, he answered the question.

1    Move on to your next question.

2    BY MR. HURST:

3    Q.    If the example had been three rather than two, the

4    calculations would be different; is that correct?

5    A.    If I had used three rather than two, I don't know that

6    it matters what the example was, but if I had decided to use

7    three rather than two, it would have given us a different

8    answer.

9    Q.    And you weren't required to use the example in the

10   '470 patent?  You could have used a different example from

11   somewhere else; right?

12   A.    Yes.  But, again, I liked that example because it was

13   the example you were using to prove that the patent was

14   invalid.

15   Q.    If I took three milligrams and I divided it by the

16   same .74 that you used, right --

17   A.    Yes.

18   Q.    -- I would come up with a different dilution factor?

19   A.    That's correct.

20   Q.    And if I took that dilution factor and I divided by

21   five-percent ethanol, correct, I would come up with a

22   different definition of essentially free of ethanol; is that

23   right?

24   A.    If you did that, you would.

25   Q.    And so under that example, we -- at the high end, we

1    wouldn't infringe, right, because we'd be above 1.2 percent.

2              Do you see that?

3    A.    If that was -- if that was the definition that we --

4    that I had derived, you would have correct.

5    Q.    Okay.  And when you looked at the '512 patent, you did

6    not see any milligram per milliliter stock solution that was

7    as low as two milligrams, did you, sir?

8    A.    In the specification are we talking about?

9    Q.    Yes.  The lowest is ten milligrams per millimeter; is

10   that right?

11   A.    Do you mind if I look at the patent?

12   Q.    Sure.

13   A.    Well, your statement is not correct because in column

14   three, line 31, 2, 3, 4, they talk about stock solution

15   between 6 and 20.  So, obviously, they do talk about numbers

16   less than ten.

17   Q.    That's taxol; right, sir?

18   A.    Oh, I'm sorry.

19   Q.    Okay.  I mean, for instance --

20   A.    No, I'm sorry.

21   Q.    That's fine.  You're going to see 10 to 200 at some

22   places.

23   A.    Yes.

24   Q.    Ten is going to be the lowest, I think.  Can you

25   accept that as an assumption for now?

1    A.    I will accept it.  I think -- I certainly recall that

2    in the claims of the patent, the range of ten to one.

3    Q.    Fair enough.  So if we had used the lowest

4    concentration in the '512 patent rather than the

5    concentration in the '470 patent, you would have gotten

6    different numbers for the definition of essentially free of

7    ethanol; is that correct?

8    A.    If I would have -- if I would have said that that was

9    a minimum number for a stock solution and that's my

10   calculation, that's correct.

11   Q.    So we can walk through the math.  It would be ten

12   milligrams divided by .74, would give you a dilution factor

13   of 13.5; right?

14   A.    That's correct.

15   Q.    And then you take the five percent, you divide by 13.5

16   and you get .37 percent; right?

17   A.    That's correct.

18   Q.    And if that had been your stock solution example,

19   Hospira would not infringe because we would not be

20   essentially free of ethanol; correct?

21   A.    Again, if I had -- if I had -- I thought that was the

22   correct way to do it, you're correct.

23   Q.    Now, in terms of reaching your definition, can we put

24   up Myerson 1, please?

25            Now, in terms of helping me define the phrase,

1   essentially free of ethanol in claim 7 of the '512 patent,

2   your starting point was an example in the '470 as we

3   discussed; right?

4   A.    Correct.

5   Q.    That example is not disclosed anywhere in the '470

6   patent; correct?  Strike that.

7            That example is not disclosed in the '512

8   patent; is that correct?

9   A.    That's correct.

10  Q.    Okay.  And another factor that you used to help you

11  define what it means in claim seven to be essentially free

12  of ethanol was the concentration of the stock solution in

13  this prior art '470 patent, two milligrams per millimeter;

14  right?

15  A.    Yes.

16  Q.    And that is not disclosed anywhere in the '512 patent;

17  is that correct?

18  A.    No, I don't believe so.

19  Q.    And then to help determine what essentially free of

20  ethanol means under claim 7 of the '512 patent, you used

21  concentrations of active in a perfusion that you took from

22  Hospira's product label; is that correct?

23  A.    Correct.  That was one way I did it.  And, of course,

24  I also did the absolute amount of ethanol calculation, which

25  I showed as well.

1    Q.    Okay.  And, obviously, Hospira's product label

2    information is not in the '512 patent to help people

3    understand how to define essentially free of ethanol; right?

4    A.    Hospira's information is not in the '512 patent,

5    though I do believe there's a dosing range for docetaxel,

6    which is .3 and 1 per ml.

7    Q.    .74, you are not going to find that particular number

8    in the patent; right?

9    A.    The actual number, .74, falls in the range of .3 to 1

10   mg per ml.

11   Q.    I'm sorry.  Did I interrupt?  Through your

12   calculations, you got dilution ratios of 6.7 to 2.7; right?

13   A.    Correct.

14   Q.    And you're not going to see those dilution ratios

15   anywhere in the '512 patent; correct?

16   A.    No.

17   Q.    Okay.  So if you go to the next slide, Myerson 2.

18            So am I accurate, that through this analysis

19   that you used to reach essentially free of ethanol, that

20   none of the factors that I've listed here that you relied on

21   is actually something that you took from the '512 patent

22   itself?

23   A.    I don't agree with the concentration and the perfusion

24   because, as I said, the patent says .3 to 1, which contains

25   those numbers.  I don't agree with that.

1    Q.    All right.  Will you at least agree with the other

2    three?

3    A.    Yes, I will agree with that.

4    Q.    Okay.  But one of your range numbers was tied to .74;

5    right?

6    A.    Well, yes.  As I said previously, the actual number

7    .74 in the patent is not in the patent, but the range is

8    there, covered.

9    Q.    You do know the range .3 to 1 that you are referring

10    to was for taxol?

11    A.    I believe it's repeated again for Taxotere, but for

12    docetaxel.  I can go look again, but I believe that's the

13    case.

14    Q.    All right.  There's no need to continue on this, but

15    at least for three of the four factors that we've identified

16    that you relied on --

17              THE COURT:  He has answered that.  He has

18    answered that.  Come on.

19              MR. HURST:  Okay.  No further questions.

20              MR. SCOTT:  Good afternoon, your Honor.  Ian

21    Scott, for Apotex.

22              THE COURT:  All right.

23    BY MR. SCOTT:

24    Q.    Good afternoon, Dr. Myerson.

25    A.    Mr. Scott?

1    Q.    Dr. Myerson, you just provided your opinion that the

2    Apotex proposed product infringes the '512 patent; is that

3    correct?

4    A.    I'm having trouble hearing you.

5    Q.    Okay.  I'm sorry.

6          You just provided your opinion that the Apotex

7    proposed product infringes the '512 patent; is that correct?

8    A.    Claim 7 and asserted claims of the '512 patent, that's

9    correct.

10   Q.    Asserted claims of the '512 patent?

11   A.    Yes.

12   Q.    But you have no opinion with regard to any

13   infringement by the Apotex product of the '561 patent?

14   A.    I've issued no opinions about infringement of the '561

15   patent.

16   Q.    Okay.  And you testified this morning that in the

17   preparation of your opinion with regard to the '512 patent,

18   you reviewed the patents-in-suit, and I believe you also

19   said that you reviewed the Court's claim construction; is

20   that correct?

21   A.    That's correct.

22   Q.    Did you review the file wrapper of the '512 patent?

23   A.    Yes.

24   Q.    A certified copy of the file wrapper?

25   A.    I know I reviewed the file wrapper and the one given

1    to me by counsel.  I don't know if it was a certified copy

2    or not.

3    Q.    All right.  Did you also review the Apotex B2

4    application?

5    A.    Yes.

6    Q.    You understand that PEG 300 is a solvent; is that

7    right?

8    A.    Yes, it is.

9    Q.    Do you also under that in the Apotex injection

10   concentrate, that the docetaxel drug product is dissolved

11   solely in PEG 300?

12   A.    Yes.  In the first vial, that's correct.

13   Q.    Is that first vial, in your opinion, a stock solution?

14   A.    Well, it's not a stock solution in regards to making a

15   perfusion, so it's not a stock solution from that

16   perspective.  If you happen to want to have a stock solution

17   of docetaxel in PEG where you are just going to dilute it

18   later with more PEG or, you know, with water or whatever,

19   that could be a stock solution for something else.  But it's

20   certainly not a stock solution in regards to making a

21   product from it.  Stock solution means it's a concentrated

22   solution that will be diluted for further use.

23            So it's not a stock solution in light of this --

24   of this application.

25   Q.    I'm not sure I understand the answer that you just

1    gave.

2            It is true that the injection concentrate is

3    diluted; is that correct?

4    A.    Yes, but the -- it's being compositionally changed

5    when it's diluted, so -- and then it's being diluted again,

6    where it's not compositionally changed.  So from my

7    perspective, remember, when you take the premix, and you

8    dilute it, the ratio of the components stay fixed because

9    you're just taking this premix and put it in water.  When

10   you add the two vials together, your first vial and your

11   second vial, the relative ratios of the components changes.

12   Okay.

13           So there are different things in that

14   perspective.

15   Q.    Okay.  So I guess I'm still not clear, Dr. Myerson.

16   Are you saying that the first vial of the Apotex product is

17   not what you would class as a stock solution?

18   A.    Not if -- not if we're defining a stock solution for

19   something that's going to be diluted to a perfusion, no.

20   Q.    Okay.  But the construction that this Court gave for a

21   stock solution was a concentrate; is that correct?

22   A.    Concentrate solution, yes.

23   Q.    Okay.  So do you have an opinion as to the injection

24   concentrate?

25   A.    Again, I'm using the Court's construction because I

1    mean, you have to include what's in the concentrate.  I

2    mean, if you just say in a concentrate, it could be a

3    concentrate of anything.

4         So the stock solution that's a concentrate has

5    to be the thing that's going to be diluted until you find a

6    use.  That's my only point.  The premix is, to my mind, the

7    effective stock solution for dilution, because that's what

8    you measure out and dilute.  Before that, I mean, I don't

9    quibble with the idea that your first vial is a stock

10   solution of docetaxel that you are going to use for

11   something other than the dilution into a perfusion.  You

12   have another use for it, it could be a stock solution of

13   docetaxel.

14        That's my opinion.  That's all.

15   Q.   Okay.  So, Dr. Myerson, you have seen this slide

16   before?

17   A.   Yes.

18   Q.   And this is a depiction of the Apotex proposed

19   product; is that correct?

20   A.   That's correct.

21   Q.   So we have the vial on the left, which is the

22   injection concentrate that we were just talking about?

23   A.   Mm-hmm.

24   Q.   And then we have on the right a diluent vial, which I

25   believe is what you had just were discussing when you said

1    you mixed the second vial with the first vial, and you get

2    to what's termed a first dilution or a premix; is that

3    correct?

4    A.    That's correct.

5    Q.    Is it your opinion that the first vial is not a stock,

6    but the premix is a stock solution?

7    A.    Well, again, I mean, it's one of these -- I guess

8    it's, you know, one of these points that a scientist would

9    make, because we're a little fussy about how we define

10   things.

11        Certainly, the first vial meets the standard of

12   a concentrated stock solution of docetaxel.  However, it's

13   not something that you directly dilute for final use.  Okay?

14   It's certainly a stock solution of docetaxel.  I don't

15   disagree with that.

16        The mixture of the two is a stock solution for

17   making a perfusion.  That would be the way I would say it.

18   Q.    Okay.  But in the first vial, am I correct in saying

19   that that there is no alcohol present?

20   A.    That's correct.

21   Q.    All right.  Can we go to PDX-8-14, please?

22        This is a slide that you put up earlier today,

23   Dr. Myerson; is that correct?

24   A.    Yes, it is.

25   Q.    Okay.  In this one, you're talking about the Apotex

1    perfusion product; is that correct?

2    A.    That's right.  I have an example of the Apotex premix

3    being diluted to the higher dosing, docetaxel.

4    Q.    Okay.  So the numbers on the top left would be the

5    product present in the premix, which you just earlier said

6    was the stock solution?

7    A.    Correct.

8    Q.    All right.  And we have 66.3 milliliters per liter of

9    ethanol; is that correct?

10   A.    That's correct.

11   Q.    Would I be correct in saying that that is the same as

12   saying 6.63 percent?

13   A.    That's correct.

14   Q.    Okay.  And I don't think I need to go back to the

15   slide where you define what essentially free -- actually,

16   let's do that.  Could I have PDX-8-2?

17            So here you're saying the stock solution is no

18   more than five-percent ethanol by volume; is that correct?

19   A.    That's correct.

20   Q.    And it's plain to say that 6.63 is greater than five.

21   That's correct?  Did you agree with that?

22   A.    I did.

23   Q.    Okay.

24            MR. SCOTT:  Could we have PDX-8-10, please?

25   That's it.

1    BY MR. SCOTT:

2    Q.    When you were discussing this slide this morning, Dr.

3    Myerson, you stated that the Hospira expert, Dr. Myrdal,

4    also did his calculation with respect to the Apotex product;

5    is that correct?

6    A.    That's correct.

7    Q.    You read Dr. Myrdal's report; is that correct?

8    A.    Yes.

9    Q.    Is it not correct that Dr. Myrdal did not, in fact,

10    perform the calculations that you are talking about with

11    respect to the Apotex product?

12    A.    I don't -- I really don't remember.  I'd have to look.

13    I know I did calculations for the Apotex product exactly

14    this way, because they're in my responsive expert report.  I

15    thought Dr. Myrdal did them for all of the Taxotere, Hospira

16    and Apotex, but possibly I'm incorrect.

17    Q.    So you are saying today you are not sure whether

18    that's a fact or not?

19    A.    That Dr. Myrdal did those calculations for Apotex?  I

20    am not positive, no.

21    Q.    Could you go to the claims?

22          Could you blow up Claim 1.

23          So, Dr. Myerson, in Claim 1, it states that

24    there is a composition which comprises a certain compound,

25    wherein the compound is dissolved in surfactants selected

1    from polysorbate, polyoxyethylated vegetable oil and

2    polyethoxylated castor oil.  Is that correct?

3    A.    Yes.

4    Q.    And can you move on to Claim 7?

5          Claim 7 depends from Claim 6 and Claim 6 depends

6    from Claim 1.  Is that correct?

7    A.    Correct.

8    Q.    Claim 7 is one of the asserted claims in this suit.

9    That is correct?

10   A.    Correct.

11   Q.    Claim 7 states, wherein said surfactant is

12   polysorbate.  Is that right, Dr. Myerson?

13   A.    That's correct.

14   Q.    So the '512 patent covers any grade of polysorbate.

15   Correct?

16   A.    Yes.

17   Q.    There are solid polysorbates.  Is that correct?

18   A.    Yes.  I think we discussed this in my deposition.  I

19   recall this line of questioning.  But, yes, that's correct.

20   Q.    So in your opinion, would a solid polysorbate work in

21   the compositions which are claimed in the '512 patent?

22         MR. COLLINS:  Objection.  Beyond the scope.  It

23   was never addressed on direct.

24         MR. SCOTT:  I think Dr. Myerson is here to give

25   his views on the infringement of the '512 patent.  I think

1    this is an appropriate question.

2              THE COURT:  I think it is.  I will overrule the

3    objection.

4              THE WITNESS:  I give the same answer as I gave

5    previously:  You certainly peaked -- any solid polysorbate

6    has a very low melting temperature.  So you could actually

7    heat them and make them look good if you wanted to use them,

8    on the off chance that you did, but you would probably

9    prefer the polysorbates that are liquid at room temperature.

10             Polysorbates are compounds that have differing

11   molecular weights.  Some of them are viscous liquids and

12   there are a few that are amorphous-type solids at room

13   temperature, but you can't heat them up and liquify them.

14   Q.   The focus of the '512 patent, Dr. Myerson, is for

15   injectable solutions.  Is that correct?

16   A.   Yes.

17   Q.   So would a solid polysorbate be a likely choice for a

18   formulator in preparing an injectable solution?

19   A.   I would say it would be an unlikely choice because you

20   would have to keep your stock solution as a condition, or

21   warm it up prior to use and prior to the dilution.  It would

22   be something you might only do if you had an incredible

23   medical benefit in formulating that way.

24             MR. SCOTT:  Can I take a moment, Your Honor?

25             THE COURT:  Yes.

1          (Pause.)

2          MR. SCOTT:  I have no further questions.  Thank

3    you.

4          THE COURT:  Mr. Collins, redirect.

5          MR. COLLINS:  Just a few questions, Your Honor.

6                     REDIRECT EXAMINATION

7    BY MR. COLLINS:

8    Q.   Professor Myerson, just to follow up on where we left

9    off.

10         Would a person of ordinary skill in the art know

11   how to select a suitable grade of polysorbate 80?

12   A.   Yes.

13   Q.   Or polysorbate.  Excuse me.

14   A.   Yes.  They would go to the standard reference, which

15   is The Handbook of Pharmaceutical Excipients, and there is

16   information in great detail on all the polysorbates.

17   Q.   Mr. Brooks, if we could pull up PDX-8-2, please.

18   Professor Myerson, did you faithfully apply the claim

19   construction of the Court?

20   A.   Yes, I did.

21   Q.   Claim 7 is a composition or process claim?

22   A.   Composition claim.

23   Q.   Did you apply a process limitation in your

24   infringement analysis?

25   A.   No, I did not.

1  Q.    What is the fundamental problem with the analysis

2  that's been advanced by Mr. Hurst?

3  A.    The real difficulty, in my mind, is that you could

4  make, using that analysis, you could have the same perfusion

5  with the same amount of ethanol -- I should say two

6  different perfusions with the same amount of ethanol.  One

7  would be considered essentially free, and one would not.

8        That to me is intellectually impossible.  So

9  essentially free has to mean that if one has this much

10 ethanol and is essentially free, the other one must not.  To

11 use the analysis another way, it couldn't work out that way.

12 Q.    Does Mr. Hurst's analysis attempt to find the maximum,

13 the upper limit, on ethanol in a perfusion that corresponds

14 to a stock solution with 5 percent ethanol?

15 A.    I am sorry.  Could you repeat that question?

16 Q.    Sure.  Does Mr. Hurst's analysis attempt to find the

17 maximum, the upper limit, on ethanol in a perfusion that

18 corresponds to a stock solution with 5 percent ethanol?

19 A.    I am not sure I understand your question.

20 Q.    I will withdraw it.

21       Let me ask you this:  Is the information for

22 dosing patients with perfusions the same for Taxotere as it

23 is for Hospira's product and Apotex's product?

24 A.    Yes, they are.

25       MR. COLLINS:  Your Honor, if I may a moment to

1    confer with my co-counsel.

2                  (Pause.)

3                  MR. COLLINS:  Nothing further, Your Honor.

4                  THE COURT:  Thank you, Mr. Collins.

5                  Mr. Hurst, are you going to want to have the

6    witness available?

7                  MR. HURST:  I think the answer is -- I don't

8    want to inconvenience the witness too much.  But if we can

9    convene as a team tonight and figure it out by tomorrow

10   morning, would that inconvenience your witness too much?

11                 MR. COLLINS:  If we could confer and report

12   back...

13                 THE COURT:  That's fine.  I won't excuse the

14   witness for now.  I will leave it to an agreement among the

15   parties on that point.

16                 You may excuse the witness, if you deem it

17   appropriate to do so.

18                 MR. HURST:  Thank you, Your Honor.

19                 MR. COLLINS:  Thank you, Your Honor.

20                 THE COURT:  For today, you are excused.

21                 (Witness steps down from stand.)

22                 MR. PAPPAS:  Your Honor, Dr. Myerson was the

23   last witness we were going to call in round one of our

24   presentation.  It moves to the defense.

25                 THE COURT:  Mr. Hurst.

1          MR. HURST:  Will you entertain a Rule 52(c)

2     motion.

3          THE COURT:  You should put it on the record.

4          MR. HURST:  I understood that from your comments

5     before --

6          THE COURT:  I would entertain it even more

7     specifically as a Bench trial memo, in brief, in summary, if

8     you want to do that to preserve your points, rather than

9     having you spend time right now attempting to advocate a

10    position that I am not likely to adopt at this point.

11         MR. HURST:  That sounds fine to me.  If we file

12    it at a later time, as long as --

13         THE COURT:  The record is open for that purpose.

14    That is fine.

15         MR. HURST:  Thank you, Your Honor.

16         MR. DRESNER:  We would probably file a joinder

17    on that motion.

18         THE COURT:  Good.

19         MR. PAPPAS:  We will prepared to respond, if it

20    is filed.

21         THE COURT:  I think their concern is the Federal

22    Circuit's rather strict rule on the preservation points for

23    appeal.  So they need to do that.  That is why I have

24    instructed them in the way that I have.

25              You can respond, if you choose.  I have already

1  said it's unlikely that I am going to address these matters

2  substantively at this point, given the record volume and the

3  relative complexity of the underlying issues.  Not legal

4  issues so much, but technology.

5            MR. PAPPAS:  I understand, Your Honor.  They

6  will preserve their issue.  It will probably be easier for

7  the Court if we all briefed at once.

8            THE COURT:  Mr. Pappas, it's going to be your

9  associates who will be up late doing this.  That's who I am

10  thinking about, that's all.  That's up to you.

11            MR. PAPPAS:  That is fine, Your Honor.

12            MR. HURST:  So do you want us to call our first

13  witness?

14            THE COURT:  Yes.

15            MR. HURST:  Julie Liu will be our first witness.

16            ... JULIE LIU, having been duly

17      sworn as a witness, was examined and testified as

18        follows ...

19            MR. ALY:  Your Honor, I know you don't want more

20  binders.

21            THE COURT:  No.  Pass it up.

22            MR. ALY:  I am going to hand one to the witness

23  as well.

24            THE COURT:  Please do.

25            MR. ALY:  May it please the Court...

1          THE COURT:  Yes, sir.

2                  DIRECT EXAMINATION

3   BY MR. ALY:

4   Q.    State your name?

5   A.    My name is Julie Liu.

6   Q.    Where do you work, Ms. Liu?

7   A.    I work at Hospira Australia.

8   Q.    Where is that located?

9   A.    In Melbourne.

10  Q.    What is your title?

11  A.    My title is technical leader at the R&D department in

12  Hospira Australia.

13  Q.    What do you do at Hospira?

14  A.    My current title is the technical leader at Hospira

15  Australia in Melbourne, in our R&D department.

16  Q.    What do you do as the technical leader at Hospira

17  Australia?

18  A.    As a technical leader, my responsibility is to lead

19  and supervise all the formulation people in the

20  manufacturing process and development.  And I also am

21  responsible for analytical methods of development and

22  preservation.

23          MR. ALY:  Your Honor, it took me about five

24  minutes to get used to the accent.  So it will take some

25  time.

1   BY MR. ALY:

2   Q.    Ms. Liu, were you involved in Hospira's docetaxel

3   injection product development?

4   A.    Yes, I did.

5   Q.    What was your contribution to that product?

6   A.    I developed the Hospira docetaxel injection

7   formulation.

8   Q.    Who helped pick the excipients for that product?

9   A.    I did myself.

10  Q.    I will get to the details of that product and learn

11  more about it.  I would like to tell the Court about your

12  educational background.

13           Where did you go to college?

14  A.    I started for a Bachelor degree of medicine, major in

15  pharmacy, in Acian (phonetic) University in China, Medical

16  University in China.

17  Q.    Did you get a degree there?

18  A.    I did.  A Bachelor of medicine degree.

19  Q.    What did you do with that degree?  Can you describe to

20  the Court what that degree involves?

21  A.    That degree consists of four years course work and

22  one-year pharmaceutical practice.

23  Q.    What do you mean the one-year pharmaceutical practice?

24  Can you describe that?

25  A.    It's a pharmacy practice.  I have to practice in a

1  hospital pharmacy as a practical pharmacist.

2  Q.    What did you do after you graduated?

3  A.    After I graduated, I worked as an industrial

4  pharmacist in a pharmaceutical company called Shingau

5  (phonetic) Pharmaceutical Company in China for five years.

6          THE COURT:  Shingau?

7          THE WITNESS:  Shingau.

8  BY MR. ALY:

9  Q.    Your work in China, Ms. Liu, did you work as a

10  pharmacist while you were there?

11  A.    I practiced for 12 months as a hospital pharmacist as

12  part of my degree.

13  Q.    During your training, did you get any experience

14  working with formulations there?

15  A.    During my trainingship?  Part of my degree studies,

16  formulation is one of the components in a pharmaceutical

17  assigned project.

18  Q.    Did you happen to handle and work with intravenous,

19  I.V., pharmaceutical formulations?

20  A.    Yes.  Part of degree study in the pharmaceutical

21  science subjects, formulation development, includes

22  development of an injectable formulation.  And I also

23  handled preparation, dispensing of injectable product in the

24  hospital pharmacy department.

25  Q.    What did you do next?

1    A.    I then worked as an industrial pharmacist for five

2    years in China, as I mentioned before.

3    Q.    What did you do as an industrial pharmacist?

4    A.    My major responsibility at that time was development

5    of different pharmaceutical dosage forms, involving

6    injectable dosage form, liquid dosage form and solid dosage

7    form as well.

8    Q.    What did you do after that job?

9    A.    After that job I emigrated to Australia, Melbourne, in

10   1992.

11   Q.    At that time in 1992 when you moved to Australia, did

12   you speak English?

13   A.    Very little.

14   Q.    What did you do?

15   A.    I had to study English for almost two years to be able

16   to continue my career in pharmaceutical field.

17   Q.    What did you do while you were in school?

18   A.    While I was studying, I also worked part time in

19   several pharmacy shops as a pharmacy technician, dispensing

20   different medications to the patient.

21   Q.    After you learned English, what did you do next?

22   A.    I then studied for a Master's degree in pharmaceutical

23   science in Reded (phonetic) College of Pharmacy at Monez

24   University for about three years.

25                THE COURT:  Which university?

1    THE WITNESS:  Monash University in Melbourne.

2    BY MR. ALY:

3    Q.    That is in Australia?

4    A.    That is in Australia.

5    Q.    What year was that that you received that Master's

6    degree?

7    A.    I received my Master's degree in March 1997.

8    Q.    What did you do when you got that degree?

9    A.    I then joined a pharmaceutical company in Melbourne

10   called Sigma Pharmaceutical.

11   Q.    What did you do at Sigma Pharmaceuticals?

12   A.    I was product development scientist at the R&D

13   department at Sigma Pharmaceutical.

14   Q.    What did you do in that department at Sigma

15   Pharmaceutical?

16   A.    Basically, my role was to go over formulations related

17   to liquid and injectable dosage forms.

18   Q.    What did you do next?

19   A.    I then joined Hospira Australia.  At that time the

20   company was called Foli Pharmaceutical.

21   Q.    What year was that?

22   A.    That was May 1999.

23   Q.    For the last ten years or so you have been with

24   Hospira?

25   A.    That's correct, yes.

1  Q.    Today, how many people report to you?

2  A.    About nine scientists.

3  Q.    What do these people do?

4  A.    These people, their responsibility is to develop

5  formulation and manufacturing processes for Hospira's new

6  products.

7  Q.    Ms. Liu, how many years of formulation experience do

8  you have?

9  A.    Altogether, it's more than 18 years.

10  Q.    How many formulations, pharmaceutical formulations

11  have you worked on or tested?

12  A.    I really can't remember.  Heaps.

13  Q.    Can you give examples of where they have become

14  commercial products after you have worked on the

15  formulation?

16  A.    There are about five or six formulations that I worked

17  on currently still on the market as a commercial product.

18  Q.    Let's talk about the work you did on Hospira's

19  docetaxel injection product.  Do you understand the work you

20  did is accused of infringing and copying patents and

21  products in this case?

22  A.    Yes, I do.

23  Q.    When did you start working on the docetaxel project at

24  Hospira?

25  A.    I started working on it about 2004, I think from July,

1  August 2004.

2  Q.    What did you do at that time to get started?

3  A.    At that time I was appointed as a formulator for

4  Hospira docetaxel injection products by the project team.

5  Q.    From a technical point of view, what did you do to

6  first start on the project?

7  A.    When I first started on this project, I did extensive

8  literature search and literature review.

9  Q.    Did you learn anything about existing docetaxel

10 products?

11 A.    Yes, I did.

12 Q.    What did you find?

13 A.    What I found is, at that time, by just reading the

14 available literature information and the patient product

15 information leaflet about the Taxotere product, I discovered

16 there are three major disadvantages about this product.

17 Q.    You referred to a patient product information leaflet.

18 Is that right?

19 A.    That's correct.

20 Q.    Did you look at the product information leaflet for

21 2004 when you started working on the project?

22 A.    Yes, I did.

23        MR. ALY:   I would like to put up HTX-347, Page

24 3.

25 BY MR. ALY:

1    Q.    In the middle column, the top, just the heading there?

2          Ms. Liu, is this the product we are talking

3    about, Taxotere?

4    A.    Yes, it is.

5    Q.    Is this generally what the label looked like that you

6    reviewed?

7    A.    That's correct.

8    Q.    Page 7, please, of this document.

9          What were you looking for when you were

10   reviewing the label?

11   A.    As a generic company, our aim and goal is always to

12   make a better product.  So my intention was to look at the

13   existing product to see if I can make anything better than

14   the existing product.

15   Q.    Were you looking at the label to see how you could

16   copy that product?

17   A.    No.

18   Q.    Who assigned you the goal of working on this product?

19   A.    It's my manager at the time, and also the project

20   leader at the time.

21   Q.    Did you look for information about how the formulation

22   worked, what happens to Taxotere?

23   A.    Yes, I certainly did look at information to that

24   effect.

25   Q.    Please blow up the preparation administration section,

1    all the way down.  It looks like just from the side, we have

2    to take this in pieces, start at a., preparation?

3              We have a. and b. on the screen.  Ms. Liu, can

4    you see that all right?

5              MR. ALY:  Your Honor?

6              THE COURT:  Yes.

7    BY MR. ALY:

8    Q.    What I would like to ask you, Ms. Liu, you mentioned

9    there were some problems.  What about the label told you

10   about any problems with using this product?

11   A.    When I was reading the label, the first problem I read

12   was Taxotere is a two-vial product.  So it consists of one

13   vial containing a concentrate, which is docetaxel dissolved

14   in polysorbate 80, the solution is very viscous, and also

15   containing another vial referred to as a diluent vial in

16   this product leaflet.  So there is a two-vial system.

17   Q.    Is that described in the instructions for how to make

18   the solution?

19   A.    It is.  If you read Step No. 2, it says that,

20   Aseptically withdraw the contents of the appropriate diluent

21   vial, which is the vial that only contains water with

22   ethanol, into a syringe and transfer it to the appropriate

23   vial of Taxotere for injection concentrate, referred to as a

24   concentrate vial.

25   Q.    What does that mean, for preparing the solution?

1    A.    By reading it, if you see, the underlined sentence, it

2    says, If the procedure is followed as described an initial

3    diluted solution of ten milligram per milliliter docetaxel

4    will result.

5          That gave me a thought of lot of, this could be

6    a potential issue, that if human error is introduced in this

7    procedure, we might not end up with 10 milligrams per

8    milliliter of solution.

9    Q.    How does having two vials of this product end up

10   meaning you may not have 10 milligrams per milliliter of

11   solution?

12   A.    This addition of solution step requires pharmacists to

13   be really careful for the exact procedure, take the entire

14   content from the diluent vial, transferred into a

15   concentrate solution vial.

16         There is two potential risks in here.  One is,

17   it gives hospital pharmacists one additional step to handle

18   more needles, which is a potential safety risk for the

19   pharmacist.  The second one is it could cause a potential

20   human error, that you introduce error during the dilution.

21         If you think about Hospira did the injection,

22   finished product, manufacture, we quality tested it and

23   showed that the final concentration is ten milligrams per

24   ml.  But here the 10 milligrams per ml is only in pharmacy

25   accurately for the procedure.  It can't end up as 10

Liu - direct

milligrams per milliliter.

So the second possible problem is if ten milligrams per milliliter solution is not achieved, then it could be a potential risk for the patient, because it's a safety and efficacy problem.

Q.   How could there be a risk for the patient if the 10 milligrams per milliliter is not issued?

A.   Because the dose that the pharmacist prepared is purely relying on this ten milligram per ml concentration. If ten milligram per milliliter concentration is not accurate, it was an, it was 10.5 milligram or 9.5 milligram, which means the final dose for the patient is inaccurate, you have a very sick cancer patient.

You are relying on accurate doses to treat for the disease, but if you have a higher dose or lower dose, you either have caused a severe side effect or affected the desired efficacy result.

Q.   Ms. Liu, have you actually seen vials of Taxotere?

A.   I did.

Q.   Have you asked people to prepare samples of those vials?

A.   Yes, I did.

Q.   Now, could you get the active ingredient?  Were you able to send a sample of the active ingredient of docetaxel to us for use as a demonstrative today?

1    A.    No.

2    Q.    Why not?

3    A.    Because it's a cytotoxic product.  It's very dangerous

4    to be handled by a normal, healthy patient because the side

5    effect of the cytotoxic product is also very severe.  In

6    fact, as a scientist, when we handle the active

7    pharmaceutical ingredient of docetaxel, we have to fully get

8    up, carry our respirator in the laboratory to avoid any

9    contact with this drug.

10   Q.    And, Ms. Liu, what about polysorbate 80?  When you

11   handle that in the lab, what special steps or precautions do

12   you have to take?

13   A.    Polysorbate 80, it's just a normal chemical that we

14   need to break glass and then put on a mask.  It's different

15   than cytotoxic.

16   Q.    When we have a vial, were you able to make a sample of

17   the polysorbate 80?

18   A.    Yes.

19         MR. ALY:  Your Honor, I have the samples without

20   the active ingredient in them that I'd like to pass around.

21         Can I approach?

22         THE COURT:  Surely.

23   BY MR. ALY:

24   Q.    Now, Ms. Liu, what are we looking at here?  What do

25   you have in front of you?

1    A.    What I put in front of me is a placebo of Taxotere

2    solution.  This is the concentrate I just mentioned.  The

3    actual Taxotere has a docetaxel drug in this viscous

4    solution.  Polysorbate.  Taxotere concentrate.

5    Q.    Is that word "viscous"?  I just want to make sure

6    you're clear for the record.  You're saying that word?

7    A.    Viscous.

8              THE COURT:  So the vial which has the least

9    amount of fluid is the one that would have the docetaxel?

10             THE WITNESS:  It has the docetaxel in the

11   polysorbate 80.  And this is a separate vial that is packed

12   together.  As a Taxotere finished product, it contains 13-

13   percent of alcohol remaining in water, referred to as -- in

14   Taxotere, but called diluent.

15             THE COURT:  So this has 13-percent alcohol and

16   the balance is water?

17             THE WITNESS:  And the balance is water.

18   BY MR. ALY:

19   Q.    In 2004, when you were reading about how to make a

20   premix, how did you find out one uses these bottles to make

21   a premix?

22   A.    What I found out from the information, if you see from

23   Step 3 and 4 is, after you withdraw the entire content of

24   the diluent solution that is already described in No. 2,

25   transfer it with the syringe into the concentrated vial, and

1    gently rotate it for approximately 15 seconds to ensure full

2    mixture of concentrate and diluent.

3            From my experience, polysorbate 80 is a very

4    viscous solution.  It's very difficult to mix with water.

5    It takes a long time.  Otherwise, it foams up.

6            If you don't gently mix it, product, it's

7    like you're mixing a -- a surfactant is like a washing

8    powder.  You mix in water, immediately causes bubbles.

9    Q.    You're saying "foam"?

10   A.    Yes.

11   Q.    Can you repeat that word just for the record?

12   A.    Foam.

13            THE COURT:  We got it.

14   BY MR. ALY:

15   Q.    Okay.  And when that happens?  When you put those two

16   together, what do you have?

17   A.    If the foam had occurred --

18   Q.    Okay.  Describe it.  What happens when the foam

19   occurs?

20   A.    If the foam occur, first, you're not going to end up

21   with the exact amount of solution in the vial because some

22   of the solution becomes bubbles, and, secondly, the

23   pharmacist requires the entire content of the example, eight

24   ml solution, you form one ml of bubbles, you only end up

25   with seven ml solution.  So, again, that's a dosing issue

1   for the patient later on.

2   Q.   Ms. Liu, have you actually handled Taxotere?

3   A.   Yes, I did.

4   Q.   Have you actually made a premix?

5   A.   Yes, I did.

6   Q.   When you dilute -- when you take the premix and you

7   gently rotate for approximately 15 seconds, what do you see?

8   What have you seen?

9   A.   You do see lumps of polysorbate 80, which is a yellow

10  solution, floating in the solution of water, and seven-

11  percent alcohol.

12  Q.   Does that mean you've made the premix?

13          THE COURT:   I think we missed a word there.

14  Logging?  I missed it.

15  BY MR. ALY:

16  Q.   Could you repeat your description, Ms. Liu?

17          THE COURT:   Please repeat it, the answer to his

18  last question.  Just state the question.

19  BY MR. ALY:

20  Q.   Ms. Liu, when you take the two together and you make

21  the premix and gently rotate for approximately 15 seconds,

22  have you seen what happens?

23  A.   What happened was, you do see the -- this is viscous

24  solution.  It's very difficult to form a homogeneous

25  solution when you mix the two together because the procedure

1    does not allow you to vigorously shake it until it forms

2    bubbles.  You have to very gently mix the solution.

3              What happened is, I do see lumps of polysorbate

4    80 floating in the solution.

5              THE COURT:  Floating in the solution.

6    BY MR. ALY:

7    Q.    Lumps floating in solution?

8    A.    Yes.

9    Q.    Why is that a problem, to have lumps floating in the

10   solution?

11   A.    Then you don't end up with a homogenous solution.  So

12   if you want to take part of the solution for the dosing,

13   then you won't be able to use your accurate amount of

14   docetaxel into the solution.  Not allowed by label.

15             So that's accurate dosing issue.

16   Q.    Ms. Liu -- thank you.  Ms. Liu, you said that when you

17   try to shake, that that's not allowed by the label?  What do

18   you mean by that?

19   A.    Because labels actually said, in this label, it didn't

20   say no shake, but the label I read at the time, it actually

21   specified, do not shake.  But this one, it says,

22   appropriately 15 seconds to assure full mixture of the

23   concentrate and diluent.

24   Q.    Have you actually put the two together and tried

25   shaking the vial?

1    A.    I did try.

2    Q.    What happened?

3    A.    If you don't gently rotate, then immediately forms

4    bubbles.

5    Q.    And is that described, a possibility of foam in the

6    label?

7    A.    That is in step number four, the second sentence.

8    However, there may be some foam on top of the solution due

9    to the polysorbate 80.

10   Q.    And why is that a problem?

11   A.    I mentioned before, it's going to cause a potential

12   accurate dosing issue.

13   Q.    And then the label, though, says that you could let it

14   stand for a few minutes and allow any foam to dissipate.

15   Why isn't that enough?

16   A.    We actually tried it in the laboratory.  Once the foam

17   occurred in the vial, it's actually very difficult to

18   disappear.  So after a few minutes, it did not disappear.

19   It's simple like you putting washing powder in the water.

20   Once it has a lot of foam, it is very difficult to

21   disappear.

22   Q.    The label says that it's not required that all the

23   foam dissipate prior to continuing the preparation process.

24         Why isn't that enough?

25   A.    The docetaxel could be still remaining in foam.

1    Q.    What do you mean by that?

2    A.    Which means that when you have foam, the solution is

3    not homogeneous, so your API, some of the API could be in

4    the foam or could be remaining in the solution.  So you end

5    up with a solution not having final ten milligram per

6    solution.  It's an accurate dosing issue.

7    Q.    When you put the two vials together, how long does

8    that last?

9    A.    That only lasts for eight hours.

10   Q.    And that solution, once you put it together, is eight

11   hours typically enough?

12   A.    Eight hours is not a very convenient shelf life for a

13   product that needs to be used for I.V. preparation.

14   Q.    And is that -- the thing that's eight hours, is that

15   directly injected into a patient, that premix?

16   A.    No.  We have to do another dilution using the premix,

17   infusion bags, to create a concentration, 7.3, 7.4

18   milligrams per ml.  That solution can be used as I.V. for a

19   patient.

20   Q.    What happens if someone makes a premix, puts the two

21   vials together, but does not make a perfusion within eight

22   hours?

23   A.    Then you discard the solution, because the API does

24   not precipitate out.

25   Q.    What does it mean to precipitate out?

1    A.      At the same time, in addition to that, there's also a

2    risk of microbial contamination or due to human error into

3    this premix solution as well.

4    Q.      Ms. Liu, did you make a demonstrative slide

5    summarizing the problems you found in 2004 with the Taxotere

6    approach to the formulation?

7    A.      Yes, I did.

8    Q.      We'll put up HDX-1-1.

9            Ms. Liu, are these the problems you identified,

10   two-vial system?

11   A.      That's right.

12   Q.      And you mentioned there was a foaming problem?  That's

13   listed there?

14   A.      Yes.

15   Q.      And the short stability of the premix?

16   A.      Yes.

17   Q.      What did you do to set out to try to solve these

18   problems?

19   A.      I developed a single vial product that contained

20   additional acid, resolved the two-vial system, and my

21   formulation does not have foaming problem.  And my

22   formulation, which ends up with Hospira injection, had a

23   shelf life of 24 months, stored at room temperature.

24           So I resolved the short stability issue of

25   the premix solution, which means pharmacies can grab the

1    product from the shelf at any time required and do the

2    dilution for intravenous preparation for use for the

3    patient.

4    Q.    Ms. Liu, let's start at the product development

5    beginning to the road to get to that product.

6          What's the first types of tests that you did?

7    A.    When I look at all these issues, what I realized, the

8    major issue was the water content in the premix solution

9    that does not agree with docetaxel, because docetaxel is a

10   fully water-soluble drug containing polysorbate 80.

11         So my first intention was to identify another

12   organic solvent that can replace the water in the

13   formulation, so I can resolve the foaming problem and

14   potentially I can improve the stability of the formulation

15   as well.

16   Q.    What's wrong with water?  It's an everyday substance.

17   What's wrong with that?

18   A.    As I described before, because the -- about 65 percent

19   of the water in a premix solution was creating foaming

20   problems, because water and surfactant, when you mix it, you

21   have foaming problem, and also the high level of water in a

22   premix solution had a physical stability problem for the

23   docetaxel as a pharmaceutical ingredient because docetaxel

24   is a water-insoluble drug.

25   Q.    Did you look for other alternative solvents to use?

1  A.    I did.  I actually tried several different solvents.

2  Q.    Did you do tests on the solvent?

3  A.    I did.  My first test was to test the solubility of

4  docetaxel in different variety of solvents that can be used

5  for pharmaceutical formulations.

6  Q.    Did you record the results of your tests in a study

7  report?

8  A.    Yes, I did.

9  Q.    Did you do so as part of your normal job at Hospira?

10  A.    Yes, as part of normal practice.

11  Q.    Let's go to JTX-35, please.

12        Ms. Liu, is this the first report you did on the

13  solubility test?

14  A.    That's right, yes.

15  Q.    It's got this code on the top right, 950 SFS-001.

16  What does that mean?

17  A.    950 is the project code that Hospira used.  SFS is

18  study for formulation study.  That's another code that we

19  only use for all the formulation study reports.

20  Q.    It has been carried out by, and it has some names

21  there.

22        Did you work on the test yourself?

23  A.    The solubility study, I worked on the solubility

24  study.  I also had my team members do all the analysis as

25  well.

1    Q.    **And when did you do this work?**

2    A.    **In late 2004.**

3    Q.    **Did you record your results in this report?**

4    A.    **Yes, I did.**

5              **MR. ALY:  Page 5, Mr. Young.**

6    **BY MR. ALY:**

7    Q.    **Ms. Liu, I'm highlighting table one of just Page 5 of**

8    **8 of that report, JTX-35.**

9              **Can you describe what you did?**

10   A.    **These results demonstrated that docetaxel is soluble**

11   **in some of the solvent, but actually not very soluble in**

12   **certain solvent as well.**

13             **For example, in table 1, in hundred-percent**

14   **propylene glycol, only soluble, two-milligrams per ml, which**

15   **indicated this is not a physical solvent to be used for**

16   **docetaxel formulation.**

17             **But if you look at table number three,**

18   **solubility of docetaxel is at 98.8-milligram per ml, in**

19   **100 percent of polyethylene glycol, which I will refer to as**

20   **a poly P-300.**

21   Q.    **Okay.**

22   A.    **And also you see Table No. 4, absolute alcohol is also**

23   **a very good candidate to study the lines of docetaxel**

24   **injection.**

25   Q.    **After these tests, did you develop a conclusion?**

1    A.    I did.

2    Q.    Did you report that conclusion?

3    A.    Yes.

4    Q.    If we go two more pages into the document, last page,

5    and conclusion.

6          What did you find as a result of your solubility

7    tests?

8    A.    The solubility tests of what I found is, for example,

9    absolute alcohol, polyethylene glycol, a promising solvent

10   can be used for the formulation.  However, in this study, I

11   actually discovered -- I found that absolute alcohol is

12   stabilized docetaxel, produced a major degradation product.

13   Q.    Could you just describe what that is, provide

14   degrading products?  What does that mean?

15   A.    Which means breaks down the docetaxel active

16   pharmaceutical ingredient.

17   Q.    Break down?

18   A.    Break down the drug.

19   Q.    What's the next test you did after this?

20   A.    The next test I did after this, I actually formulated

21   eight different formulations containing docetaxel

22   ten-milligram per ml in several different combinations of

23   solvent system.

24   Q.    Did you develop a report like this one for that?

25   A.    I did.

1    MR. ALY:  Mr. Young, JTX-36, please.

2    BY MR. ALY:

3    Q.    Ms. Liu, is this the next test that you did?

4    A.    That's correct.

5    Q.    What is this one titled?

6    A.    "Formulation of Non-Aqueous Docetaxel Solution."

7    Q.    What was your objective?

8    A.    My objective was to formulate different non-aqueous

9    docetaxel solutions for stability assessment.  Basically, to

10   find the best stability for my formulation.

11   Q.    Did you record results in a table here?

12   A.    Yes, I did.

13   Q.    Page 3, Table 2.

14         Ms. Liu, please describe your work and what you

15   found.

16   A.    That is the eight different formulations that I

17   produced in the laboratory at the time.

18   Q.    And where did you come up with these ingredients to

19   try in these different formulations?

20   A.    These ingredients I came up with based on my

21   literature search and the pre-formulation study, solubility

22   study results, and I formulated, for example, for

23   Formulation No. 1, I tried to look at possibly formulating

24   docetaxel injection in combination with polysorbate 80 and

25   absolute alcohol.

1          Given the solubility study, I realized

2    docetaxel can be stabilized in alcohol solutions, so I tried

3    to minimize the alcohol content.  And then also during the

4    literature review, I found that citric acid may be

5    potentially -- may potentially stabilize docetaxel API.

6          So in this study, I look at a combination of

7    solvents with are or without citric acid, combination of

8    solvent with or without combination of P-300 and citric acid

9    to look at which one is more stable.

10   Q.   Why were you doing the different combinations of these

11   particular ingredients?

12   A.   I tried to develop a stable docetaxel solution

13   product.

14   Q.   When you tried different experiments, did you get

15   results?

16   A.   I did.

17   Q.   Now, some of these ingredients, the list of

18   ingredients that you tried is listed in the first column; is

19   that right?

20   A.   Yes.

21   Q.   So of the ingredient options there are, which one

22   ended up most like the Hospira formulation at this

23   preliminary stage, looking back?

24   A.   At this preliminary stage, Formulation No 6 appeared

25   to be the most stable formulation and it actually ended up

1    as the lead formulation for final docetaxel injection

2    product.

3    Q.    Now, what are the ingredients in that formulation?

4    A.    It contained docetaxel ten-milligram per ml in the

5    solvent vehicle containing .80 to 200 milligrams per ml, and

6    last combination of PEG 300, citric acid and absolute

7    alcohol.

8    Q.    What's absolute alcohol?

9    A.    Ethanol, and also referred as dehydrated alcohol.

10   Q.    What were the results of this particular study?

11   A.    The results of this particular study actually showing

12   there's a possibility that I can develop a stable single

13   vial docetaxel non-aqueous solution.  And also show that

14   solution containing polysorbate 80 plus ethyl alcohol is not

15   a physical formulation at all.

16   Q.    Why not?

17   A.    Because the chemical, it's unstable.

18   Q.    Did you report your results in this study set report?

19   A.    Yes, I did.

20   Q.    We'll go to Page 9, results and discussion.

21          To clarify on the record, when you were

22   referring to absolute alcohol, that's ethanol?

23   A.    Yes.

24   Q.    Now, what did you find about ethanol when you were

25   doing these combination studies?

1    A.    When I was doing these combination studies, my initial

2    intention was to minimize the alcohol level, because it

3    destabilized docetaxel product.  However, while I was

4    formulating the different formulations in the laboratory, I

5    realized that PEG 300 and polysorbate 80 does not mix.  So

6    it formed two layers solution.

7              I have to have a certain amount of ethyl alcohol

8    in the solution to make polysorbate eighty and PEG 300 mix

9    together.

10   Q.    Did you try to test how much ethanol you needed just

11   to make these two mix together?

12   A.    I actually did in my later optimization study, what is

13   the minimum level of alcohol required to make a homogeneous

14   solution.

15   Q.    What did you find was the minimum amount of ethanol

16   needed to make a homogeneous stock solution?

17   A.    That was about 18 percent.

18   Q.    What was the next step that you did?

19   A.    The next test after this, I tested immediate after

20   formulation to look at the impurity level, which is

21   degradation level, of a different formulation and then also

22   tested after four weeks 40-degree and 50-degree condition,

23   and continued after eight weeks, 12 weeks, 6 months.

24   Q.    I know you did a lot of work, Ms. Liu, but let's at

25   least look at a couple of them.

1    A.    Yes.

2    Q.    JTX-107.

3          Ms. Liu, when did you do this work, the one

4    described in SFS 004 as the study report, JTX-107?

5    A.    This was immediately after a difficult formulation, I

6    tested the formulation to see how it based.

7    Q.    Did you record your results?

8    A.    Yes.

9    Q.    Could we go to Page 5, table 7?

10         Are these your results, Ms. Liu?

11   A.    That's right.

12   Q.    There are some formulation numbers on the left, 1

13   through 8.   Which are those formulations?

14   A.    Those have a formulation that I produced in the

15   laboratory, which reported in SFS 03.   Just mentioned it

16   before.

17   Q.    Just so we're clear, which one was Formulation 1?

18   A.    Formulation 1 was the formulation containing

19   polysorbate 80 plus ethyl alcohol without citric acid.

20   Q.    What happened when you tried making a formulation with

21   docetaxel, polysorbate 80 and ethanol, and only those

22   ingredients?

23   A.    As indicated, this product is not going to be stable

24   because immediately after you produce the formulation, the

25   total impurity of degradation products only reached

1    0.9 percent.

2    Q.    When you say initial time point, how much time passes

3    by the time you make the combination and you test it?

4    A.    Three hours a day.

5    Q.    Is that number an acceptable number?

6    A.    It is not acceptable.  If I want to formulate a

7    product, commercial product, that can be sitting on the

8    shelf for 24 months, kept at room temperature, and having a

9    degradation -- proper degradation level of less than two

10   percent, which is required by the I CH guidelines for

11   injectable product, this .96 percent after 24 hours, imagine

12   you store for 24 months at room temperature, how much

13   degradation would result.

14            So my immediate reaction is this formulation is

15   not going to be viable at all.

16   Q.    What was the temperature conditions for these tests?

17   A.    That's at room temperature.  Produced the formulation

18   in laboratory conditions and tested it.

19   Q.    The formulations that you had tested, those eight

20   formulations, which one was best in terms of not having

21   impurities?

22   A.    Based on Formulation No. 6.

23   Q.    That's the one that you eventually had chosen; is that

24   right?

25   A.    That's right.

1    Q.    Now, even for that particular Formulation No. 6, it

2    says that the total percent impurity is .3.  Why is that?

3    A.    Some impurities already present in the actual API that

4    I used for the formulation.  If you look at it, I always

5    used the API that I used for the formulation as a control

6    when I do the test.

7            If you look at the second column from the

8    bottom, API 2, 0.5 milligram, you see the total impurity is

9    0.25 percent, and that's allowing for error, between 22.5

10   and .3.

11   Q.    When you did the work, what did you conclude?

12   A.    My conclusion is Formulation No. 6 is possible that it

13   can end up with a stable formulation, but it was very early

14   to decide at the time frame.

15   Q.    Did you do another time point?

16   A.    Of course.  Yes, I did.

17   Q.    Of the stability testing?

18   A.    Yes.

19   Q.    What was the next time point where you checked to see

20   what happened?

21   A.    The next time point I actually tested all eight

22   formulations stored at condition of 40-degree and 50-degree

23   at four weeks and I repeat the same test.

24            MR. ALY:  JTX 108, please, Mr. Young.

25   BY MR. ALY:

1  Q.    Ms. Liu, is this the report where you did the work you

2  were describing?

3  A.    Yes.

4  Q.    Why did you choose these conditions one month at

5  40 degrees C and 50 degrees C?

6  A.    40 degrees at relative humidity of 75 percent, it's

7  required condition to be submitted for the regulating

8  authority to apply for room temperature product, so I used

9  that as an indication.  At the same time I increased the

10  temperature just to confirm if I get a result of 40-degree

11  confirmed by 50-degree result.  In addition to that, if the

12  product is very stable, one month might not tell me any

13  degradation, so higher temperature might give me a better

14  indication.

15  Q.    In the real world we don't have 40 of 50 degrees

16  Celsius.  That is like putting it in an oven.  Right?

17  A.    That's true.

18  Q.    Why did you use that condition?  What is that meant to

19  show?

20  A.    In the real world, it is not.  But once we register

21  the product, we can use, for example, FDA accepted three

22  months 40 degree accelerated data to claim for room

23  temperature shelf life.

24  Q.    What did you find when you did these tests?

25  A.    What did I find?

1       The results come back that Formulation No. 6

2   referred to in my previous study is the most stable

3   formulation.  And after being stored at 40 degrees, there is

4   almost no change, no degradation occurred.  Whereas

5   Formulation No. 1 produces more than ten percent degradation

6   product when sample is stored at 40 degrees for four weeks.

7   Q.    Did you record those results in this report?

8   A.    Yes, I did.

9   Q.    Page 5, Table 6.

10       Ms., there are a lot of numbers here?

11  A.    Yes.

12  Q.    Which formulation were you describing?

13  A.    The numbers on the top, 1, 3, 8, that is the

14  formulation number that I referred to from the previous

15  reports, and the number on the left column, that's the

16  relative retention time representing each individual

17  impurity due to analysis.

18       And the bottom row, total means total impurity

19  detected in each formulation at the time.

20  Q.    Okay.  Now, for Formulation 1, the one that had just

21  docetaxel, polysorbate 80 and ethanol, what happened under

22  these testing conditions?

23  A.    Under these test conditions, you see the total

24  degradation product is more than ten percent at 40 degree

25  for four weeks, which, when I test the sample side by side,

1  the same sample stored at the same storage conditions for

2  four weeks, Formulation No. 6, you see the total impurity is

3  0.33.

4        If you remember, immediately after I made the

5  formulation, at the initial time point, the total impurity

6  is 0.3 percent, indicating there is no change, no

7  degradation in product occurred in the product after four

8  weeks stored at 40 degree for Formulation No. 6.

9  Q.    In terms of the ingredients, the different ingredients

10 chosen for Formulation 1 and Formulation 6, what are the

11 differences?

12 A.    Formulation No. 1, containing a vehicle of polysorbate

13 80 plus ethyl alcohol, with Formulation No. 6, containing

14 additional ingredients of PEG 300 and citric acid.

15 Q.    Do you consider the PEG 300 and citric acid to be

16 filler, Ms. Liu?

17 A.    No.

18 Q.    Why not?

19 A.    It's clearly demonstrated, it stabilized my

20 formulation.

21 Q.    How is that clearly demonstrated?

22 A.    By the degradation of the product.

23 Q.    Did you reach a conclusion in this report?

24 A.    Yes.

25 Q.    Page 6 of 10, please.

1          Now, is part of your testing at this point, did

2    you also look at the Taxotere product to see how it behaved?

3    A.    That's correct.

4    Q.    What did you find about that product?

5    A.    Taxotere product shows similar stability as the

6    Formulation No. 6 at that time.  And also, I found Taxotere

7    product is also acidic.

8    Q.    What does that mean to you, that it is acidic?

9    A.    The pH of Taxotere product was lower.

10   Q.    Did you know what ingredient that was?

11   A.    No, I didn't.

12   Q.    To your knowledge, as of today, do you know if there

13   is any ingredient that makes it --

14   A.    Later I tried to identify if Taxotere used any acid or

15   if Taxotere actually used citric acid.  But the results from

16   our laboratory show that Taxotere doesn't have citric acid.

17   And I couldn't see where, even in a label or in a technical

18   product information leaflet on Taxotere, that says that it

19   contains any acid.

20          So at that time, I knew Taxotere was formulated

21   under acidic conditions but I have no knowledge of what acid

22   was used.

23   Q.    Is there a word used at Mayne to describe the brand

24   company product?

25   A.    Yes.  We normally refer to brand company as an

1    innovator.

2    Q.    Compared to that product, did you do further tests

3    down the road?

4              THE COURT:  Let's take our afternoon break.

5              (Recess taken.)

6              THE COURT:  Apologize for the delay.  We will

7    work till 5 today, try to make up a little time.

8              I will probably share a few thoughts with patent

9    counsel after we finish for the day.  That is I was just

10    meeting with the other judges about, the local patent

11    lawyers, about basic information with regard to this Court.

12              MR. ALY:  May I proceed, Your Honor?

13              THE COURT:  Yes.

14    BY MR. ALY:

15    Q.    Ms. Liu, we were at JTX-108.  Did you also do a test

16    at 50 degrees Celsius for the four weeks?

17    A.    Yes, I did.

18    Q.    Are those reported in Table 7?

19    A.    That's right.

20    Q.    What did you find?

21    A.    The finding actually supported the results from the

22    sample kept at 40 degrees for four weeks.  Formulation No.

23    1, severe degradation.  Whereas Formulation No. 6, the most

24    stable.

25    Q.    Formulation No. 6, that's the one with polysorbate 80,

1  the ethanol, citric acid and PEG 300?

2  A.    That's correct.

3  Q.    What happened to Formulation No. 1, the one with the

4  ethanol and polysorbate?

5  A.    You can see that there is almost 30 percent more

6  degradation occurred in Formulation No. 1, when compared

7  with Formulation No. 6, when stored at the same storage

8  condition for the same length of time.

9  Q.    When you are recording the 33 percent degradation,

10  what is it that's degraded?

11  A.    This is the API that breaks down into other

12  degradants.

13  Q.    How do you know that?

14  A.    I actually compared the chromatogram of the docetaxel

15  API on its own, and I know at that time even though that's a

16  very early study, the major degradation of product at

17  relevant retention times of 1.46, 1.32, are due to

18  substantial degradants, related to docetaxel.

19  Q.    You mentioned there was a chromatogram.  What was

20  that?

21  A.    That was the HPLC, high pressure liquid

22  chromatographic analysis that we obtained to detect API and

23  also other degradants.

24  Q.    Did you make one of those chromatograms for this

25  particular experiment?

1    A.    Yes, I did.

2    Q.    Go to Page 7 of that.  We are comparing, Ms. Liu,

3    Figure 1, which the API.  What is that on the top page?

4    A.    On the top, if you look at the biggest peak, at the

5    retention time of 14.2 minutes, that is the docetaxel API.

6    Q.    The bottom, Figure 3, Formulation 6 at 40 C for one

7    month, what is that?

8    A.    If you look at Formulation 6 at 40 degrees for one

9    month, again, the major peaks appeared at 14.005 minutes, is

10   docetaxel API.  And another two, you can tell one is at

11   18.5, another at 20.6, the same peaks and API.

12   Q.    At the time you were doing these tests, did you reach

13   any conclusions from looking at these chromatograms?

14   A.    There is no change between the API and the Formulation

15   No. 6 stored for four weeks and 40 degrees.

16   Q.    Did you also compare the API, the starting drug, with

17   Formulation 1?

18   A.    Yes.

19   Q.    Can you show us those comparisons?

20         Ms. Liu, what happened when you compared the API

21   with the Formulation 1, the one with the polysorbate 80 and

22   ethanol alone?

23   A.    The one with polysorbate 80 and ethanol, you can see

24   there is another huge degradation peak that is coming out at

25   20.8 minutes after the API peaks.  And there is a second

1   degradation peak coming out after the 20.8 minutes.  These

2   two peaks are significantly higher than the API sample, and

3   also higher than the Formulation, which actually had the

4   exact number in the table.

5   Q.   At the time, what did that tell you about these

6   results?

7   A.   It tells me that docetaxel breaks down to other

8   degradation product.

9   Q.   There is still a peak at 14.22 in the Formulation 1.

10  How do you reach that conclusion?  How did you reach that

11  conclusion?

12  A.   There is still API remaining in Formulation No. 1,

13  however, because there is a large amount of other

14  degradation products in the chromatogram which shows that

15  the docetaxel API has been significantly broken down.  So

16  the remaining docetaxel API are not equivalent to the

17  initial API that I added into the formulation.

18  Q.   Let's go back to Table 7.  Let's look at Table 6 for

19  just a moment.  I know there is a lot of material there.

20  Table 6 on Page 6 of JTX-108.  I am sorry, Page 5.

21       The information on the chromatograms that you

22  did, is that shown in the table?

23  A.   Yes.

24  Q.   And you talked about this table, I just wanted you to

25  explain, Formulation 1, then there is degradants that are

1    here, what percentage was that that you found?

2    A.    The first percentage, the first degradant percentage

3    is 8.58 at relative retention time of 1.46.

4    Q.    What was the total amount of degradants found in

5    Formulation No. 1?

6    A.    No. 1, the total amount is 12.89 percent.

7    Q.    Did you view that as adequate chemical stability for a

8    pharmaceutical composition?

9    A.    No.

10   Q.    Why not?

11   A.    This is only 40 degrees for four weeks.  For example,

12   if I have to apply instructions for a product, I need to

13   supply a minimum of three months stability data under 40

14   degree accelerated conditions, in addition to any room

15   temperature stability.  But the requirement for the total

16   degradation should be a lot more than 2 percent.  But right

17   here, we are already getting more than ten percent

18   degradation product after four weeks and 40 degrees storage

19   condition.

20   Q.    Ms. Liu, if you would go to the next page, Table 7.

21   Here, what did you find for Formulation 1 in terms of total

22   impurities?

23   A.    For impurities is 33 percent, compared with the total

24   impurity in Formulation No. 6, 0.67 percent, which, this 50

25   degrees data actually supported my 40 degree data, suggested

1    that Formulation No. 1 is not a viable formulation and

2    Formulation No. 6 is a viable formulation that can lead to a

3    commercial product.

4    Q.    Formulation 1, that has the 33 percent impurities did

5    you consider that had adequate stability for a

6    pharmaceutical composition?

7    A.    Not at all.

8    Q.    Did you write the conclusions?

9    A.    I did.

10   Q.    Take a look at the conclusion on the bottom.

11         At the time what did you attribute the reason

12   for the stability improvement in Formulation 6?

13   A.    At that time, the reason for the stability of the

14   Formulation No. 6, I considered it could be the presence of

15   citric acid.  However, the mechanism of the citric acid to

16   stabilizing the formulation I wasn't sure, so further study

17   was required at the time.

18   Q.    What did you say -- what did you think at the time

19   would be the next study you would investigate?

20   A.    The next study, I was going to investigate the

21   different levels of citric acid and also combination of PEG

22   300 and citric acid on the stability of docetaxel injection

23   to try to identify an optimum formulation for the commercial

24   product.

25   Q.    What did your optimization steps involve?

1    A.    Optimization steps, you are actually looking at -- I

2    used Formulation No. 6 as a lead formulation, I repeated

3    that formulation to confirm the study from this previous

4    study.  And then at the same time I looked at different

5    levels of PEG 300 and citric acid combination in the

6    formulation, and also looking at different level of alcohol

7    on the stability of the formulation.

8    Q.    In that optimization process, while that was going on,

9    did you continue the stability testing as well for these?

10   A.    Of course, yes.  I continued stability testing for

11   Formulation No. 6, after six months, I actually later tested

12   Formulation No. 6 for nine and 12 months.

13   Q.    What happened to Formulation 1 during that time?

14   A.    I stopped testing after eight week point.

15   Q.    Why did you do that?

16   A.    It's demonstrated this formulation is not viable at

17   all, and it's not useful to waste major resources and time

18   to test this formulation.

19   Q.    Now, you described, Ms. Liu, some problems on HDX-1

20   with the stock solution premix of the Taxotere product.  Do

21   you remember that slide?

22   A.    That's correct.

23   Q.    Did the work you did on formulating Hospira's stock

24   solution address these problems?

25   A.    Yes, I actually addressed all these problems.  I

1    formulated, finally I formulated Hospira docetaxel injection

2    products.  That product that is a single vial product, does

3    not have the foaming problem, and it's stable for 24 months

4    at room temperature.  In addition to that, due to the high

5    level of alcohol in my formulation, Hospira product can be

6    used as a multi-dose vial.

7    Q.    What does that mean, a multi-dose vial?

8    A.    Multi-dose vial means that you can open the vial and

9    use any required amount of the product, keep the remaining

10   amount of product on the shelf, use it for next time.

11   Because my formulation is a multi-dose formulation, Hospira

12   is able to make one additional large presentation, which is

13   160-milligram vial.  That can be used any time at any dose,

14   minimize the number of vials and number of nato, improving

15   during the sample preparation for the infusion study.  The

16   infusion for the patient to be used.

17   Q.    What is the Taxotere largest size available?

18   A.    80 milligrams per milliliter.

19   Q.    How does the multiple dose that you were describing

20   for Hospira compare to the Taxotere version?

21   A.    Taxotere is a single-dose vial.  Once you open it,

22   make the solution, you can only make it eight hours, you

23   cannot reuse it again, even after eight hours.

24          For example, you made an 8 ml premix solution.

25   If you are only required to use four ml, the remaining four

1    ml has to be discarded.  And that is a huge waste because

2    the product is very expensive.

3    Q.    In comparison, how long does the formulation you

4    developed last?

5    A.    24 months.

6    Q.    Where you are comparing a premix to a stock solution.

7    Why are you doing that?

8    A.    Because that is premix and a stock solution is the

9    solution that any pharmacist in hospital need to be used to

10   prepare for the infusion solution for the patient I.V.

11   administration.  That's why I compared.

12   Q.    What is it about the ingredients that you did?  What

13   are the differences that make it possible to have the

14   multi-use vial and the other benefits you described?

15   A.    The ingredients for my formulation compared with

16   premixes, my formulation containing PEG 300, citric acid,

17   these two components doesn't have any premix solution of

18   Taxotere.  In addition, I have 23 percent alcohol in the

19   formulation, whereas Taxotere premix solution only contains

20   up to ten percent of alcohol level, plus the remaining is

21   water.

22   Q.    Ms. Liu, do you need that much ethanol to make that

23   formulation work?

24   A.    Well, I actually discovered during my formulation

25   study that I need minimum of 18 percent of alcohol to make a

1   uniform solution.

2   Q.    What happened when you used less than five-percent

3   ethanol in the stock solution, Ms. Liu?

4   A.    Even at ten-percent ethanol, what happened was,

5   polysorbate 80 and PEG 300 do not mix.  Polysorbate 80 was

6   not on the surface of the -- this is the vial.  The result

7   is you have polysorbate 80 was not on the top of the

8   solution with P-300 remaining on the bottom of solution and

9   form two layers.

10  Q.    Ms. Liu, did you have people on your team send some

11  placebo samples, just the formulation part of your

12  formulation?

13  A.    Yes, I did.

14            MR. ALY:  May I pass those up, your Honor?

15            THE COURT:  I'm not sure that I really --

16            MR. ALY:  I will just hold it up.  If I can give

17  it to the witness?

18            THE COURT:  Yes..

19            MR. SIPES:  It's labeled docetaxel injection,

20  but it's not docetaxel injection.

21  BY MR. ALY:

22  Q.    That's what I understand.  People put labels on here,

23  but is there really any active ingredient in there?

24  A.    Because I cannot bring a docetaxel ingredient into the

25  Court --

1    MR. SIPES:  We probably just violated the

2  Federal Food and Drug Act.

3         THE COURT:  I probably don't have jurisdiction.

4         MR. ALY:  We can peel them off, if that makes a

5  difference.

6  BY MR. ALY:

7  Q.   Ms. Liu, what is in your hand there?  What is that

8  vial?

9  A.   This is the actual solvent vehicle that's used for

10  Hospira injection, except I don't have docetaxel in the

11  solution.

12  Q.   And how do you use that?  How do people use that vial

13  you created?

14  A.   In the hospital, pharmacists, if needed, at any time,

15  you can get the sample from the shelf, open it, take the

16  required amount of the solution for the I.V. administration.

17  Q.   Let me put up HDX-1-4, please.

18         Ms. Liu, you described an example for me the

19  other day.  Let's go to HDX-1-3.

20         Now, earlier today you had described the

21  problems you saw on the Taxotere label.  Were you involved

22  in any changes to the labeling insofar as making this

23  formulation into a perfusion?

24  A.   I drafted the preparation of administration plan for

25  Hospira's docetaxel injection product.

Q.      There are a lot of words here.  One on the left, what
is that?

A.      On the left, that is the instruction for preparation
and administration for Taxotere product, and on the
right-hand column, that's the instruction for Hospira's
product.

Q.      Why the difference, Ms. Liu?

THE COURT:  Yes?

MR. SCOTT:  We have no formal objection to this.
We note this is clearly a product-to-product comparison.
We're not objecting to it, but we do note that they're
opening the door to our also introducing evidence on a
product-to-product comparison.

THE COURT:  Why the slide, Mr. Aly, and why the
line of questions?

MR. ALY:  This is to show it's not a copy.  It
makes a difference not only on the product, but to the label
as well.

MR. SIPES:  To be clear, our assertion is
they're copying the patent, not our product.

MR. ALY:  AND, your Honor, the patented product
is different in terms of the excipients is uses, as Ms. Liu
testified.

THE COURT:  But, again, you're saying, that as
the plaintiff, that you're copying the claims, you infringe

1    by copying the claims.

2                MR. SIPES:  We've had a lot of testimony on

3    this.  We're allowing them to go forward, but we do believe

4    we should be entitled, because they opened the door, we

5    should be entitled to respond.

6                THE COURT:  You may be willing.  Okay?

7                MR. SIPES:  Fair enough, your Honor.

8                THE COURT:  But I'm not willing to venture far

9    enough down this road.  I don't see this as relevant

10   testimony.

11               Is that the nature of your objection?

12               MR. SIPES:  Yes, sir.

13               THE COURT:  Sustained.

14               MR. ALY:  In fact, your Honor, it may be more

15   effective if I just asked.

16               THE COURT:  Please take that down.

17   BY MR. ALY:

18   Q.    Ms. Liu, does it make a difference to have the one

19   vial versus the two vial?  Does it make a difference?

20   A.    Yes.

21   Q.    What?

22   A.    First one, I removed the additional solutions for

23   preparation, so avoid the potential risk for the safety

24   issue and avoid the potential risk of --

25               THE COURT:  Mr. Aly, we've covered this.  Okay?

1    There's a tool known as repetition, but after a point, it

2    becomes nauseation, if that's a word.  You have to make some

3    assumptions about the intellectual fact-finder and it's

4    adequate to the needs that are out there.  Okay?  After a

5    point, I take it as condescension.

6              This is not just for you.  I'm talking to both

7    sides, all sides.  All right?

8              MR. ALY:  I understand the message, your Honor.

9              THE COURT:  All right.  Let's go.

10   BY MR. ALY:

11   Q.   Let's talk about perfusions, Ms. Liu.

12             Can you use the Hospira product to make an

13   infusion perfusion?

14   A.   Yes, you can.

15   Q.   Did you test the differences in the formulation you

16   made to test if there's a difference in the perfusion?

17   A.   Yes.

18   Q.   Is that in a report?

19   A.   It is.

20   Q.   SFS 24.  Is that what you call that report?

21   A.   That's one of the preliminary studies in the report.

22             MR. ALY:  JTX-24, please.

23   BY MR. ALY:

24   Q.   And what were you doing in this study, Ms. Liu?

25   A.   In this study, I was looking at the Taxotere comparing

1    to docetaxel formulation.

2    Q.    What did you find?

3    A.    What I found is Hospira's docetaxel formulation

4    produced in a laboratory condition compared with Taxotere

5    shows that Hospira's Taxotere formulation, if it's not

6    better, at least equivalent to Taxotere in an infusion

7    solution.

8    Q.    I just want to ask you about the docetaxel product.

9    Did you record any kind of appearance and other tests for

10   what happened in the perfusion?

11   A.    I did.

12   Q.    Turn to table 8, please, which is on Page 7, JTX- 46.

13         What did you find in terms of -- what tests did

14   you do for the perfusion?

15   A.    I tested the pH appearance and also particular count

16   for docetaxel infusion bag and also Taxotere in an infusion

17   bag.

18   Q.    What time point did you test for your formulation,

19   perfusion was made of which?

20   A.    I tested initial TPO at 4 hours, and also wanted the

21   appearance of both products in the infusion bag at six and

22   eight hours.

23   Q.    What happened?

24   A.    It showed that docetaxel in the solution is still

25   clear, colorless, free from visible particulates at four

1    hours.

2    Q.    What happened after that?

3    A.    After that, at six hours, docetaxel, Hospira's

4    docetaxel formulation, in an infusion bag, failed the

5    appearance, which solution became cloudy.

6    Q.    What does it mean to become cloudy?

7    A.    It means that precipitation occurred in the solution.

8    Q.    Did you do another perfusion study after this one?

9    A.    I did another infusion study using docetaxel final

10   formulation manufactured in the manufacturing facility,

11   compared with Taxotere finished product in an infusion

12   solution.

13   Q.    JTX-47.

14         Ms. Liu, is this the study to which you

15   referred?

16   A.    Yes.

17   Q.    Will you please turn to table 8?

18         MR. HURST:  Honor, may I have a second with Mr.

19   Aly?

20         THE COURT:  Yes.

21         MR. HURST:  May I address just an issue, your

22   Honor, at this point?

23         THE COURT:  Yes.

24         MR. HURST:  With respect to the

25   product-to-product comparison, if you sustain that

1    objection, I want to just explain what is about to proceed

2    so it does not seem like we're violating your order.

3             THE COURT:  Go ahead.

4             MR. HURST:  One of the big issues in this case

5    are the two claims that talk about consisting essentially of

6    and when the extra ingredients make a difference.

7             THE COURT:  Yes.

8             MR. HURST:  And she did testing which

9    technically was comparing Taxotere to our product, but

10   there's an extra ingredient.  So she's seeing that the PEG

11   compared to not having the PEG makes a difference, so it

12   does -- it's not a product-to-product comparison.  It just

13   happens to be Taxotere.

14            THE COURT:  Fair enough.

15            MR. HURST:  Thank you, your Honor.

16            THE COURT:  I'm go going to overrule an

17   objection you're about to make.

18            MR. SIPES:  I would like to respond to that.

19            THE COURT:  Okay.

20            MR. SIPES:  That, in fact, is the exact argument

21   I made about Dr. Sparrboom's analysis and his testing.  Mr.

22   Hurst objected and said, well, it's product to product.  I'm

23   happy to have this come in because I do believe it

24   illuminates the properties of their product.  I just think

25   it opens the door --

1        THE COURT:  Are you asking me to revisit my

2   ruling with respect to Dr. Sparreboom?

3        MR. SIPES:  We don't have to take it up now,

4   your Honor.  I believe they have opened the door and we

5   should be able, at some point in the future, be able to

6   discuss that.

7        MR. HURST:  You did let the report in.

8        THE COURT:  I did let the report in.  I think

9   you're covered on your points.  We can make talk about it

10  later or write about it later.  It depends on how we agree

11  to do it. .

12        Yes, I do understand, Mr. Hurst.

13        MR. HURST:  Thank you, your Honor.

14  BY MR. ALY:

15  Q.   Ms. Liu, what did you find in the test results on the

16  perfusion study?

17  A.   In the perfusion study in the test results, again, it

18  shows Hospira docetaxel in the perfusion solution is

19  equivalent or better than Taxotere product.

20  Q.   At --

21  A.   At four hours time point.

22  Q.   As you understand it, what is the difference between

23  the products?  What ingredients difference allows that to

24  happen?

25  A.   It's because Hospira's docetaxel injection formulation

1     contains a combination of citric acid and P-300.  That

2     combination would have some impact on the stability of the

3     solution.

4     Q.    Ms. Liu, while you were working on this formulation

5     project, was Dr. Sparreboom involved in the formulation at

6     all?

7     A.    Not in the formulation, no.  I was the formulator for

8     this product.

9     Q.    What did he do?

10     A.    He was a consultant employed at the time, tried to

11     evaluate the bioequivalency of Hospira's formulation

12     compared with Taxotere.

13     Q.    How many reports did he provide?

14     A.    He provided five reports.

15     Q.    Many versions to those reports?

16     A.    I remember many versions.  He reviewed the process.

17     Many draft versions of it.

18     Q.    And how many ultimate reports did he submit?

19     A.    For submission?

20     Q.    Including all of the draft and -- actually, the

21     question I have for you Ms. Liu is, how many reports did he

22     have in final form, did he submit?

23     A.    Submit to Hospira?

24     Q.    Yes.

25     A.    Five reports.

1    Q.    And of the reports, how many were relied upon by

2    Hospira, for example, to submit to the FDA?

3    A.    We didn't submit the report.

4    Q.    Why not?

5    A.    As I understand, one was a project team decision.

6    Second is, at least one of the studies wasn't scientifically

7    sound because one of the methods was not reliable.  The

8    result was not conclusive.

9              MR. ALY:  May I have a moment, your Honor?

10             THE COURT:  Yes.

11   BY MR. ALY:

12   Q.    And on this particular report, Ms. Liu, did you reach

13   a conclusion?

14   A.    My conclusion at this report is Hospira's product in

15   the infusion bag is stable or better than innovative

16   product.

17             MR. ALY:  Can we go to Page 10 of SFS 30, JTP-

18   47?

19   BY MR. ALY:

20   Q.    Based on the perfusion study that you did, what did

21   you conclude?

22   A.    If you read the last sentence, based on these results,

23   concluded that innovator sample is less stable than Mayne's

24   in-house formulation.

25   Q.    How many hours did you find that the in-house, that's

1  the Hospira formulation, was stable?

2  A.   Four hours.

3  Q.   And the Hospira formulation, the one that you

4  developed, did you find that it was -- up to what period of

5  time did you find that was stable?

6  A.   The appearance of Hospira products do appear colorless

7  after four hours.

8  Q.   And up to how many hours?

9  A.   Up to six hours.

10  Q.   The samples that you tested from Taxotere, up until

11  what point were they stable?

12  A.   The sample is stable after three hours, but that's by

13  the test results, and innovator solution becomes cloudy at

14  four-and-a-half hours.

15  Q.   And let's start with the innovator solution.  When it

16  says it becomes cloudy and particulates failed at

17  four-and-a-half hours, what does that mean?

18  A.   Which means that you cannot use this infusion solution

19  for I.V. administration.

20  Q.   Why not?

21  A.   Because you don't want to inject particles into a

22  human body, through intravenous.  It can create a very bad

23  side effect or safety problem.

24  Q.   What kind of safety problem?

25  A.   You inject too many particles, you could die.

1  Q.    Ms. Liu, over what period of time did you develop the

2  formulation you worked on?

3  A.    A period of time.

4  Q.    How many months did you work on that product?

5  A.    From initial, my involvement until final docetaxel

6  commercial product, it's about two-year time period.

7              MR. ALY:  Thank you very much.

8              THE COURT:  Thank you.

9              Ms. Sipes, are you going to cross-examine?

10             MR. SIPES:  Yes.

11                  CROSS-EXAMINATION

12 BY MR. SIPES:

13 Q.    Good afternoon, Ms. -- is it Ms. Liu or Dr. Liu?

14 A.    Ms. Liu.

15 Q.    Ms. Liu.  Good afternoon.  We've not met before.  My

16 name is Christopher Sipes.

17 A.    Hi.

18 Q.    And I'm counsel for Sanofi.

19             Let me ask you, we've spent a lot of today

20 talking about stability of the stock solution.  Remember

21 that?  The type of stability we're talking about there is

22 chemical stability.

23 A.    Right.

24 Q.    That has to do with the rate at which the docetaxel

25 degrades in the stock solution; is that correct?

1    A.    Yes.

2    Q.    Only at the end did we get to something called

3    physical stability; is that correct?

4    A.    Yes.

5    Q.    That has to do with the rates at which the docetaxel

6    precipitates out of the perfusion; is that correct?

7    A.    That's correct.

8    Q.    And you understand that by perfusion, I mean the

9    intravenous infusion that's administered to patients?

10   A.    Perfusion is the patient prepared for I.V.

11   administration.

12   Q.    Thank you.

13              And so when we talk about stability with the

14   stock solution, we typically mean chemical stability; is

15   that correct?

16   A.    Can you repeat that again?

17   Q.    When the term stability is used for stock solution, it

18   typically means the chemical stability; is that correct?

19   A.    No.  It means chemical and also physical.

20   Q.    But the main issue with the stock solution -- main has

21   two meanings in this case.  The principal issue with

22   stability with the stock solution is the chemical stability;

23   is that correct?

24   A.    That's correct.

25   Q.    And the principal issue with stability with the

1    perfusion is the physical stability; correct?

2    A.    It can be chemical as well.

3    Q.    The perfusion is typically administered over the

4    course of a couple of hours?

5    A.    It depends on what -- yes.

6    Q.    So for the chemical stability in a perfusion, it does

7    not have to be much beyond, say, eight hours; correct?

8    A.    Yes.

9    Q.    And that's achieved by all of the products; correct?

10   A.    All the product depends on the stability or shelf life

11   of the provisional solution.

12   Q.    But in terms of the Taxotere commercial product,

13   Hospira product, all of them have more than adequate

14   chemical stability in the perfusion; is that correct?

15   A.    More than adequate chemical stability in perfusion,

16   after eight hours you mean?

17   Q.    And so the issue you studied with the perfusion

18   closely was the physical stability?

19   A.    Yes.

20   Q.    That was the challenge with the perfusion, was the

21   physical stability; is that correct?

22   A.    Yes.

23   Q.    I'm sorry?

24   A.    Yes.

25   Q.    I apologize.  You have a perfectly charming accent,

1    but I have a little -- I don't have the best hearing.

2                THE COURT:  We've got the HVAC going, too.

3                MR. SIPES:  Thank you.

4    BY MR. SIPES:

5    Q.    So when you were doing your early formulation studies,

6    you looked at a range of excipients; correct?

7    A.    That's right.

8    Q.    Did you look at any surfactant other than polysorbate

9    80?

10   A.    In my early state of formulation?

11   Q.    Correct.

12   A.    No.

13   Q.    You only looked at polysorbate 80?

14   A.    That's right.

15   Q.    You didn't look at Cremophor?

16   A.    During my solubility study, the very early study, I

17   did look at the solubility of the Cremophor.

18   Q.    You did look at Cremophor?

19   A.    Yes.

20   Q.    But you selected polysorbate 80 over Cremophor?

21   A.    Yes.

22   Q.    Did you look at pluronic L64?

23   A.    No.

24   Q.    Other than -- okay.  You also looked at benzyl

25   alcohol; is that correct?

1    A.    Yes.

2    Q.    But you rejected benzyl alcohol; correct?

3    A.    Yes.

4    Q.    Just like you rejected Cremophor; correct?

5    A.    No.

6    Q.    You rejected it for different reasons?

7    A.    That's correct.

8    Q.    Why did you reject the Cremophor?

9    A.    Because I only develop a generic version of docetaxel

10   injection, and from the literature, some of the literature

11   indicated that polysorbate 80 might also make a

12   bioequivalent of docetaxel.  In order to still develop a

13   bioequivalent product, I intended to keep the surfactants

14   the same and concentrate on the same in my formulation.

15   Q.    Changing the identity of the surfactant might change

16   the biological effects of the perfusion; is that correct?

17   A.    I'm not sure.

18   Q.    It was possible?

19   A.    I didn't do study.

20   Q.    But you rejected Cremophor because you were worried

21   that if you changed the Cremophor, the perfusion might have

22   different biological effects when administered; correct?

23   A.    Correct.

24   Q.    And, similarly, you kept the amount of polysorbate 80

25   the same; is that correct?

1    A.    Yes.

2    Q.    Because you were worried that if you changed the

3    amount of polysorbate 80, that might change the biological

4    effects of the perfusion; is that correct?

5    A.    I simply wanted to keep the same amount and same

6    surfactant so I have the bioequivalent product in the end.

7    Q.    And by bioequivalence, you mean a product that has the

8    same therapeutic effect as the innovator product, correct?

9          MR. ALY:  Objection, your Honor.  Bioequivalency

10   was ruled on in the motion in limine.

11         MR. SIPES:  I'm trying to find out what her

12   reason was for developing her formulation.  They spent two

13   hours  on what her choices were.  I'm simply drawing out the

14   fact that what she's saying is, changing the amount of

15   polysorbate 80 will have an effect on the safety and

16   effectiveness of the product, potentially.

17         THE COURT:  She discussed that, but go ahead,

18   Mr. Aly.

19         MR. ALY:  Your Honor, bioequivalence is what it

20   does in the body, how it releases in the bloodstream.

21         THE COURT:  Yes.  I don't recall her discussing

22   on direct bioequivalence.  Now, my memory is not perfect on

23   this thing.  I think counsel is backing me up on it,

24   fortunately.

25         MR. SIPES:  What I'm trying --

1     THE COURT:  Your you're officers of the Court.

2     Remember that.

3           MR. SIPES:  Your Honor, when she says the amount

4     of change in the --

5           THE COURT:  I don't want this to get into a

6     joust about bioequivalence and an issue we have already

7     dealt with in the joint pretrial conference.

8     BY MR. SIPES:

9     Q.    What you were concerned about is if you changed the

10    amount of polysorbate 80, the perfusion might not be equally

11    safe and effective as the innovator product?

12    A.    At that time, the effect I wasn't concerned changing

13    that amount, because the literature information showed that

14    during the particular clinical study, the amount of

15    surfactant, polysorbate 80 used, was different than Taxotere

16    finished product.  But in order to develop a bioequivalent

17    product, I kept the same amount of polysorbate 80 for the

18    registration purposes.

19    Q.    So the way that you might be able to make some

20    adjustments to the polysorbate 80 level was the clinical

21    studies that sanofi had done with Taxotere?

22    A.    I am sorry.  Can you repeat that?

23    Q.    The clinical studies you refer to were the studies

24    that sanofi had done with its Taxotere formulation in Phase

25    I and Phase II?

1    A.    It published in paper, yes.

2    Q.    Without those studies, there would have been

3    uncertainty about what the range of polysorbate 80 level

4    would do to the safety and effectiveness of the product.

5    Correct?

6    A.    When injected into patient?

7    Q.    Yes.

8    A.    It could be at that time.

9    Q.    And you rejected benzyl alcohol because it degraded

10   the docetaxel.  Correct?

11   A.    Yes.

12   Q.    So you felt that benzyl alcohol was not a suitable

13   excipient for a docetaxel formulation.  Correct?

14   A.    That's correct.

15   Q.    And so you, as a formulator, would not select a

16   formulation that had benzyl alcohol in it for docetaxel.

17   Correct?

18   A.    Benzyl alcohol also shows that it had limited

19   solubility in PEG 300.  So it does not give me the required

20   amount of benzyl alcohol that can be used for formulation

21   with docetaxel.

22   Q.    But you rejected it?

23   A.    Yes.

24   Q.    Do you know what the stability would be with a

25   formulation that had some benzyl alcohol in it?

1    A.    I don't know.

2    Q.    Let me ask you to turn to Joint Trial Exhibit 107.  We

3    could turn to the second page of that, to Table 2?

4              You testified a lot today about the difference

5    between Formula 1 and Formula 6.  Correct?

6    A.    Yes.

7    Q.    You drew some conclusions about the differences in

8    physical stability between Formula 1 and Formula 6.

9    Correct?

10   A.    Physical stability?

11   Q.    Physical stability.

12   A.    I didn't say difference between Formula No. 1 and 6.

13   Q.    In the physical stability -- I am sorry.  Thank you

14   for correcting me.

15              That's my mistake.

16              The chemical stability?

17   A.    Yes.

18   Q.    If we could highlight Formula 1 and Formula 6?

19              There are a number of differences between

20   Formula 1 and Formula 6.  Correct?  There is twice as much

21   polysorbate 80 in Formula 1 as Formula 6.  Right?

22   A.    That's correct, yes.

23   Q.    There is substantially more ethanol in Formula 1 than

24   Formula 6.  Correct?

25   A.    Yes.

1    Q.    So in addition to the fact that Formula 1 is without

2    citric acid and without PEG 300, Formula 1 is with double

3    the polysorbate 80 and substantially more ethanol.  Correct?

4    A.    Yes.

5    Q.    And your conclusion is that ethanol degrades

6    docetaxel?

7    A.    That's correct.

8    Q.    So when Formula 6 had better chemical stability than

9    Formula 1, that could be attributable to the difference in

10   ethanol, too, could it not?

11   A.    It can be.

12   Q.    And it could also have something to do with the amount

13   of polysorbate 80, could it not?

14   A.    Actually, if you look at Formulation No. 3, it has

15   identical amount of polysorbate 80 as Formulation No. 6.

16   The only difference is No. 3 doesn't have citric acid, and

17   have high level of benzyl alcohol.

18   Q.    So the ethanol seems to be an important component.

19   Correct?

20   A.    It is an important component.  Formulation No. 7 and

21   No. 6, if you look at it, the only difference is the citric

22   acid in Formulation No. 6 and No. 7 had very similar as as I

23   understand in all level.

24   Q.    So your conclusion would be based then not on 1 versus

25   6?

1    A.    My conclusion is -- what conclusion are you asking?

2    Q.    The improvement in chemical stability, was that from

3    reducing the ethanol or adding the citric acid?

4    A.    It's from combination of adding citric acid, PEG 300,

5    and also reducing the level of alcohol.

6    Q.    So the discovery that one can reduce ethanol

7    contributes to chemical stability.  Right?

8    A.    Only contributes to.

9    Q.    Now, I want to just talk to you very briefly about

10   citric acid, to start with.

11            You are aware, are you not, that the Taxotere

12   product is acidic -- I should be clearer -- that the acidity

13   level in the Taxotere product is acidic similar to what the

14   Hospira product is.  Correct?

15   A.    Yes.

16   Q.    And so there is some acid content to the Taxotere

17   product.  Correct?

18   A.    Yes.

19   Q.    Now, the ingredients of the Taxotere product are set

20   forth on the Taxotere label which you have reviewed.

21   Correct?

22   A.    That's right, yes.

23   Q.    There is no citric acid?

24   A.    No.

25   Q.    There is, however, polysorbate 80.  Correct?

1    A.    Yes.

2    Q.    Now, the acid content of polysorbate 80 can vary.

3    Correct?

4    A.    Yes.

5    Q.    So it is possible that Taxotere is acidic in the way

6    the Hospira product is through an acidic grade of

7    polysorbate 80.  Correct?

8    A.    I am not sure.

9    Q.    It is correct that the polysorbate 80 used by Hospira

10   is quite low, is it not?

11   A.    Polysorbate 80 what?

12   Q.    The acid content of the polysorbate 80 used by Hospira

13   is quite low?

14   A.    That's right.  It's a conventional -- viable

15   polysorbate 80 used for normal pharmaceutical product.

16   Q.    And it is quite low, is it not?

17   A.    Yes.

18   Q.    The acid content is around 0.6.  Correct?

19   A.    That's right.

20   Q.    And, in fact, the specification, under the National

21   Formulary, would allow an acid content up to 2.2?

22   A.    Yes.

23   Q.    Almost four times as much?

24   A.    I cannot remember that number.

25   Q.    If it would help you, I can refresh your recollection.

Could we pull up Joint Trial Exhibit 315. This is Mayne's

specification for polysorbate 80. Correct?

A.    Yes.

Q.    And you will see acid value there. Do you see that?

A.    Yes.

Q.    That tells you how much acid is in the polysorbate 80.

Correct?

A.    Yes.

Q.    And polysorbate 80 is in a sense a natural product.

Right?

A.    Yes.

Q.    You take a natural product and you polyethoxylate it

to make it a surfactant. Do I have the nomenclature right?

A.    I am not a synthetic chemist so I don't know how

polysorbate was manufactured and produced.

Q.    Is it fair to say that it is a natural product that is

not a pure compound, it has a mix of things in it? Correct,

if you know?

A.    I cannot answer this question because I am not a

synthetic chemist.

Q.    Fair enough.

       The acid content of polysorbate 80 can vary.

Correct?

A.    Absolutely.

Q.    And the acid content of the polysorbate 80 used by

1  Hospira is 0.6.  Correct?

2  A.    At that particular batch is 0.6.

3  Q.    The specification, that is, what's allowed by the U.S.

4  Pharmacopeia, is no more than 2.2?

5  A.    Yes.

6  Q.    So the acid content of the polysorbate 80 used by

7  Hospira could be almost four times as much and still be

8  polysorbate 80.  Correct?

9  A.    Three times?

10  Q.    This USP for polysorbate 80, this goes way back.

11  Correct?

12  A.    What do you mean goes way back?

13  Q.    That specification goes back --

14        THE COURT:  That's a colloquialism.

15  BY MR. SIPES:

16  Q.    The specification on acid value for polysorbate 80 is

17  several decades old, is it not?

18  A.    No.  The specification we applied for polysorbate 80,

19  we actually applied the current Pharmacopeia standard.

20  Q.    Do you believe that the limit on acid value has

21  changed over the last 30 years?

22  A.    I am not sure.

23  Q.    For purposes of chemical stability of the stock

24  solution, or of the perfusion made from it, is there a

25  difference between taking an acidic grade of polysorbate 80

1    or taking a low acid grade and adding the citric acid?

2    A.    Is there a difference?

3    Q.    Will there be a difference in the properties of the

4    stock solution or the perfusion between taking a low acid

5    grade of polysorbate 80 and adding citric acid versus taking

6    a grade of polysorbate 80 with a higher acid content?

7    A.    Are you talking about docetaxel stability?

8    Q.    Correct.

9    A.    In polysorbate 80 only solution?

10   Q.    Let's start with a stock solution.  The stock solution

11   of docetaxel, you believed that the acidity of the stock

12   solution affects the chemical stability.  Correct?

13   A.    No.  I believe it's a combination of the acidic

14   condition and PEG 300 affects the stability.

15   Q.    Holding everything else constant, just now talking

16   about the acidity, everything else being constant, is there

17   a difference between adding citric acid and using a low acid

18   polysorbate 80 versus using just a higher acid polysorbate

19   80?

20            MR. ALY:  Your Honor, I don't know that the

21   witness was qualified, but we didn't offer her as an expert.

22   She is giving opinion testimony.  Objection.

23            THE COURT:  Where are we going with this?

24            MR. SIPES:  The claims allow you to use

25   polysorbate 80.

1    THE COURT:  Would you address Mr. Aly's point?

2    MR. SIPES:  As a formulator, she is

3  experienced -- I will withdraw the question.  I believe that

4  she --

5    THE COURT:  The question is withdrawn.

6    MR. SIPES:  I will get into it another way.

7  BY MR. SIPES:

8  Q.    I am going to talk to you then about the physical

9  stability of the perfusion.  Have you done tests that

10  suggest that the true time for precipitation of the

11  perfusion is 20 hours?  Do you recall that?

12  A.    Have I ever done the test at 20 hours?  I did one to

13  look at the appearance of the physical stability, the

14  appearance of the solution at my first early stage.

15  Q.    And you saw that you could avoid precipitation up to

16  20 hours.  Correct?

17  A.    When I study one of the studies it shows.

18  Q.    One of the studies showed that.  Correct?

19  A.    Very early studies, yes.

20  Q.    Now, when you do these perfusion tests that you looked

21  at with counsel, with Mr. Aly, those are sort of worst-case

22  tests, are they not?

23  A.    The one that we look at, it represented -- we tried to

24  mimic the condition that we actually used in the hospital in

25  the pharmacy bench.

1   Q.   You are looking at possible worst case?

2   A.   Similar to the pharmacy bench.

3   Q.   In order --

4            THE COURT:  The pharmacy bench?

5            THE WITNESS:  The pharmacy in the hospital when

6   they prepare the infusion batch on the Bench.

7            THE COURT:  That's her answer.

8   BY MR. SIPES:

9   Q.   Because you want to make sure there is a sufficient

10  safety margin that even in those circumstances you will have

11  at least four hours.  Correct?

12  A.   I want to make sure that Hospira formulation is at

13  least equivalent to Taxotere at four hours, because the

14  label of Taxotere claimed stable for four hours.

15  Q.   And you recognize that the labeling for four hours

16  builds in a safety margin for better than worst-case

17  conditions.  Correct?

18  A.   Yes.

19  Q.   And, in fact, you are aware that the Taxotere product

20  is labeled in Australia to eight hours.  Correct?

21           THE COURT:  Which one do you want her to answer?

22           MR. SIPES:  That is my fault, Your Honor.  I

23  apologize.

24  BY MR. SIPES:

25  Q.   You are aware that the Taxotere product is labeled in

1  Australia with a minimum physical stability of eight hours.

2  Correct?

3  A.    Yes.

4           MR. ALY:  Objection, Your Honor.  Foundation.

5  It is the same product.

6           THE COURT:  Why don't you establish your

7  foundation.

8  BY MR. SIPES:

9  Q.    The Australian product is the same product.  Correct?

10 A.    Yes.  Can I correct that?  It's Australian Taxotere

11 product, it's a Taxotere, but distributed in Australia.

12 Q.    But it's formulated the same.  Correct?

13 A.    It has the similar component in the product, yes.

14 Q.    It has the same components.  Correct?

15 A.    Yes.

16 Q.    And the Hospira product, you believe, is comparable in

17 physical stability to the Australian product as well.

18 Correct?

19 A.    Yes.

20 Q.    So you believe you could meet eight hours or more of

21 physical stability as well.  Correct?

22 A.    Later on, when we -- when there is an Australian

23 Taxotere product available, we actually did identical tests,

24 compared Hospira formulation with Taxotere in the same

25 infusion container that is specified in Hospira product

1    information -- sorry, in the Taxotere product information

2    leaflet for Australian market, yes, that shows formulation

3    is equivalent to Taxotere.

4    Q.    Which means more than eight hours of physical

5    stability.  Correct?

6    A.    Yes.

7    Q.    What you are talking about as the worst case is when

8    you use infusion bags that was, for example, PVC.  Correct?

9    A.    I cannot remember which bag.

10   Q.    If we could turn to Plaintiffs' Trial Exhibit 822.

11   And to Page 4?

12            There we go.  If we could blow up the paragraph

13   under the chart.

14            These are the special bags for following the

15   labeling.  Correct, the Baxter AVIVA bags?

16   A.    I believe so.

17   Q.    And it says the AVIVA container is made with non-latex

18   plastic material and doesn't contain PVC, DEHP or other

19   plasticizers.

20            Do you see that?

21   A.    Yes.

22   Q.    The problem is there is a lot of polysorbate 80 in the

23   docetaxel perfusions.  Correct?

24   A.    A lot of polysorbate 80?

25   Q.    A large amount.

1    A.    In the docetaxel injection?  You mean Hospira

2    docetaxel?

3    Q.    There is the same amount of both.  Correct?

4    A.    Yes, that's right.

5    Q.    In all of the docetaxel perfusion, there is a lot of

6    polysorbate 80?

7    A.    Yes.

8    Q.    And the polysorbate 80 as a surfactant can strip

9    plasticizers out of plastics.  Correct?

10   A.    I cannot comment on that because I am not a technical

11   expert in that area.

12   Q.    You are aware that the labeling for Taxotere instructs

13   not to use infusion bags that have PVC and DEHP.  Correct?

14   A.    Yes.

15   Q.    So for this study, if these bags were used that were

16   made for products like the docetaxel perfusion that don't

17   contain those sorts of plasticizers; correct?

18   A.    That's correct.  This is a study we in investigated

19   for registration of docetaxel.

20   Q.    And that's when you see that the physical stability

21   goes out past eight hours; correct?

22   A.    Yes.

23   Q.    Now, you've spent some time formulating docetaxel, did

24   you not?

25   A.    Yes.

1    Q.    And you put a lot of work into developing the

2    formulation for docetaxel; correct?

3    A.    Yes.

4    Q.    And it's not easy to formulate docetaxel; correct?

5    A.    No.

6    Q.    And, in fact, it's so hard to formulate docetaxel,

7    that you filed a patent application for a formulation; is

8    that correct?

9              MR. ALY:  Objection, your Honor.  Difficulty of

10    formulation does not have to do with application.

11              THE COURT:  Say it again.

12              MR. ALY:  Objection.  Relevance, opinion.

13              MR. SIPES:  Your Honor, we've had two hours of

14    testimony about how much work she put into formulating

15    docetaxel.  Our point here is -- are we doing this as a

16    sidebar, your Honor?

17              (Sidebar conference held as follows.)

18              MR. SIPES:  Your Honor, two things going on

19    here.  One is, she filed a patent application in which she

20    filed an oath that described the properties and effects of

21    the ingredients, and I will get into that with her.

22              In addition, we had two hours of discussion

23    about how they developed the new formulation and what she

24    did.  I think we're entitled to bring out, because it bears

25    on validity, too.  She has experience formulating docetaxel.

1    She represented it to the Patent Office.  It is difficult to

2    formulate docetaxel and what the problems are.

3              That's part of our case, that our patent, too,

4    which comes 14 years -- she just filed an application on

5    another patent in the U.S.

6              Fourteen years earlier, our inventor spent a lot

7    of time trying to formulate docetaxel.  We're entitled to

8    bring out that Hospira recognizes how hard it is and that

9    innovation --

10             THE COURT:  I think this is part of the KSR

11   analysis?

12             MR. SIPES:  It is.

13             MR. ALY:  Your Honor, this is irrelevant for the

14   following reason.  It's an application and Ms. Liu was not

15   talking about her patent application on direct and we don't

16   know what the connection, if any, between her work on her

17   one formulation and what lawyers do when they draft an

18   application, which means something different.

19             THE COURT:  Okay.

20             MR. SIPES:  I want to bring out what she

21   believes about how the difficulties in formulating docetaxel

22   as a formulator.

23             THE COURT:  But you can do that without getting

24   into the area -- I think that's Mr. Aly's point -- of the

25   patent application, and all of that.

1          MR. SIPES:  So --

2          THE COURT:  That's sort of a sidebar, I think,

3  is his point.

4          MR. ALY:  Yes, sir.

5          MR. SIPES:  I just want to go to some of the

6  statements she made in her patent application.

7          THE COURT:  Like, for instance, what?

8          MR. SIPES:  She talks about -- that it's

9  equivalent to use acidic rate of an ingredient or add citric

10  acid.

11         THE COURT:  But she'll tell you that.  She'll

12  tell you that without referencing the patent application I

13  think is another point that Mr. Aly, if he hasn't made it

14  already, at least it's implied in his objection.

15         MR. SIPES:  That's what I asked her, and she

16  seemed confused about the question.  I'd like to put it into

17  context.

18         THE COURT:  I think that frankly is a waste of

19  time.  I think there's another way you can do this more

20  directly without dancing all around as they say robin hoods

21  barn.  If you get straight to the point I think that will

22  not ask an objection.

23         MR. ALY:  You can ask all the questions you want

24  about technology as long as they're not opinions.

25         THE COURT:  Fair enough.

1    MR. SIPES:  Fair enough.  You want me to show

2    her the patent application?

3    THE COURT:  I think you should ask her --

4    there's agreement that the line of inquiry you want to

5    engage you at this point is fair and relevant.

6    MR. SIPES:  All right.

7    THE COURT:  Okay.

8    (End of sidebar conference.)

9    BY MR. SIPES:

10   Q.    Ms. Liu, I apologize for the delay.  I appreciate you

11   bearing with me.

12   Let me ask you whether in your opinion, your

13   idea of acidifying by adding citric acid can be achieved by

14   acidifying the formulation itself or by adjustment of the pH

15   of any of the components of the formulation?

16   A.    Repeat that.  Sorry.

17   Q.    Whether or not you agree that --

18   MR. SIPES:  We can take that down, Mr. Brooks.

19   I apologize.

20   BY MR. SIPES:

21   Q.    Whether you agree that the idea of improving the

22   chemical stability of the formulation can be achieved either

23   by acidifying the formulation itself, or by adjustment of

24   the pH of any of the components of the formulation?

25   MR. ALY:  Objection, your Honor.  Opinion.  The

1    same question.

2              THE COURT:  Yes.  I didn't understand that was

3    the road you wanted to take or travel.

4              MR. SIPES:  All right, your Honor.  I will try

5    something else, then.  That's fine, your Honor.

6              THE COURT:  Okay.

7    BY MR. SIPES:

8    Q.    When you were formulating, one of the challenges of

9    formulating docetaxel is that it's very water-insoluble;

10   correct?

11   A.    Yes.

12   Q.    And because it's very water-insoluble, it has a

13   tendency to precipitate when the perfusion is made; correct?

14   A.    Not only when perfusion is made.  It's also -- -- when

15   you formulate the docetaxel product containing any water in

16   the formulation.

17   Q.    And one place where a lot of water is added is when

18   the docetaxel is made into a perfusion; correct?

19   A.    Yes.

20   Q.    The perfusion is almost all water; is that correct?

21   A.    That's right.

22   Q.    And another place where the docetaxel may precipitate

23   is when the perfusion is infused into the bloodstream;

24   correct?

25   A.    I cannot make any comment on that because I'm not a

1    pharmacologist or I don't understand the behavior of

2    docetaxel in patient.

3    Q.    When you design a formulation, when you work -- sorry.

4    When you were formulating docetaxel, were you attempting to

5    develop a formulation that would be safe and effective?

6    A.    Yes.

7    Q.    And were you attempting to formulate a docetaxel

8    formulation that would have suitable physical stability for

9    intravenous infusion into patients?

10   A.    Yes.

11   Q.    And those are concerns that you would have as a

12   formulator in formulating docetaxel; correct?

13   A.    Yes.

14   Q.    And one of the challenges to achieving that was the

15   fact that docetaxel is practically insoluble in water; is

16   that correct?

17   A.    Yes.

18   Q.    And that limited the ability to make changes -- strike

19   that.

20          The high water insolubility of docetaxel limited

21   the choice of excipients that you could use for successful

22   formulation; correct?

23             MR. ALY:  Objection, your Honor.  Opinion.

24             THE COURT:  Sustained.

25             THE WITNESS:  Did you say high --

1    THE COURT:  No.  You don't have to worry when I

2  sustain the objection.  Thank you.

3  BY MR. SIPES:

4  Q.    Did the low water solubility of docetaxel limit which

5  excipients you could use?

6    MR. ALY:  Objection, your Honor.  Opinion.

7    THE COURT:  No, that's not.  No.  Overruled.

8    You may answer.

9    THE WITNESS:  Yes.

10 BY MR. SIPES:

11 Q.    And there are a number of solvents that were good

12 solvents for docetaxel that you found; correct?

13 A.    That's correct.

14 Q.    And two of them were ethanol and polyethylene glycol;

15 correct?

16 A.    Yes.

17 Q.    Despite the good solubility of docetaxel in those

18 solvents, neither solvent alone would be suitable for

19 perfusion; correct?

20 A.    Perfusion of docetaxel formulation?

21 Q.    Correct.

22 A.    Alone?

23 Q.    Right.

24 A.    I think so.

25 Q.    Because, for example, if you use only ethanol, the

1    docetaxel would precipitate immediately in the perfusion; is

2    that correct?

3    A.    Yes.

4    Q.    And so there is not -- there's not a direct

5    correlation between the solubility of docetaxel in a solvent

6    and the stability of docetaxel in a perfusion; correct?

7    A.    What do you mean about stability of docetaxel in the

8    solution.

9    Q.    The physical stability of the infusion solution made

10   with the formulation vehicle.

11   A.    Yes.

12   Q.    You first started by looking at solubility; correct?

13   A.    That's correct.

14   Q.    But the solubility you find didn't tell you what the

15   physical stability of a perfusion made with them would be;

16   correct?

17   A.    The solubility of the solvent identified didn't tell

18   me the physical stability of the perfusion solution.

19   Q.    Those -- the solubility insolvent and the physical

20   stability of a perfusion made with it are unrelated

21   properties; is that correct?

22   A.    I'm not sure.

23   Q.    Are you aware of any relationship between the

24   solubility of docetaxel in a particular solvent and the

25   physical stability of a perfusion made with that solvent?

1    A.    You mean docetaxel in any particular solvent in an

2    infusion bag, the physical stability?

3    Q.    Correct.

4    A.    No.

5    Q.    Now, when you were doing your solubility studies, you

6    looked at a high concentration of docetaxel in a 50/50

7    mixture of polysorbate 80 ethanol, did you not?

8    A.    Yes.

9    Q.    And you were able to prepare a solution of

10   217 milligrams of docetaxel in a 50/50 mixture of

11   polysorbate 80 and ethanol; correct?

12   A.    217 milligrams of docetaxel in 50/50 concentration?

13   Q.    Correct.

14   A.    Sorry.  I cannot remember the number in my --

15   Q.    Let me see if I can refresh your recollection.

16   A.    All right.

17          MR. SIPES:  Mr. Brooks, if we could pull up

18   Plaintiff's Exhibit 856, and turn to Hospira --

19          MR. ALY:  Your Honor --

20          MR. SIPES:  Oh, I'm sorry.

21          MR. ALY:  This is a new exhibit not on the

22   exhibit you list in the pretrial order.

23          MR. HURST:  We've actually been restraining in

24   not doing that.

25          MR. SIPES:  Your Honor, this is a Cross exhibit

1    that is produced from her files as part of her laboratory

2    notebook.  I'm using this as for purposes of

3    cross-examination.

4              THE COURT:  Not if it violates my pretrial

5    order.

6              MR. SIPES:  Your Honor, my understanding is the

7    pretrial order does not require identification if it is

8    solely for cross-examination.

9              THE COURT:  But it does require identification

10   of all exhibits.

11             MR. SIPES:  Fair enough.

12             THE COURT:  I guess -- you just talked right by

13   me.  No, it does, and the purpose is notice.

14             MR. SIPES:  Fair enough, your Honor.  Then, what

15   I'd like to do, your Honor, simply use this to refresh her

16   recollection and won't use the exhibit.  I won't publish it.

17             THE COURT:  I will let you use the exhibit.

18             MR. ALY:  Your Honor, I was informed that the

19   prior exhibit is not on the exhibit list.  I ask that it be

20   stricken.

21             THE COURT:  Is that correct, Mr. Sipes?

22             MR. SIPES:  It is not on the exhibit list, your

23   Honor.

24             THE COURT:  I will strike it.

25             Why don't you go ahead and refresh her

1    recollection.

2    BY MR. SIPES:

3    Q.    Ms. Liu, if you could -- if you look on Page Hospira

4    37896 --

5    A.    Yes.

6    Q.    -- line 7a, does this refresh your recollection as to

7    whether or not you were able to make a solution of

8    217 milligrams of docetaxel in a 50/50 mixture of

9    polysorbate 80 in ethanol?

10   A.    This is solubility study that I've done to test the

11   solubility in combination of 50 percent ethanol and

12   polysorbate 80 and the results show that I can get a maximum

13   solubility of docetaxel, about 217 milligrams ml in

14   combination with 50 percent -- and 50 percent ethanol.

15   Q.    So you were able to make a solution prepare check) of

16   217 milligrams of docetaxel in a 50/50 mixture?

17   A.    Yes.

18   Q.    A 50/50 -- let me start the question over again.  If

19   you will let me finish the question.  My fault.

20         You were able to make a solution of

21   217 milligrams docetaxel?

22   A.    This is a situated solubility, which means -- maximum

23   solubility.  Any slight change will cause -- at this --

24   Q.    So -- but you were able to make a solution of

25   217 milligrams of docetaxel in a 50/50 mixture of

1   polysorbate 80 and ethanol; correct?

2   A.   Yes.

3          MR. SIPES:  Your Honor, if I could have a minute

4   to confer with my colleagues?

5          THE COURT:  Yes.

6          (Pause while counsel conferred.)

7   BY MR. SIPES:

8   Q.   The answer to that question was yes?

9   A.   Yes.

10         MR. SIPES:  Your Honor, just to clarify.  I

11  apologize, I should have known this.  The exhibit I was

12  using was actually an excerpt from Plaintiffs' Exhibit 7.

13  But I think for present purposes, that's my fault, your

14  Honor.

15         THE COURT:  If it was on the list, then it's in

16  the record.

17         MR. SIPES:  I think, your Honor, for present

18  purposes, it's not.  It's not necessary.

19         In fact, why don't we pull up Plaintiffs'

20  Exhibit 7.

21  BY MR. SIPES.

22  Q.   I'm sorry.  JTX-032.  And if we could go to Page

23  Hospira 37896.

24         Ms. Liu, Page Hospira 037896, is this part of

25  your laboratory notebook?

1   A.    Yes.

2   Q.    That's yes?

3   A.    Yes.

4   Q.    And this reflects -- did this reflect the experiment

5   where you were able to make a solution of 217 milligrams of

6   docetaxel in a 50/50 mixture of polysorbate 80 and ethanol?

7   A.    These results demonstrate that maximum solubility of

8   docetaxel can be achieved in 50/50 percent of polysorbate

9   and 217 milligrams.  It's the maximum solubility of

10  docetaxel in the solvent system.

11  Q.    And that's line 7a in the chart; is that correct?

12  A.    Yes.

13          MR. SIPES:  Thank you, Ms. Liu.  I have no

14  further questions.

15          THE COURT:  Mr. Aly, redirect.

16                    REDIRECT EXAMINATION

17  BY MR. ALY:

18  Q.    Ms. Liu, I am not going to talk about that document.

19          There was testimony about testing you had done

20  at eight hours or greater of perfusion conditions with your

21  product.  Do I understand that correctly?

22  A.    The study that I supervised we didn't test anything

23  beyond eight hours.  At eight hours time point, I only look

24  at the appearance of the solution.

25  Q.    The study that went beyond eight hours, under what

1  conditions did it take to get anywhere near above eight

2  hours?

3  A.    This was the laboratory condition that we put the

4  perfusion bag in the roller mixer and continue to mix it.

5  Q.    When you say roller mixer, can you describe what that

6  means?

7  A.    It's equipment that provides continuously mixing

8  process when you put the sample on.

9  Q.    For how long?

10  A.    As long as the experiment goes.

11  Q.    So does mixing in your experience have an effect on

12  how soluble something stays?

13  A.    It does with these conditions.

14  Q.    In a hospital, when the perfusion bag is hung, in your

15  experience, is that mixed while it's hung?

16  A.    No, you basically manually mix the bag and keep it on

17  the bench.

18  Q.    In the tests that you did, what conditions did you

19  use?

20  A.    The later test when we tried to confirm the stability

21  of the formulation in the bags in the report, SFS030 is we

22  tried to mimic what procedure that Hospira pharmacists will

23  take.

24  Q.    That is JTX-47.  Is this that study?

25  A.    Yes.

1    Q.    And when you were mimicking the procedures and steps

2    that are taken in a hospital, if you go to the conclusion,

3    Paragraph 6 on Page 10, what did you find?

4    A.    What I found is the innovator product is less

5    physically stable than Hospira product, and innovator sample

6    is stable after three hours, that's by particular tests, and

7    the solution becomes cloudy at four and a half hours.

8    Q.    Under those same conditions, up to how many hours did

9    you find that the Hospira perfusion lasted with the

10   real-life conditions?

11   A.    After six hours.

12   Q.    What product does Hospira sell, Ms. Liu, a stock

13   solution or a perfusion?

14   A.    Stock solution.

15             MR. ALY:  Thank you.

16             THE COURT:  All right.  Ms. Liu, you are

17   excused.  That you.

18         (Witness excused.)

19             THE COURT:  I don't think it would make much

20   sense to start another witness.  I think we will adjourn for

21   the day.

22             Those of you in the well of the court are free

23   to leave.  Counsel, I am going to come down and chat with

24   you for a moment regarding another issue.  (Reset as 4:51

25   p.m.)

1

2                           -   -   -

3

4      **Reporters:   Valerie Gunning and Kevin Maurer**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25